John P. Schnurer (SBN 185725)
jschnurer@perkinscoie.com
Matthew C. Bernstein (SBN 199240)
mbernstein@perkinscoie.com
Brian Wacter (SBN 223165)
bwacter@perkinscoie.com
Cheng Chieh Ko (SBN 244630)
jko@perkinscoie.com
PERKINS COIE LLP
11988 El Camino Real, #200
San Diego, CA 92130-3334
Telephone: 858.720.5700
Facsimile: 858.720.5799

Attorneys for Plaintiffs
ATEN INTERNATIONAL CO., LTD. and ATEN TECHNOLOGY,
INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| ATEN INTERNATIONAL CO., LTD. and ATEN TECHNOLOGY, INC., <br><br> Plaintiffs, <br><br> v. <br><br> EMINE TECHNOLOGY CO., LTD., BELKIN INTERNATIONAL, INC., and BELKIN, INC., <br><br> Defendants. | Case No. 8:09-CV-843 AG (MLGx) <br><br> PLAINTIFFS ATEN INTERNATIONAL CO., LTD. AND ATEN TECHNOLOGY, INC.'S CLAIM CONSTRUCTION BRIEF <br><br> Date: May 9, 2011 <br> Time: 10:00 a.m. <br> Judge: Hon. Andrew J. Guilford <br> Ctrm: 10D |

# **TABLE OF CONTENTS**

**Page**

I.    ATEN'S '112 and '287 KVM and KVMP PATENTS ................................... 1

    A.    KVM and KVMP Switch Technology ............................................... 1

    B.    '112 Patent ........................................................................................ 3

    C.    '287 Patent ........................................................................................ 4

II.    LEGAL STANDARDS OF CLAIM CONSTRUCTION ............................ 4

    A.    General Principles of Claim Construction ....................................... 4

    B.    Limitations of Embodiments Disclosed in the Specification
          Should Not Be Read Into the Claims ................................................ 5

    C.    Construction of Means-Plus-Function Terms ................................... 5

III.    ATEN'S PROPOSED CONSTRUCTIONS OF THE DISPUTED
     TERMS ......................................................................................................... 6

    A.    '112 Patent ........................................................................................ 6

         1.    Body .................................................................................... 6

         2.    Integrated Into / Integrating … Into ................................. 13

         3.    Fixedly Attached ............................................................... 14

    B.    '287 Patent ...................................................................................... 17

         1.    Wherein the console devices can be switched either
             synchronously or asynchronously with the one or more
             than one peripheral device to the same one of the plurality
             of computer systems or to different ones of the plurality
             of computer systems, without interruption of the signal to
             the one or more than one peripheral device (Claim 1) ............ 17

         2.    Hub Switch Module (Claim 1) ......................................... 19

         3.    Such that a signal passing from the hub switch module to
             the one or more than one peripheral device emulates
             origination from a computer (Claim 1) .................................... 20

         4.    Means for switching the selected console device between
             the first channel and the third channel without interruption
             of the data flow through the second channel between the
             first selected computer system and the selected peripheral
             device (Claim 7) ...................................................................... 21

         5.    Without interruption of the data flow through the second
             channel (Claim 7) ................................................................... 24

IV.    CONCLUSION ........................................................................................... 25

# TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*AllVoice Computing PLC v. Nuance Comm., Inc.*,
    504 F.3d 1236 ................................................................................. 10

*Bancorp Services, L.L.C. v. Hartford Life Ins. Co.*,
    359 F.3d 1367 (Fed. Cir. 2004) ....................................................... 15

*Bradford Co. v. Conteyor N.A., Inc.*,
    603 F.3d 1262 (Fed. Cir. 2010) .......................................................... 7

*Certain Switches and Products Containing Same*,
    Inv. No. 337-TA-589, Commission Opinion at 6 (Feb. 12, 2008) ....................... 7

*Edwards Lifesciences LLC v. Cook Inc.*,
    582 F.3d 1322 (Fed. Cir. 2009) ....................................................... 15

*Epistar Corp. v. Int'l Trade Comm'n*,
    566 F.3d 1321 (Fed. Cir. 2009) ................................................... 9, 10

*Hologic, Inc. v. Senorx, Inc.*,
    --- F.3d ----, 2011 WL 651791 (Fed. Cir. Feb. 24, 2011) .......................... 14

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004) ....................................................... 16

*Ishida Co. v. Taylor*,
    221 F.3d 1310 (Fed. Cir. 2000) ....................................................... 22

*Kraft Foods, Inc. v. Int'l Trading Co.*,
    203 F.3d 1362 (Fed. Cir. 2000) ....................................................... 15

*Laitram Corp. v. Rexnord, Inc.*,
    939 F.2d 1533 (Fed. Cir. 1991) ....................................................... 15

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004) .................................................... passim

*Micro Chem, Inc. v. Great Plains Chem. Co.*,
    194 F.3d 1250 (Fed. Cir. 1999) ....................................................... 22

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003) ...............................................................5, 6, 22

*Pass & Seymour, Inc. v. Hubbell Inc.*,
    No. 5:07-CV-00945, 2009 WL 7296903 (N.D.N.Y. Dec. 30, 2009)...................7

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ..................................................passim

*Saunders Group, Inc. v. Comfortrac, Inc.*,
    492 F.3d 1326 (Fed. Cir. 2007) ...................................................................... 10

*Texas Instruments Inc. v. Cypress Semiconductor Corp.*,
    90 F.3d 1558 ........................................................................................................7

## STATUTES

35 U.S.C. § 112 ¶ 6 .............................................................................................5, 22

1      ATEN International Co., Ltd. and ATEN Technology, Inc. (collectively,

2  "ATEN") submit this brief to address the claim construction of the disputed terms

3  in U.S. Patent Nos. 7,035,112 (the "'112 patent") and 6,957,287 (the "'287 patent").[1]

4  ATEN's proposed constructions are supported by the intrinsic evidence, *i.e.*, the

5  claim language, specifications, and file histories of the '112 and '287 patents.  This

6  brief does not address Belkin's proposed constructions because Belkin refused to

7  provide ATEN with Belkin's proposed constructions prior to the filing of this brief.

8  **I.      ATEN'S '112 and '287 KVM and KVMP PATENTS**

9       **A.      KVM and KVMP Switch Technology**

10      This case is about KVM and KVMP switches.  ATEN is a worldwide KVM

11  and KVMP leader, with facilities throughout the world, including in Orange

12  County.

13      KVM stands for "keyboard, video, mouse."[2]  As the cost of computers has

14  decreased, more people purchase and use multiple computers.  KVM switches

15  allow users to interact with and control multiple computers with the same keyboard,

16  video, and mouse.  For example, a lawyer could have a desktop computer at his

17  home, a personal laptop, and a work laptop.  A KVM switch allows the user to use

18  a single keyboard and mouse to control all three computers, rather than three

19  keyboards and three mice.  A KVM switch also lets the user switch between the

20  three computers as the need arises.  In this example, the KVM switch also allows

21  the user to use a single computer monitor to display data or view video from any of

22  the three computers.

23      KVMP stands for "keyboard, video, mouse, peripheral."  KVMP switches do

24  the same thing that KVM switches do, but also allow users to control one or more

25  peripheral devices such as audio devices (*e.g.*, speakers), printers, scanners, and

26  _____

27  [1] ATEN will shortly be filing an unopposed motion to dismiss all claims and
counterclaims related to the other two patents-in-suit, U.S. patent numbers
7,542,299 and 7,613,854.

28  [2] The "video" in KVM is typically a computer monitor or other display.

1   other similar devices.  In the example above, say the lawyer bought a printer and

2   some speakers.  A KVMP switch would not only allow the user to control and

3   switch between the three computers (with a single keyboard, video, and mouse), but

4   would also allow the user to control the printer and speakers.  The user could print a

5   file from his desktop computer, and then use the KVMP switch to print another file

6   from his work laptop.

7         The above is just one example of the use of KVM and KVMP switches.

8   KVM and KVMP switches are also commonly used by system administrators who

9   have responsibilities for server maintenance.  Servers are computer systems which

10   provide services such as file storage, backup services, and database, application, or

11   website hosting.  End users rarely connect directly to servers using their keyboard,

12   video, and mouse.  Instead end users typically have applications and utilities on

13   their own local computers which connect to and interact with servers "behind the

14   scenes" over a network.  System administrators, however, do need to connect

15   directly to servers at least occasionally in order to perform maintenance and

16   administrative tasks.  KVM and KVMP switches allow these system administrators

17   to efficiently access a number of servers from one keyboard, video, and mouse.

18         KVM and KVMP switches save users money.  Users do not have to buy

19   keyboards, monitors, and mice, or their cables, for every computer they own.  Nor

20   do users have to buy printers (or other peripheral devices) for each one of their

21   computers, because the peripherals can be shared with a KVMP switch.  KVM and

22   KVMP users also save time, because they do not have to connect, disconnect, then

23   connect printer cables (or other peripheral device cables) when they want to switch

24   the computer that needs to do the printing.  Finally, KVM and KVMP switches save

25   space (*i.e.*, reduce clutter), as fewer keyboards, monitors, and mice, and their

26   respective cables, are needed.

27

28

## B.    '112 Patent

The '112 patent[3] is directed to a KVM switch in which the cables for connecting the host computers are physically attached within the switch "body." The switch body encloses a switching circuit and includes connector ports for connecting a set of "console devices."  '112 patent at 2:23-25.  Console devices are just another name for keyboards, video, and mice because they make up the user's "console" for interacting with the multiple computers.  Console devices connect to a KVM switch.  Computers also connect to the KVM switch, and often these computers are called "host computers" because these computers *host* a user's session (*i.e.*, they provide the user with an environment for running applications).  Each of the cables attached to the switch body includes a set of connector plugs used for connecting one host computer system to the switch.  *Id.* at 2:66 – 3:6.  The switch allows the console devices (*e.g.*, keyboard, mouse, and display) to be switched among the computers connected via the cables attached to the switch body.  *Id.* at 1:36-38.



FIG.2

Unlike box-style switches known in the prior art (*Id.* at Fig. 1; 1:18-32), the invention includes cables physically connected within and extending from the switch body (labeled 20 in the above figure).  *Id.* at 3:9-13.  This simplifies setup and improves the user experience by eliminating the need to locate and correctly attach a series of cables to the switch.

---

[3] A copy of the '112 patent is attached as Exhibit A to the Declaration of Matthew C. Bernstein in Support of Plaintiff ATEN's Claim Construction Brief ("Bernstein Decl.").

### C.    '287 Patent

The '287 patent[4] is directed to a KVM switch which additionally serves as a peripheral sharing switch:  a KVMP switch.  '287 patent at 1:64 – 2:6.  The invention allows peripheral devices to be shared among multiple computer systems connected to the switch.  The invention provides users with flexible control over both (1) the connections between console devices and computer systems, as well as (2) the connections between peripheral devices and computer systems.  Connected peripheral devices may include, for example, printers, scanners, or cameras.  *Id.* at 4:36-40.

The invention allows peripheral devices to be switched either *synchronously* or *asynchronously* with the switching of computer systems.  *Id.* at 3:40-44.  Synchronous switching refers to the switching of peripheral devices and computer systems together.  For example, during a synchronous switch, a user's switching of console device connections from connected computer A to connected computer B would also switch a scanner connected to computer A to computer B.  In contrast, asynchronous switching refers to independent switching of peripheral devices and computer systems.  During an asynchronous switch, a user's switching of console device connections from computer A to computer B may occur without any switching of the scanner connected to computer A.  The invention also enables asynchronous switching to occur without interrupting any communication between a computer system and a connected peripheral device.  *Id.* at 4:29-35.

## II.    LEGAL STANDARDS OF CLAIM CONSTRUCTION

The following discussion highlights legal principles that are of particular relevance to the terms at issue.

### A.    General Principles of Claim Construction

It is a "bedrock principle" of patent law that "the claims of a patent define the invention to which the patentee is entitled to the right to exclude."  *Phillips v. AWH*

---

[4] A copy of the '287 patent is attached as Exhibit B to the Bernstein Decl.

*Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).  Claim terms are "generally given their plain and ordinary meaning[, *i.e.*,] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  *Id.* at 1312-13.  Where the meaning of a claim term is not immediately apparent, courts may consider intrinsic evidence including the words of the claims themselves, the written description, and the prosecution history.  *Id.* at 1314.  While courts may also consider extrinsic evidence, it is generally considered "less reliable" than intrinsic evidence in construing claim terms.  *Id.* at 1318.

### B.   Limitations of Embodiments Disclosed in the Specification Should Not Be Read Into the Claims

The claims "must be read in view of the specification, of which they are a part."  *Phillips*, 415 F.3d 1315.  While construing terms in light of the specification, courts must be careful "to avoid the danger of reading limitations from the specification into the claim."  *Id.* at 1323.  To avoid improperly reading limitations from the specification into the claim, it is important to recognize that "the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so."  *Id.* at 1323.  Thus, while a specification may describe specific embodiments of the invention, claims should not be confined only to those specific embodiments.  *Id.*  Indeed, even where a patent describes only a single embodiment, it is improper to construe the terms as being limited to that embodiment.  *Id.*

### C.   Construction of Means-Plus-Function Terms

35 U.S.C. § 112 ¶ 6 authorizes the use of means-plus-function language in patent claims.  Per the statute, such limitations are "construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  35 U.S.C. § 112 ¶ 6.  Claim construction of a means-plus-function limitation is a two-step process.  *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1321 (Fed. Cir. 2003).  First, the claimed function must be identified.

*Id.* Second, the court must "ascertain the corresponding structures in the written description that perform" the claimed function. *Id.* A disclosed structure is corresponding structure "only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim" and it is "necessary to perform the claimed function." *Id.*

## III.   ATEN'S PROPOSED CONSTRUCTIONS OF THE DISPUTED TERMS

### A.   '112 Patent

#### 1.   Body

##### a.   The claim language supports ATEN's "body" construction

| ATEN's Proposed Construction | Belkin's Proposed Construction |
|---|---|
| An enclosure having one or more connector port openings and an internal switching circuit | **Belkin refused to provide ATEN with its proposed construction**[5] |

The term "body" does not have any special meaning in the relevant field. [Olivier Decl. ¶ 7.] Nor is it a term that requires "elaborate interpretation." *See Phillips*, 415 F.3d at 1314 (explaining that claim construction sometimes involves "little more than the application of the widely accepted meaning of commonly understood words"). A careful review of the intrinsic evidence indicates that a person of ordinary skill in the art would understand the familiar term "body" in the

---

[5] Belkin refused to meet and confer in good faith with ATEN. On March 4, 2011, this Court granted a stipulation modifying the procedural schedule, including dates with respect to Markman briefing, in this case. [D.I. 257.] On March 18, 2011, ATEN sent a letter to Belkin identifying those terms ATEN proposed for construction by the Court. [Bernstein Decl. ¶ 4, Exh. C.] On March 23, 2011, Belkin sent a letter to ATEN identifying additional terms for construction. [Bernstein Decl. ¶ 5, Exh. D.] The parties met and conferred on March 28, 2011 and discussed an exchange of proposed constructions to take place over the next two days to be followed by additional meet and confers to attempt to narrow the claim construction issues for the Court. [Bernstein Decl. ¶ 6.] The day after the meet-and-confer, ATEN provided its proposed constructions in a letter to Belkin. [Bernstein Decl. ¶ 7, Exh. E.] After numerous delays throughout the week, Belkin informed ATEN on April 1, 2011 that it would not be providing ATEN with its proposed constructions for the disputed terms prior to ATEN filing its opening brief on April 4. [Bernstein Decl. ¶¶ 8, 9, 10.]

context of the '112 patent to refer simply to the enclosure for the switching circuit which includes connector ports.[6]

Claim construction begins with an examination of the claim language itself. *Bradford Co. v. Conteyor N.A., Inc.*, 603 F.3d 1262, 1270 (Fed. Cir. 2010).  Claim 1 of the '112 patent reads as follows:

> 1.  A switch comprising:
>
> a body;
>
> a switching circuit contained within the body;
>
> a set of connector ports electrically coupled to the switching circuit; and,
>
> a plurality of cables fixedly attached to and extending from the body, each cable in the plurality of cables having a plurality of connector plugs, wherein each connector plug in the plurality of connector plugs for one of the cables in the plurality of cables are matched a respective connector plug in another one of the cables in the plurality of cables, and wherein the switching circuit switches to connect each of the set of connector ports to one of the plurality of cables.

The first element of claim 1 simply recites "a body" and nothing more.  The context of the "body" element within the claim, however, provides substantial guidance as to its meaning.  *See Phillips*, 415 F.3d at 1314 ("[T]he context in which a term is used in the asserted claim can be highly instructive.").  First, the claim

---

[6] The term "body" was construed narrowly by ALJ Charneski during ITC Investigation No. 337-TA-589.  *Certain Switches and Products Containing Same*, Inv. No. 337-TA-589, Commission Opinion at 6 (Feb. 12, 2008).  The Commission reversed that narrow construction of "body" in favor of a broader construction.  *Id.* at 7 (construing "body" as "an enclosure for an internal circuit board").  The Commission, however, also held that the inventor had disavowed certain features of the prior art described in the Background section of the patent.  *Id.* The Federal Circuit has held that decisions of the ITC on patent issues are not entitled to preclusive effect in subsequent district court litigation.  *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1568-69 ("[T]he rule that decisions of the ITC involving patent issues have no preclusive effect in other forums has not changed. . . .  The distict court can attribute whatever persuasive value to the prior ITC decision that it considers justified.").  *See also, e.g., Pass & Seymour, Inc. v. Hubbell Inc.*, No. 5:07-CV-00945 (NAM/DEP), 2009 WL 7296903, at *7 (N.D.N.Y. Dec. 30, 2009) ("Accordingly, while I have carefully reviewed the decisions of ALJ Charneski and the ITC and agree with many of their findings, I have not accorded them any special weight in making my claim construction recommendations.").

states that a switching circuit is "contained within the body."  Second, the claim states that a set of connector ports are "electrically coupled" to the switching circuit contained within the body.  Third, the claim states that a plurality of cables are "fixedly attached to and extend[] from the body."  A plain reading of claim 1 thus indicates the body encloses the switching circuit, provides a set of connector ports, and has a plurality of cables that are fixedly attached.  Claim 21, the only other independent claim, suggests a consistent understanding of the term "body."[7]

### b. The doctrine of claim differentiation supports ATEN's "body" construction

The differences among the claims of the '112 patent reinforce the simple understanding of "body" gleaned from the independent claims.  *See Phillips*, 415 F.3d at 1314-15 ("Differences among claims can also be a useful guide in understanding the meaning of particular claim terms.").  For instance, claims 2 and 3 which depend from claim 1 add the limitation that the "body" include a circuit-protecting layer made from injection-molded plastic which surrounds the switching circuit.  The presence of this additional limitation in dependent claims 2 and 3 triggers a presumption that the same limitation, *i.e.*, a circuit-protecting layer made from injection-molded plastic, is not present in broader independent claim 1.  *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) ("As this court has frequently stated, the presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim.").  Similarly, the presence of the added limitation in claims 5 and 6 requiring the body to include an outer case with a rigid outer surface triggers a presumption that this limitation is not found in claim 1.

---

[7] Claim 21 is a method claim.  The claimed method includes steps of "enclosing a switching circuit within the body," "integrating [cables] into the body," and "providing a plurality of connector ports on a surface of the body."  Performing these steps yields a body which encloses a switching circuit, is attached to a plurality of cables, and provides connector ports.

**c.    The specification supports ATEN's "body" construction; there was no disavowal**

The specification of the '112 patent also indicates that the body is simply an enclosure for the internal switching circuit and that it contains a set of connector ports.  The specification states the switch "includes a main body externally provided with connector ports and enclosing an internal circuit board."  '112 patent at 1:39-41.

The specification does describe a very specific embodiment, reflected in Figures 3 and 4, in which the body "has an integral enclosure that is formed through three times of injection molding" to include a circuit-protecting layer, an outer case, and an anti-slipping layer.  *Id.* at 2:30-36.  However, the additional features described in this preferred embodiment do not appear in the independent claims and should not be read into the term "body."  *See Phillips*, 415 F.3d at 1323 ("In particular, we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.").  The specification includes no evidence that the patentee disavowed claim scope over switches with bodies lacking these particular features.  *See Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1335 (Fed. Cir. 2009) ("Disavowal requires expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.").

Courts routinely refuse to limit broad claim terms based on limitations of particular disclosed embodiments.  For example, in *Kara Tech. Inc. v. Stamps.com Inc.*, the parties disputed whether the claim term "preestablished data" should be construed to require an embedded key within the data.  582 F.3d 1341, 1346-47 (Fed. Cir. 2009).  The court acknowledged that the specification repeatedly discussed a key embedded in the preestablished data and that the only detailed embodiments disclosed in the patent similarly described preestablished data with an embedded key.  *Id.* at 1347.  The court held that these factors were "not enough,

1   however, to limit the patentee's clear, broader claims." *Id.*  The court observed that

2   some of the claims expressly included a limitation directed to the embedded key

3   and concluded that "when the inventor wanted to restrict the claims to require the

4   use of a key, he did so explicitly." *Id.* at 1346. *See also Saunders Group, Inc. v.*

5   *Comfortrac, Inc.*, 492 F.3d 1326, 1333 (Fed. Cir. 2007) (refusing to limit the term

6   "pneumatic cylinder" to pneumatic cylinders with pressure activated seals despite

7   repeated statements in specification describing pneumatic cylinder which included

8   at least one pressure activated seal).

9       A review of the dependent claims reveals that claim 1 of the '112 patent was

10   not intended to cover every feature of the preferred embodiment.  Nor was the term

11   "body" intended to cover every feature of the main body described in the preferred

12   embodiment.  Rather, as is common practice, the inventor elected to claim various

13   features of the preferred embodiment via a series of dependent claims. *See*

14   *AllVoice Computing PLC v. Nuance Comm., Inc.*, 504 F.3d 1236, 1248 ("[E]ach

15   claim need not include every feature of an invention.").  Dependent claim 3, for

16   example, adds the circuit-protecting layer; claim 4 adds injection-molding, claim 5

17   adds an outer case; and claim 7 adds an anti-slipping layer.  There is no reason to

18   read these limitations into the term "body" in every claim, since the claim language

19   itself makes it obvious which claims include these limitations and which do not.

20   *See Saunders Group*, 492 F.3d at 1333 ("While the restrictive language of the

21   specification might be sufficient in other contexts to limit the scope of the claims, it

22   is not sufficient in this case, ***where the language of the claims so clearly***

23   ***distinguishes between those claims that require the present of a pressure***

24   ***activated seal and those that do not***.").  If every aspect of the main body of the

25   preferred embodiment were inherently part of the "body" in claim 1, the various

26   dependent claims would be rendered meaningless. *See Liebel-Flarsheim*, 358 F.3d

27   898, 910 ("[W]here the limitation that is sought to be 'read into' an independent

28

1   claim already appears in a dependent claim, the doctrine of claim differentiation is

2   at its strongest.").

3                    **d.      The file history supports ATEN's "body" construction**

4          Like the claims and specification, the prosecution history counsels against a

5   narrow construction of "body."  As initially filed, claim 1 read as follows:

6          1.  An automatic switch, comprising:

7          a main body having connector ports provided thereon,
            more than one or two sets of cable-connected connectors
8          directly extended from said main body, and a circuit
            board provided in said main body and electrically
9          connected to said sets of cable-connected connectors via
            signal cables; and
10

11         said main body having an integral enclosure that is
            formed through three times of injection molding to
12         include a circuit-protecting layer for enclosing said circuit
            board, an outer case enclosing said circuit-protecting
13         layer, and an anti-slipping layer coating an outer surface
            of said outer case.

14         In original claim 1, the "body" element was saddled with a host of limitations

15   including an "integral enclosure" which includes a circuit-protecting layer, an outer

16   case, and an anti-slipping layer.  Original claim 1 was cancelled, however, via

17   preliminary amendment.  U.S. Patent App. No. 10/190,015, Preliminary

18   Amendment at 3, Sept. 5, 2003.  [Bernstein Decl. ¶ 11, Exh. H.]  The ATEN

19   inventor[8] replaced the narrow claim with a broader independent claim closely

20   resembling the version which ultimately issued as claim 1.[9]  The new claim

21   removed all of the above limitations on the "body" element, save that it (1) encloses

22   a switching circuit, (2) has connector ports, and (3) has attached cables.  The

23   various narrowing limitations of original claim 1 were moved to new dependent

24   claims which depended from the new independent claim.

25   _____

26   [8] The inventor of the '112 patent is Kevin Chen, the founder and CEO of
     ATEN International.
27   [9] The differences between the language of new claim 4 of the application
     (which replaced original claim 1) and the version that eventually issued as claim 1
28   of the '112 patent are minor and are confined to the "plurality of cables" element.
     As such, the distinctions are not relevant to the discussion here.

The Federal Circuit has held that broadening amendments to claims may favor a broader reading of the amended terms.  In *Liebel-Flarsheim*, the applicant replaced claims requiring the claimed injector to have a "pressure jacket" with new claims, some of which omitted the "pressure jacket" limitation.  358 F.3d at 909.  In refusing to read a "pressure jacket" limitation from the preferred embodiment into the asserted claims, the Federal Circuit explained that the broadening change to the claims during prosecution was "a strong indication that the applicants intended those claims to reach injectors that did not use pressure jackets."  *Id.*  The file history of the '112 patent, in particular the inventor's broadening of claims by eliminating several narrowing limitations, similarly shows that the amended claims were intended to reach embodiments in which the body was not injection-molded and/or did not include the three disclosed layers.

### e. Extrinsic evidence supports ATEN's construction

ATEN's proposed construction is also consistent with the ordinary meaning of the term "body."  The term "body" is defined in Merriam-Webster's Collegiate Dictionary as "the main, central, or principal part."  [Bernstein Decl. ¶ 12, Exh. I.] *See Phillips*, 415 F.3d at 1314 (noting that "general purpose dictionaries may be helpful" in determining the generally accepted meanings of non-technical terms). The enclosure for the switching circuit is a "body" in that it is the *main part* of the switch, containing the "brains" of the switch, the switching circuit.  It is also *central* in that it lies between the console devices and the cables for connecting the host computers.  [Olivier Decl. ¶ 7.]

In summary, all of the intrinsic evidence, including the claims, the specification, and the prosecution history, suggests that "body" should be construed simply to mean "an enclosure having one or more connector port openings and an internal switching circuit."

## 2.    Integrated Into / Integrating … Into

| ATEN's Proposed Construction | Belkin's Proposed Construction |
|---|---|
| Physically connected within the body, so that the cables have the appearance of being permanently attached to the body | **Belkin refused to provide ATEN with its proposed construction** |

The terms "integrated into" and "integrating … into" found in claims 13 and 21 would be familiar to persons of ordinary skill in the art.  [Olivier Decl. ¶ 8.] These terms are typically used to communicate the notion of bringing one component into another.  *Id.*  Consistent with that common understanding, ATEN proposes that these terms be construed in the context of these claims to mean that the cables are "physically connected within the body, so that the cables have the appearance of being permanently attached to the body."

Claims 13 and 21 indicate that one end of each of the plurality of cables is "integrated into" the body.  Claim 21 further points out that the "first end" of each cable is "electrically coupled to the switching circuit" which is enclosed in the body.  While claim 13 does not expressly include that same limitation, it inherits a similar limitation found in claim 1 from which it depends.[10]  Since the cables must be electrically connected at one end to a switching circuit which is enclosed in the body, the claims themselves teach that the first end of these cables must enter the body.  [Olivier Decl. ¶ 8.]  The claims themselves thus support ATEN's proposed construction of "physically connected within the body, so that the cables have the appearance of being permanently attached to the body."  At the very least, because the cables are connected within the body, they cannot be removed without damaging the switch or cables.

---

[10] Claim 1 requires that "the switching circuit switches to connect each of the set of connector ports to one of the plurality of cables."  A person of ordinary skill in the art would understand that this switching could not occur without an electrical connection between the switching circuit and the cables.  [Olivier Decl. ¶ 9.]

The specification also teaches that the plurality of cables is physically connected within the body.  For instance, the specification states that the cables (1) "extend[] from the main body" and (2) are electrically connected to the internal circuit board.  '112 patent at 1:45-50.  Again, since the cables are electrically connected to a circuit board **which is "internal" to the main body**, the cables themselves must partially enter the body.  This is also consistent with the description of the cables as "extend[ing] from" the main body.  *Id.* at 2:23-27.  Finally, Figures 2 and 3 depict the cables entering the body and show a permanence to the attachment.

ATEN's proposed construction is also consistent with the plain and ordinary meaning of the term "integrate."  Merriam-Webster's Collegiate Dictionary defines the term "integrate" as "to form, coordinate, or blend into a functioning or unified whole."[11] [Bernstein Decl. ¶ 12, Exh. I.]  By physically connecting the cables within the switch body, two distinct components are formed or blended into a functioning or unified whole.  The result is that the cables appear to be permanently attached to the body.

### 3.    Fixedly Attached

| ATEN's Proposed Construction | Belkin's Proposed Construction |
|---|---|
| Physically connected within the body, so that the cables have the appearance of being permanently attached to the body | **Belkin refused to provide ATEN with its proposed construction** |

Claims 1 and 12 describe the plurality of cables as being "fixedly attached" to the switch body.  The term "fixedly attached" does not have any special meaning in the art.  [Olivier Decl. ¶ 9.]  ATEN proposes the same construction for "fixedly attached" as it does for "integrated into," namely that the plurality of cables are

---

[11] Additional definitions for "integrate" consistent with ATEN's proposed construction include "to unite with something else" and "to incorporate into a larger unit."  [Bernstein Decl. ¶ 12, Exh I.]

1   "physically connected within the body, so that the cables have the appearance of

2   being permanently attached to the body."  The use of different terms in different

3   claims does not require that the terms be construed differently.  *Hologic, Inc. v.*

4   *Senorx, Inc.*, --- F.3d ----, 2011 WL 651791, at \*7 (Fed. Cir. Feb. 24, 2011) ("As we

5   have explained, '[d]ifferent terms or phrases in separate claims may be construed to

6   cover the same subject matter where the written description and prosecution history

7   indicate that such a reading … is proper'").[12]

8        The use of different terms in different ways, moreover, can rebut a

9   presumption that they have different meanings.  *See Bancorp Services, L.L.C. v.*

10  *Hartford Life Ins. Co.*, 359 F.3d 1367, 1373-74 (Fed. Cir. 2004) ("In this case,

11  moreover, the patent uses the two terms in slightly different ways, which may

12  account for the choice of different language."); *Edwards Lifesciences LLC v. Cook*

13  *Inc.*, 582 F.3d 1322, 1330 (Fed. Cir. 2009) (construing "graft" and "intraluminal

14  graft" to have the same meaning where the claims included a subtle distinction in

15  how the terms were used).[13]  In this case, the terms "fixedly attached to" and

16  "integrated into" are used in different ways in the claims.  "Fixedly attached to" is

17  used in the claims to refer to how the *entire set of cables* is attached to the body.

18  '112 patent at claim 1 ("**plurality of cables** fixedly attached to and extending from

19  the body"), claim 12 ("**plurality of cables** are fixedly attached to the body").  In

20  contrast, the terms "integrated into" and "integrating … into" are used to describe

21  how *individual cables* are connected to the body.  '112 patent at claim 13 ("wherein

22  _____

23       [12] *See also Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000) ("[C]laim differentiation only creates a presumption that each claim in a patent has a different scope; it is 'not a hard and fast rule of construction.'");

24  *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991) ("Claim differentiation is a guide, not a rigid rule.").

25       [13] In *Edwards Lifesciences*, the Federal Circuit noted a subtle distinction between two seemingly similar claim limitations which indicated that the claims

26  were not redundant.  582 F.3d at 1330 ("Instead, an 'intraluminal graft' describes the ultimate location of the graft, whereas the intravascular insertion describes the

27  process of moving the graft to that location.  In other words, a device could theoretically be 'intravascularly inserted' but ultimately reside outside of the vessel,

28  such as inside the heart.")

a first end of **each of the plurality of cables** is integrated into the body"), claim 21 ("integrating **a first computer cable** and **a second computer cable** into the body").

The context of "fixedly attached" within claim 1 also suggests that it should be construed as "physically connected within the body."  First, the cables are described as "extending from" the body which implies they are partially contained in the body.  Second, the claim suggests that the cables are not detachable from the body.  For example, claim 1 recites connector ports but clarifies that those connector ports are for connecting **console devices**, not for connecting the cables.[14] If the cables were detachable, one would expect the claim to recite connector ports for the cables.

The specification does not differentiate between cables that are "integrated into" the body and those that are "fixedly attached" to the body.[15] [Olivier Decl. ¶ 9.]  Furthermore, the specification teaches that the cables must be electrically connected to the circuit board which is enclosed within the body.  '112 patent at 1:45-50.  This is required for all claims, including those that describe the cables as being "fixedly attached to" the main body.[16]  To accomplish the required switching, each of the plurality of cables must be electrically connected to the switching circuit contained within the body.  [Olivier Decl. ¶ 9.]  *See Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1120 (Fed. Cir. 2004) ("[T]he context does not show that 'connected' and 'associated' should be differentiated …, and we must conclude that this is simply a case where the patentee used different words to express similar concepts, even though it may be

---

[14] '112 patent at 3:30-32 ("wherein the switching circuit switches to connect each of the set of connector ports to one of the plurality of cables").

[15] The specification contains no suggestion, for example, that the cables are detachable from the switch body.  Indeed, while the specification indicates that the body includes connector ports for connecting console devices (2:21-27, Fig. 2), it makes no reference to ports for connecting the cables used to connect the host computers.

[16] Claim 1, for example, recites that the switching circuit switches the connection of the connector ports among the plurality of cables.  '112 patent at 3:30-32 ("wherein the switching circuit switches to connect each of the set of connector ports to one of the plurality of cables").

confusing drafting practice.")  Thus, in light of the specification, one of ordinary skill in the art would understand "fixedly attached" to mean the cables are physically connected within the body.  [Olivier Decl. ¶ 9.]  Because the cables are physically connected within the body, they have the appearance of being permanently attached to the body as opposed to cables that can easily be removed.

Finally, ATEN's proposed construction is also consistent with the plain and ordinary meaning of the term "fixed."  Merriam-Webster's Collegiate Dictionary defines "fixed" as "securely placed or fastened." [Bernstein Decl. ¶ 12, Exh. I.]  By physically connecting the cables within the switch body, the cables are securely placed in the body so as to be not movable in relation to the body.  Again, the result is that the cables appear to be permanently attached to the body.

## B.   '287 Patent

### 1.   Wherein the console devices can be switched either synchronously or asynchronously with the one or more than one peripheral device to the same one of the plurality of computer systems or to different ones of the plurality of computer systems, without interruption of the signal to the one or more than one peripheral device (Claim 1)

| ATEN's Proposed Construction | Belkin's Proposed Construction |
|---|---|
| Console devices can be switched among computer systems either together with the switching of peripheral devices (*i.e.*, synchronous switching) or independently (*i.e.*, asynchronous switching). Asynchronous switching may be performed without interrupting the signal from a computer system to a peripheral device. | **Belkin refused to provide ATEN with its proposed construction** |

Claim 1 states that the console devices connected to the switch "can be switched either synchronously or asynchronously with the one or more than one peripheral device."  Claim construction of this limitation has three parts.  First, what does it mean to switch synchronously?  Second, what does it mean to switch asynchronously?  And third, whether the language of "without interruption of the

signal to the one or more than one peripheral device" applies to asynchronous switching, or to *both* asynchronous and synchronous switching.

According to the '287 patent, synchronous switching of the keyboard, video, and mouse devices with the peripheral device means that the switching has the appearance of being done at the same time, or together.  '287 patent at 3:42-44.  One of ordinary skill in the art would understand this use of "synchronous" to be consistent with its commonly understood meaning.  [Olivier Decl. ¶ 11.]  An example of synchronous switching in the '287 patent would be the situation where a keyboard, video, and mouse were hooked up to a first computer, and a printer was also hooked up to the first computer.  In the '287 patented invention, a KVMP switch would then perform a switch so that the same keyboard, video, and mouse, and printer would be switched together so that they were all connected to a second computer.  This is synchronous switching.

Asynchronous switching means that the console devices (keyboard, video, and mouse) switch separately from the peripheral device.  '287 patent at 3:42-44.  This use of "asynchronous" is consistent with its common usage by persons of ordinary skill in the art.  [Olivier Decl. ¶ 11.]  In the above example, the KVMP switch of the '287 patent would switch the keyboard, video, and mouse so that they were controlling the second computer, but the printer could remain connected to the first computer (through the KVMP switch).

As for the "without interruption" limitation, this refers only to asynchronous switching.   The specification repeatedly describes asynchronous switching in explaining how switching may be accomplished without data interruption:

> In this example, control of the peripheral first printer 22 can be maintained by computer 121 even while monitor 14, first keyboard 16 and first mouse 18 are controlling computer 122. This is because switch 10 can switch between a first channel (not shown) connecting monitor 14, first keyboard 16 and first mouse 18 to first computer 121 and a third channel (not shown) connecting monitor 14, first keyboard 16 and first mouse 18 to second computer 122, while maintaining a second channel (not

> shown) connecting first computer 121 to first printer 22
> such that a first data flow between first computer 121 and
> first printer 22 is not interrupted.

'287 patent at 3:66 – 4:1-11.

> Thus, for example, the first data flow between first
> computer 121 and first printer 22, a second data flow
> between third computer 123 and scanner 241, and a third
> data flow between fourth computer 124 and second
> printer 2421 all could be maintained without interruption
> while keyboard 16 and mouse 18, and optionally monitor
> 14, are switched among computer systems 12.

*Id.* at 4:29-35.  In contrast, nowhere in the specification is synchronous switching

described as occurring without interruption of the signal to the peripheral devices.

As stated above, it is the simultaneous switching of the channel to the peripheral

device which differentiates synchronous switching from asynchronous switching.

Because synchronous switching includes switching the peripheral device, one

would not expect synchronous switching to occur "without interruption" of the

signal to the peripheral device.

### 2.     Hub Switch Module (Claim 1)

| ATEN's Proposed Construction | Belkin's Proposed Construction |
|---|---|
| Bridge between one or more peripheral devices and one or more computers | **Belkin refused to provide ATEN with its proposed construction** |

Claim 1 recites a hub switch module.  ATEN proposes that this term be

construed as a "bridge between one or more peripheral devices and one or more

computers" as it is described in the specification.  '287 patent at 5:1-2.  While the

individual terms "hub" and "switch" would be familiar to a person of ordinary skill

in the art, the term "hub switch module" is not a term of art.  [Olivier Decl. ¶ 12.]

The specification explains that an embodying switch may contain a hub

switch module which is "configured to communicate with any of the plurality of

computer systems, and the one or more than one peripheral device."  '287 patent at

2:18-24.  In describing a particular embodiment of the KVMP switch which uses

the USB standard, the specification discusses a hub switch module:

> The USB hub switch module 32 is a ***bridge between peripheral devices 20 and computer systems 12*** and allows the signal switch 10 to connect each of a plurality of computer systems to one or more than one peripheral device.

*Id.* at 5:1-7. While the discussion of this embodiment references a *USB* hub switch module, the claim recites a generic hub switch module. The hub switch module simply provides communication channels between the peripheral devices and computer systems. Nothing about this function performed by the hub switch module is limited to the USB context. [Olivier Decl. ¶ 12.] As such, a person of ordinary skill in the art would understand that the type of signal or the format of the data communicated through those channels could vary in different embodiments. [Olivier Decl. ¶ 12.] Upon reviewing the claims and specification, a person of ordinary skill in the art would understand the term as a "bridge between one or more peripheral devices and one or more computers."

### 3. Such that a signal passing from the hub switch module to the one or more than one peripheral device emulates origination from a computer (Claim 1)

| ATEN's Proposed Construction | Belkin's Proposed Construction |
|---|---|
| Such that the signal passing from the hub switch module to a peripheral device has the appearance of originating from a connected computer system | **Belkin refused to provide ATEN with its proposed construction** |

In describing how the hub switch module communicates with connected peripheral devices, claim 1 of the '287 patent recites "such that a signal passing from the hub switch module to the one or more than one peripheral device emulates origination from a computer." *Emulation* is a concept familiar to persons of ordinary skill in the art. [Olivier Decl. ¶ 13.] Emulation generally refers to artificially providing the appearance of some characteristic. *Id.*

In this particular context, the disputed claim language indicates that the signal from the hub switch module is emulated so as to give it the appearance of originating from a connected computer system. A person of ordinary skill in the art

would recognize that this reduces complexity for the peripheral devices.  Because the signal to the peripheral device appears as if it originated from a connected computer system, the peripheral device need not account for the fact it is communicating with a connected computer *through a KVMP switch*.  [Olivier Decl. ¶ 13.]

By way of example, assume a printer was connected directly to a KVMP switch, rather than directly to a computer.  When a print job is spooled to this printer, the printer would receive the same signals from the KVMP switch as it would if the printer were directly connected to the computer.  The specification supports this understanding of the disputed claim language.  *See* '287 patent at 3:45-54 ("In other words, ***the use of emulation makes a switch appear as a computer to peripheral devices***, and enables the switch to communicate with USB devices or USB PCs at the same time."); 7:40-45 ("One skilled [in the] art with reference to this disclosure and following the referenced specifications will be able to write ***a USB emulation program suitable to make a switch appear as a PC to peripheral devices***.").

**4.  Means for switching the selected console device between the first channel and the third channel without interruption of the data flow through the second channel between the first selected computer system and the selected peripheral device (Claim 7)**

| ATEN's Proposed Construction | Belkin's Proposed Construction |
|---|---|
| ***Function:***<br>switching the selected console device between the first channel and the third channel without interruption of the data flow through the second channel between the first selected computer system and the selected peripheral device<br><br>***Corresponding Structure:***<br>Either: (1) the combination of a KVM switch and a peripheral sharing switch; or (2) the combination of a hub switch module, a device control module, and a CPU | **Belkin refused to provide ATEN with its proposed construction** |

Claim 7 of the '287 patent recites a "means for switching" which is a means-plus-function limitation subject to 35 U.S.C. § 112 ¶ 6.  The "means for switching" must be construed to cover the corresponding structure disclosed in the specification for performing the claimed function and equivalents of that corresponding structure.  35 U.S.C § 112 ¶ 6.

The function of the means for switching is "switching the selected console device between the first channel and the third channel without interruption of the data flow through the second channel between the first selected computer system and the selected peripheral device."[17]

A patent may disclose more than one corresponding structure for a means plus function element.  *Micro Chem, Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999) ("Identification of corresponding structure may embrace more than the preferred embodiment. A means-plus-function claim encompasses all structure in the specification corresponding to that element and equivalent structures."); *Ishida Co. v. Taylor*, 221 F.3d 1310, 1316 (Fed. Cir. 2000) ("[P]roper application of § 112 ¶ 6 generally reads the claim element to embrace distinct and alternative described structures for performing the claimed function. Specifically, 'disclosed structure includes that which is described in a patent specification, including any alternative structures identified.'").

The '287 patent includes two disclosures of corresponding structure linked to the switching function recited here.  [Olivier Decl. ¶¶ 16, 17.]  First, the specification discloses a combination of a KVM switch and a peripheral sharing switch.  '287 patent at 3:31-39.  [Olivier Decl. ¶ 16.]  The specification indicates that this combination performs the claimed function of performing a console switch without interrupting data flow to a peripheral device.  '287 patent at 3:40-54.  *See*

---

[17] *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1322 (Fed. Cir. 2003) ("When construing the functional statement in a means-plus-function limitation, we must take great care not to impermissibly limit the function by adopting a function different from that explicitly recited in the claim.").

1    *also Id.* at 3:60-4:11 (describing console switching "while maintaining a second

2    channel (not shown) connecting first computer 121 to first printer 22 such that a

3    first data flow between first computer 121 and first printer 22 is not interrupted").

4         Second, the '287 patent describes a preferred embodiment, in which the

5    combination of a hub switch module, a device control module, and a CPU performs

6    the claimed function.  [Olivier Decl. ¶ 17.]  Specifically, the patent describes the

7    hub switch module as a "bridge" which connects the peripheral devices and the

8    computer systems and allows "allows the signal switch 10 to connect each of a

9    plurality of computer systems to one or more than one peripheral device."  '287

10   patent at 5:1-4.  The hub switch module also enables the switching of console

11   devices to different connected computers.  *Id.* at 5:14-26.  The device control

12   module emulates signals from the console devices for the connected computers,

13   allowing the actual console device signals to be switched among them.  *Id.* at 5:16-

14   26.  The CPU emulates signals from the host computers which are sent to the

15   peripheral devices through the hub switch module.  *Id.* at 3:50-54; 7:40-45.  The

16   specification later clarifies that "the invention generates a ***path or channel between***

17   ***the USB peripherals and the linked PCs which is undisturbed by switching*** the

18   channels between the compliant KM devices and the PCs."  *Id.* at 7:6-10.  A person

19   of ordinary skill in the art would understand the "undisturbed" channel to be a

20   reference to the channel through the hub switch module because that is the

21   component that connects the peripherals to the computers.  [Olivier Decl. ¶ 17.]

22

23

24

25

26

27

28

**5.    Without interruption of the data flow through the second channel (Claim 7)**

| ATEN's Proposed Construction | Belkin's Proposed Construction |
| --- | --- |
| Plain and Ordinary Meaning:  Without interruption of the data flow through the second channel | **Belkin refused to provide ATEN with its proposed construction** |

The invention in claim 7 enables switching a selected keyboard, video, or mouse between two computer systems, "without interruption of the data flow through the second channel . . . ."  This language should be given its plain and ordinary meaning.   [Olivier Decl. ¶ 18.]

The context of this language within claim 7 and the specification reinforce that the terms simply mean what they say.  There are three "channels" referenced in claim 7 describing different connections between console devices, computers, and peripheral devices.  The "first channel" connects a console device to a first selected computer system.  '287 patent at 8:50-54.  The "second channel" connects that first selected computer system to a selected peripheral device.  *Id.* at 54-58.  In the claimed invention, there is a data flow between the first selected computer and peripheral device.  *Id.*  The "third channel" connects the selected console device to a second selected computer system.  *Id.* at 8:59-65.

The invention in claim 7 includes a means for switching the selected console device between the first channel and the third channel.  In other words, the keyboard, video, and mouse that is originally controlling the first computer (over the first channel) is switched so that the same keyboard, video, and mouse is controlling the second computer (over the third channel).  The "without interruption of the data flow through the second channel" claim language in dispute merely clarifies that when this switch between the first computer and the second computer takes place, the switching occurs without interruption of the data flow through the second channel, *i.e.*, without interrupting the data flow between the first computer and the peripheral device.  In other words, when and after the keyboard, video, and

1    mouse switch control from the first computer to the second computer, the first

2    computer stays connected to the peripheral device (through the second channel).

3         Claim 7 describes asynchronous switching, the switching between host

4    computers without also switching the peripheral device.  This is supported in the

5    specification at col. 4:29-35:

6                 Thus, for example, the first data flow between first
                  computer 121 and first printer 22, a second data flow
7                 between third computer 123 and scanner 241, and a third
                  data flow between fourth computer 124 and second
8                 printer 2421 all could be maintained without interruption
                  while keyboard 16 and mouse 18, and optionally monitor
9                 14, are switched among computer systems 12.

10   Consistent with this example from the specification, the disputed language merely

11   explains that the invention may switch a console device between two different

12   computer systems without also switching the peripheral device and without

13   interrupting data flow between one of those computer systems and a peripheral

14   device.

15   **IV.   CONCLUSION**

16        For the reasons set forth above, ATEN respectfully requests the Court adopt

17   ATEN's proposed claim constructions.

18   DATED: April 4, 2011                    **PERKINS COIE** LLP

19

20                                          By: */s/ Matthew C. Bernstein*
                                            John P. Schnurer, Bar No. 185725
21                                          JSchnurer@perkinscoie.com
                                            Matthew C. Bernstein, Bar No. 199240
22                                          MBernstein@perkinscoie.com
                                            Brian Wacter, Bar No. 223165
23                                          BWacter@perkinscoie.com
                                            Michael J. Engle, Bar No. 259476
24                                          MEngle@perrkinscoie.com

25

26                                          Attorneys for Plaintiff
                                            ATEN INTERNATIONAL CO., LTD., and
27                                          ATEN TECHNOLOGY, INC.

28

1

2

## **CERTIFICATE OF SERVICE**

3

            The undersigned hereby certifies that a true and correct copy of the above

4

and foregoing document has been served on April 4, 2011 to all counsel of record

5

who are deemed to have consented to electronic service via the Court's CM/ECF

6

system.

7

            Any other counsel of record will be served by electronic mail.

8

9

                                        */s/ Matthew C. Bernstein*
                                        Matthew C. Bernstein

10

                                        mbernstein@perkinscoie.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28