Robert W. Dickerson (State Bar No. 89367)
dickersonr@dicksteinshapiro.com
Yasser M. El-Gamal (State Bar No. 189047)
elgamaly@dicksteinshapiro.com
DICKSTEIN SHAPIRO LLP
2049 Century Park East, Suite 700
Los Angeles, California  90067-3109
Telephone: (310) 772-8300
Facsimile: (310) 772-8301

Jeffrey A. Miller (State Bar No. 160602)
millerj@dicksteinshapiro.com
DICKSTEIN SHAPIRO LLP
303 Twin Dolphin Drive, Suite 600
Palo Alto, CA 94065
Telephone: (650) 632-4328
Facsimile: (650) 632-4333

Attorneys for Defendants Belkin
International, Inc. and Belkin, Inc.

UNITED STATES DISTRICT

COURTCENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| ATEN INTERNATIONAL CO., LTD. and ATEN TECHNOLOGY, INC., <br><br> Plaintiffs, <br><br> v. <br><br> EMINE TECHNOLOGY CO., LTD., BELKIN INTERNATIONAL, INC., and BELKIN, INC., <br><br> Defendants. | CASE NO. 8:09-CV-843 AG (MLGx) <br><br> Hon. Andrew J. Guilford <br><br> DEFENDANTS BELKIN INTERNATIONAL, INC. AND BELKIN, INC.'S CLAIM CONSTRUCTION BRIEF <br><br> Date:  May 9, 2011 <br> Time:  10:00 a.m. <br> Ctrm:  10D |

# TABLE OF CONTENTS

PAGE NO.

I.  INTRODUCTION .......................................................................................... 1

II.  GOVERNING LEGAL PRINCIPLES ............................................................ 2

   A. ...... CLAIM CONSTRUCTION LAW ............................................. 2

       1. ....... Patent Specification Is the "Primary" Evidentiary Source ........ 2

           a. ........ The Specification May Evince Disclaimer of Claim Scope ........................................................................ 2

           b. ....... Even in the Absence of Disclaimer, Consistent Use of a Term in the Specification May Evince a Narrow Claim Scope ....................................................................... 3

       2. ....... Extrinsic Evidence May Be Useful But Cannot Broaden Scope of Claims Beyond That Supported By the Intrinsic Record ............................................................................. 3

   B. ....... IMPORT OF ITC'S CLAIM CONSTRUCTION ..................... 3

III.  CONSTRUCTION OF DISPUTED CLAIM TERMS .................................... 4

   A. ...... THE TECHNOLOGICAL FIELD OF PATENTS-IN-SUIT ............... 4

   B. ....... THE '112 PATENT ........................................................... 4

       1. ....... Body ......................................................................... 4

           a. ........ "Body" does not include outer walls that are made of metal material or rigid plastic material and assembled together by means of screws. ....................................... 4

           b. ....... Integrated/Integrating … into ........................................... 9

           c. ........ Fixedly Attached ........................................................... 11

   C. ....... THE '287 PATENT .......................................................... 12

       1. ....... The Prosecution History Confirms The Importance Of Uninterrupted Data Flow During Both Asynchronous And Synchronous Switching Of Console Devices And Peripherals 13

       2. ....... First Disputed Claim Term: Wherein the Console Devices can be Switched Either Synchronously or Asynchronously with the One or More than One Peripheral Device to the Same One of the Plurality of Computer Systems or to Different Ones of the Plurality of Computer Systems, Without Interruption of the Signal to the One or More than One Peripheral Device (Claim 1) ............................................................................. 14

           a. ........ The Plain Language Of Claim 1 Supports Belkin .......... 15

i

1

b. ....... The Specification Supports Belkin's Construction ........ 16

c. ........ The Prosecution History Further Confirms That Both Synchronous And Asynchronous Switching Require Uninterrupted Data Flow to Peripherals ........................ 17

d. ....... ATEN's Construction Ignores The Claim Language, The Specification And The Prosecution History ........... 17

e. ........ Second Diputed Claim Term:  Hub Switch Module ...... 19

f. ........ The Language Of The Claim And The Specification Support Belkin ................................................................. 19

g. ....... ATEN's Construction Ignores The Claim Language, The Specification And The Prosecution History ........... 21

3. ....... Third Disputed Claim Term:  Such that a Signal Passing from the Hub Switch Module to the One or More than One Peripheral Device Emulates Origination from a Computer ..... 22

a. ........ The Claim Language And The Specification Supports Belkin ................................................................. 22

b. ....... ATEN's Construction Ignores The Claim Language, The Specification And The Prosecution History ........... 23

4. ....... Fourth Disputed Claim Term:  Means for Switching the Selected Console Device Between the First Channel and the Third Channel Without Interruption of the Data Flow Through the Second Channel Between the First Selected Computer System and the Selected Peripheral Device ........... 23

a. ........ Construction Of Means Plus Function Claim Terms ..... 24

IV.   CONCLUSION ........................................................................... 28

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

TABLE OF AUTHORITIES

2

PAGE NO.

**Cases**

3

*800 Adept, Inc. v. Murex Securities, Ltd,*
4      539 F.3d 1354 (Fed. Cir. 2008)............................................................ 16

5   *Abbott Labs. v. Andrx Pharms., Inc.,*
       452 F.3d 1331 (Fed. Cir. 2006).......................................................... 22

6   *Access, Inc. v. Echostar Satellite Corp.,*
7      383 F.3d 1295 (Fed. Cir. 2004).......................................................... 3

8   *Ameranth, Inc. v. Menusoft Systems Corp.,*
       2010 Markman 1610079, 2010 WL 1610079, *6–*7 (E.D. Tex. 2010) ............... 16

9   *AquaTex Indus., Inc. v. Techniche Solutions,*
10     419 F.3d 1374 (Fed. Cir. 2005).......................................................... 3

11  *Astrazeneca AB v. Mut. Pharm. Co.,*
       384 F.3d 1333 (Fed. Cir. 2004).......................................................... 9

12
    *C.R. Bard, Inc. v. U.S. Surgical Corp.,*
13     388 F.3d 858 (Fed. Cir. 2004)............................................................ 3

14  *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.,*
       145 F.3d 1303 (Fed. Cir. 1998).......................................................... 24

15  *Commonwealth Sci. & Indus. Research Organisation v. Buffalo Tech. (USA), Inc.,*
16     542 F.3d 1363 (Fed. Cir. 2008).......................................................... 26

17  *Cyrix Corp. v. Intel Corp.,*
       846 F.Supp. 522 (E.D.Tex.1994), *aff'd,*
18     42 F.3d 1411 (Fed.Cir.1994)............................................................ 16

19  *Edward Lifesciences LLC v. Cook Inc.,*
       582 F.3d 1322 (Fed. Cir. 2009).......................................................... 9

20  *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.,*
21     423 F.3d 1343 (Fed. Cir. 2005).......................................................... 3

22  *Graham v. John Deere Co.,*
       383 U.S. 1 (1966) ....................................................................... 25

23  *Harris Corp. v. Ericsson Inc.,*
24     417 F.3d 1241 (Fed. Cir. 2005).......................................................... 27

25  *Hockerson-Halberstadt, Inc. v. Converse Inc.,*
       183 F.3d 1369 (Fed. Cir. 1999).......................................................... 20

26  *Honeywell Int'l, Inc. v. ITT Indus., Inc.,*
27     452 F.3d 1312 (Fed. Cir. 2006).......................................................... 20

28  *Housey Pharms., Inc. v. Astrazeneca UK Ltd.,*
       366 F.3d 1348 (Fed. Cir. 2004).......................................................... 25

iii

*ICU Medical, Inc. v. Alaris Medical Systems, Inc.*,
  558 F.3d 1368 (Fed. Cir. 2009) ........................................................................ 9

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
  383 F.3d 1295 (Fed. Cir. 2004) ................................................................... 3, 5

*Microsoft Corp. v. Multi-Tech Sys.*,
  357 F.3d 1340 (Fed. Cir. 2004) ..................................................................... 20

*Novartis Pharms. Corp. v. Abbott Labs.*,
  375 F.3d 1328 (Fed. Cir. 2004) ..................................................................... 28

*On Demand Machine Corp. v. Ingram Industries, Inc.*,
  442 F.3d 1331 (Fed. Cir. 2006) ....................................................................... 9

*Pass & Seymour, Inc.*,
  2009 WL 7296903 (N.D.N.Y. Dec. 30, 2009) ................................................ 4

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ............................................................... passim

*Renishaw PLC v. Marposs Societa' per Azioni*,
  158 F.3d 1243(Fed.Cir. 1998) ...................................................................... 16

*Terlep v. Brinkmann Corp.*,
  418 F.3d 1379 (Fed. Cir. 2005) ....................................................................... 3

*Texas Instruments v. Cypress Semiconductor Corp*,
  90 F.3d 1558 (Fed. Cir. 1996) ......................................................................... 4

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
  503 F.3d 1295 (Fed. Cir. 2007) ..................................................................... 16

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ......................................................................... 2

*WMS Gaming, Inc. v. International Game Tech.*,
  184 F.3d 1339 (Fed. Cir. 1999) ............................................................... 27, 28

**Statutes**

35 U.S.C. § 112 ¶ 6 .............................................................................. 10, 24, 25

iv

## I.     INTRODUCTION

ATEN's proposed constructions are contrary to the *intrinsic* and *extrinsic* evidence including the representations ATEN made to the Patent and Trademark Office (PTO) to secure allowance. By way of example, ATEN inappropriately proposes that:

- the "body" limitation of the '112 patent be construed -- contrary to both the ALJ's and ITC's decision[1] -- so broadly that it neglects the overwhelming import of the specification and reads on the very same *prior art* device that the '112 patent expressly denounced;

- the "without interruption" and "means for switching" limitations of the '287 patent be limited to <u>asynchronous</u> switching, when it is clear that the PTO also required <u>synchronous</u> switching as the basis for allowing the claims;

- the "hub switch module" limitation in the '287 patent be construed as a "bridge…," an equally ambiguous term; and

- the "emulation of origination from the computer" limitation in the '287 patent and the "integrated/integrating into" limitations in the '112 patent both are defined by "appearance," which inappropriately introduces a design patent concept into a utility patent, and creates insoluble ambiguity.

In support, ATEN relies on the sparse declaration of Dr. Olivier, who takes positions without a single reference to the prosecution histories of either patent or the immense ITC record on the '112 patent.  Indeed, Dr. Olivier's Declaration is more remarkable for what it doesn't say than for what it does.[2]  Not surprisingly, ATEN was

---

[1] The '112 patent was previously asserted by ATEN against Belkin and others in the United States International Trade Commission Investigation No. 337-TA-589 In the Matter of ***CERTAIN SWITCHES AND PRODUCTS CONTAINING SAME*** ("ITC Investigation").  *See Declaration of Yasser El-Gamal* ¶ 8 and Exs. G-H.  All exhibits referenced herein are identified and attached to the *Declaration of Yasser El-Gamal*, filed in support of this Brief.

[2] The contrast between the sparsity of Dr. Olivier's Declaration and the detailed and reasoned nature of the Declaration of Robert Dezmelyk (filed in support of this Brief) is stark, and in and of itself underscores the weakness of ATEN's positions.  ATEN

1    "unable" to make Dr. Olivier available for deposition.

2        In stark contrast, Belkin's constructions are grounded in sound analysis properly

3    predicated on the intrinsic patent record.  As to the '112 patent, Belkin's constructions

4    are those that were appropriately adopted by the ITC in an extensively litigated matter

5    involving the same patent, same parties and same issues.  As to the '287 patent,

6    Belkin's constructions are based on the claim language, specification, and the highly

7    material prosecution history.[3]

8    **II.    GOVERNING LEGAL PRINCIPLES**

9        **A.         CLAIM CONSTRUCTION LAW**

10       When construing claims, a question of law, courts follow the methodology set

11   forth in in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*).

12              **1.    Patent Specification Is the "Primary" Evidentiary Source**

13       Claim construction is  informed by the claim language, the specification, the

14   prosecution history, and extrinsic evidence.  Intrinsic evidence, *i.e.*, the patent's claims

15   and specification, as well as the prosecution history "is the most significant source of

16   the legally operative meaning of disputed claim language."  *Vitronics Corp. v.*

17   *Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  *Nystrom v. TREX Co., Inc.*,

18   424 F.3d 1136, 1142 (Fed. Cir. 2005); *Conoco, Inc. v. Energy Envt'l Int'l, L.C.*, 460

19   F.3d 1349, 1362 (Fed. Cir. 2006).

20              **a.  The Specification May Evince Disclaimer of Claim Scope**

21       A key reason for the primacy of the specification in claim construction is

22

23   also fails to address the attributes of a person of ordinary skill in the art.  Belkin urges
24   the Court to credit Mr. Dezmelyk's proffered opinions.  *Id.* at ¶¶ 31-42.

25   [3]  ATEN's repeated mantra that Belkin "refused" to provide claim constructions to
     ATEN is entitled to only a passing remark.  First, ATEN so drastically changed its
26   constructions at the last minute from what it had initially proposed that additional time
     was required to analyze them.  Second, Belkin had proposed simultaneous *Markman*
27   briefing.  ATEN objected and demanded traditional briefing where it files an opening
     brief, Belkin responds, and ATEN replies.  Accordingly, providing Belkin's
28   constructions, even if it could have, would have given ATEN unfair advantage.

DEFENDANTS' CLAIM CONSTRUCTION BRIEF
CASE NO. 8:09-CV-843 AG (MLGx)

because "an inventor may use the specification to intentionally disclaim or disavow the broad scope of a claim." *Conoco*, 460 F.3d at 1357. In such instances, "the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." *Phillips*, 415 F.3d at 1316.

### b. Even in the Absence of Disclaimer, Consistent Use of a Term in the Specification May Evince a Narrow Claim Scope

Separate and aside from disclaimer, the specification may make clear that the patentee did not intend the disputed term to encompass certain subject matter. *See, e.g., AquaTex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1380 (Fed. Cir. 2005); *Nystrom*, 424 F.3d at 1144-45. Often, "the specification makes clear … that the claimed invention is narrower than the claim language might imply based on a reading of the specification as a whole." *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 863, n. 3 (Fed. Cir. 2004). For example, "[s]tatements that describe the invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition of a claim term." *Id*. at 864.

Resort to the intrinsic record, and primarily, the specification, is absolutely essential where a disputed term has no previous meaning to those of ordinary skill in the prior art. *See, e.g., Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004).

### 2. Extrinsic Evidence May Be Useful But Cannot Broaden Scope of Claims Beyond That Supported By the Intrinsic Record

"Extrinsic" evidence can be useful in claim construction. *Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005). However, extrinsic evidence, including dictionary definitions, cannot be used to vary or broaden construction of a term beyond that dictated by the intrinsic evidence. *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1348-49 (Fed. Cir. 2005).

### B.    IMPORT OF ITC'S CLAIM CONSTRUCTION

A "district court can attribute whatever persuasive value to the prior ITC

3

1  decision that it considers justified." *Texas Instruments v. Cypress Semiconductor*

2  *Corp*, 90 F.3d 1558, 1569 (Fed. Cir. 1996).  ATEN, having lost at the ITC,

3  understandably wants to devalue the ITC's decision.  ATEN's reliance on *Pass &*

4  *Seymour, Inc.*, 2009 WL 7296903, *8 (N.D.N.Y. Dec. 30, 2009),is misplaced in that

5  ATEN fails to mention that the decision relied on the fact that accused infringer "was

6  not a party to the ITC proceeding," whereas here: the parties, patent, accused products

7  and disputed claims are all the same.

## III.   CONSTRUCTION OF DISPUTED CLAIM TERMS

### A.       THE TECHNOLOGICAL FIELD OF PATENTS-IN-SUIT

The field of the subject technology is extensively discussed in the
accompanying *Declaration of Robert Dezmelyk* ¶¶ 26-30, and will not be repeated
here.  The one point to be reiterated here, however, is that the parties agree that ATEN
was not the inventor of KVM switches, as they have been in use since the 1980's.

### B.       THE '112 PATENT

#### 1.   Body

The '112 specification compels an inescapable conclusion: the claimed "body"
must be interpreted to be something different from the prior art KVM box-type
structures (that had outer walls made of metal or rigid plastic and assembled together
by means of screws) it explicitly denounced in describing the claimed invention – *i.e.*,
a switch having a "body" comprised of a "a single integral enclosure that encapsulates
the internal circuit board" so as to provide the circuit-protection features specified as
the invention therein.  (*See Dezmelyk Decl.*, ¶¶ 43-88).

**a.  "Body" does not include outer walls that are made of metal material or rigid plastic material and assembled together by means of screws.**

| Belkin's Proposed Construction | ITC's Ruling | ATEN's Proposed Construction |
|---|---|---|
| "Body" does not include outer walls that are made of metal material or rigid plastic material and assembled together by means of screws. | Agreed with Belkin's position. | ATEN asserts that there is no disclaimer. |

4

While the claim language itself recites the claimed "body" in relation to other components (connector ports, cables, etc), the term body is neither a term of art nor is it adequately defined in the claims.  (*Dezmelyk Decl*. ¶¶ 50, 55, 74-82). To ascertain the appropriate meaning of the term "body" we must, as required by *Phillips*, analyze the intrinsic record, starting with the specification (which ATEN and its expert Dr. Olivier almost entirely ignore).

As the ITC noted, because the term **body** does not have an accepted meaning in the art, "the patent specification takes on particular importance," (Ex. H, p. 490), and the meaning of the term "body" "must be found . . . in the ['112] patent." *See Irdeto Access*, 383 F.3d at 1300.  In short, the term "body" should be construed "only as broadly as provided for by the ['112] patent itself." *Id.*

### (1)   The '112 Patent's Specification Expressly Excludes the Prior Art Structures

The '112 patent's disclosure is a mere three columns, but those three columns leave no doubt as to what the patent considered was the improvement over the prior art, and hence what, as a matter of law, it excluded from the scope of the claim term "body."  We begin with the Abstract[4] of the invention, which makes three points, all of which supports Belkin's construction.  First, the terms "*body*" and "*main body*" are used interchangeably; second, the "body" is for containing the internal circuit board; and third, the claimed inventive "body" is not just any structure, but one that has a specific construction.

### (2)   Disparagement of the Prior Art Further Confirms What Is NOT a "Body"

As Mr. Dezmelyk explains in detail (¶¶ 49, 54-87), the '112 patent states that

---

[4] The Abstract states: "An automatic switch includes a ***main body*** having connector ports provided thereon, more than one or two sets of cable-connected connectors directly extended from the main body, and a circuit board provided in the main body and electrically connected to the sets of cable-connected connectors via signal cables. ***The main body* has an integral enclosure formed through multiple times of injection molding to include a circuit-protecting layer for enclosing the circuit board, an outer case enclosing the circuit-protecting layer, and an anti-slipping layer coating an outer surface of the outer case.**" (emphasis added)

5

"[t]he present invention relates to an automatic switch for a user to automatically switch between two or more computer configurations, and more particularly to an automatic switch that has an integrally injection-molded enclosure to provide good weather-resistance, impact-resistance, and absolute protection of an internal circuit board thereof."  (Ex. A at 1:5-10)

After identifying "the present invention,", the '112 patent specification proceeds to describe prior art KVM switches:

> FIG. 1 shows *a conventional automatic switch 40* that is configured into a box 41. The box 41 is internally provided with a circuit board (not shown).  Ports 42, 43, and 44 for various types of signal cable connectors are provided on peripheral walls of the box 41. Inmost [sic] cases, *the box 41 includes outer walls that are made of metal material or rigid plastic material and assembled together by means of screws* (not shown). Ex. A at 1:18-25 (emphasis added).

The '112 patent refers to the outer enclosure of the prior art as "box 41" further confirming that the patentee did not consider this type enclosure to be a "body" as claimed in the patent. Indeed, the '112 patent's specification then explicitly *disparages the disclosed prior art switch 40 by underscoring its deficiencies*:

> *The automatic switch 40* is normally positioned on a host enclosure of a computer configuration and *tends to unexpectedly fall off the host enclosure to result in a damaged circuit board due to vibration. Moreover, when a high humidity exists, moisture in the air tends to attach to the circuit board to cause short circuit.  Repair or maintenance of the circuit board is therefore required.* (*Id.* at 1:26-32) (emphasis added).

In short, the specification tells us that the prior art switch 40 with a box 41 comprising "*outer walls that are made of metal material or rigid plastic material and assembled together by means of screws,*" suffer from the primary defect that the internal circuit board therein is subject to damage due to vibration and humidity.

The specification then contrasts the claimed invention by underscoring the features of the claimed "body" that <u>solve</u> those deficiencies:

6

- The main *body* [of the invention] has an integrally injection-molded plastic enclosure to provide good weather-resistance, impact-resistance, and *absolute protection of the internal circuit board and circuits thereon.* 'Ex. A at 1:6-44.
- The *integrally injection-molded enclosure* of the main *body includes a circuit-protecting layer for enclosing the circuit board*, an outer case enclosing the circuit-protecting layer, and an anti-slipping layer coating an outer surface of the outer case. Ex. A at 1:50-54.
- The circuit-protecting layer of the main *body* is made of a plastic material having a low melting point to *avoid damages to circuits provided on the circuit board* during the injection molding.  Ex. A at 1:55-59.
- The outer case of the main *body* has *good strength and high rigidity and therefore provides excellent protection to the internal circuit board* and the entire main body of the automatic switch.  Ex. A at 1:60-63.
- The anti-slipping layer of the main *body* has soft surface to enable firm holding of the main body and convenient plugging and unplugging of signal cables in and from the main body.  Ex. A at 1:64-67.

    Also significant, the specification sets forth *only one* embodiment for the claimed "body," and that one embodiment is shown in Figures 3 and 4.  As depicted and as described, the claimed KVM switch "body" is entirely distinct from the prior art box 41 having outer walls that are made of metal material or rigid plastic material and assembled together by means of screws. The specification leaves no doubt that the "body" shown in the Figs. 3 and 4 is the "body" described and claimed:




7

FIG. 4 is a cross-sectional view of the main body of the automatic switch *of the present invention*…. Please refer to FIGS. 3 and 4 that are perspective and cross-sectional views, respectively, of the main body 20 of the automatic switch 10 *of the present invention*. The main body 20 has an integral enclosure that is formed through three times of injection molding to include a circuit-protecting layer 21, and an anti-slipping layer 23 coating an outer surface of the outer case 22… [T]he automatic switch 10 *of the present invention uses the main body 20 . . . to replace the conventional box-type switch 40. . . .* Moreover, the enclosure of the main body 20 of the automatic switch 10 is integrally formed through multiple times of injection molding to *protect circuits provided on the internal circuit board* 24, making the automatic switch 10 safer and more convenient for use." Ex. A at 2:15-3:17 (emphasis added).

The '112 specification does not disclose any other embodiment, nor does it communicate that the scope of the claimed "body" is other than the <u>sole</u> embodiment disclosed. Thus, here the Specification not only shows clearly what a "body" is, but also what it IS NOT. The ITC found this evidence persuasive.

### (3) ATEN's Contention on Disclaimer as to "Body" Contravenes Federal Circuit Precedent

The repeated explicit statements in the '112 specification denouncing the multi-piece construct assembled by means of screws of the prior art KVM switches constitutes a disclaimer of claim scope. The Federal Circuit has stated time and again that statements in the specification that ***expressly or implicitly*** excludesubject matter from thescope of the invention can operate as a disclaimer of claim scope. *See, e.g.*, *SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337, 1342-45 (Fed. Cir. 2001).

The disclaimer here as to the term "body" is even more conclusive than in *SciMed* because there, disclaimer was found "even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *Id*. at 1341. In contrast, it is undisputed that the claim term "*body*" itself without reference to the specification lacks an accepted

8

1    meaning in the art, so reference to the specification is required.  In light of the

2    specification, the term "body," as a matter of law, cannot encompass the disclaimed

3    multi-piece enclosure construct that are assembled by screws.[5]

4         In sum, the intrinsic record, under the settled principles of claim construction,

5    plainly support the ITC's construction of "body" to exclude an enclosure containing

6    "outer walls that are made of metal material or rigid plastic material and assembled

7    together by means of screws." Ex. A at 1:23-25.[6]  Moreover, extrinsic evidence like

8    that supplied by ATEN cannot and does not trump intrinsic evidence, and the former is

9    the only "evidence" ATEN has for its strained and baseless construction.[7]

10        **b.  Integrated/Integrating … into**

| Belkin's Proposed Construction | ITC's Construction | ATEN's Proposed Construction |
|---|---|---|
| "Formed into a unified whole that is inseparable without disassembling the whole." | Same as Belkin. | Physically connected within the body, so that the cables have the appearance of being permanently attached to the body. |

[5] Contrary to ATEN's arguments, Federal Circuit precedent rejects any notion that a disclaimer analysis is governed by rigid, formalistic rules. *Astrazenca AB v. Mut. Pharm. Co.*, 384 F.3d 1333, 1340 (Fed. Cir. 2004).[5]  *See also On Demand Machine Corp. v. Ingram Industries, Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006) ("…when the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope….").

[6] Adoption of Belkin's and the ITC construction of 'body' would be dispositive and the Court need go no further with respect to the '112 patent. (See Ex. H). ." However, were it to do so, the appropriate construction of "body," in addition to excluding the prior art box, would be "A single integral enclosure that encapsulates the internal circuit board" thereby providing the circuit protection the '112 patent says is at the heart of the invention.  *See Dezmelyk Decl.* ¶¶ 82-87).

[7] Interestingly, ATEN places complete reliance on the doctrine of claim differentiation for its construction of "body," then rejects that doctrine entirely for its construction of "integrated into" and "fixedly attached." Inconsistency, ATEN is thy name. "Claim differentiation is a guide, not a rigid rule. *ICU Medical, Inc. v. Alaris Medical Systems, Inc.*, 558 F.3d 1368, 1376 (Fed. Cir. 2009) (rejecting claim differentiation argument despite similarity between claims). "Different terms or phrases in separate claims may be construed to cover the same subject matter where the written description and prosecution history indicate that such a reading of the terms or phrases is proper." *Edward Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1330 (Fed. Cir. 2009). Belkin respectfully submits that claim differentiation does not apply in this case and that the Court should adopt Belkin's construction of "body."

9

1    The ITC noted, and the parties and experts appear to agree, that "integrated

2    into" and "integrating … into" lack "accepted meanings in the art." (Ex. H, p. 498).

3    Relying on the plain meaning of these terms and "the context of the terms as … used

4    in the claims," the ITC, which Belkin adopts, construed these terms to mean "***formed***

5    ***into a unified whole*** that is inseparable without disassembling the whole." (*Id.*).

6    This construction is support by the ITC's extensive analysis and corroborated by

7    expert opinion (*Dezmelyk Decl.* ¶¶ 51, 89-107). It is also most consistent with the

8    intrinsic record, as the totality of the '112 specification makes crystal clear that

9    "integrated into" and "integrating … into" must encompass "the concept that the

10   cables and body are '***formed into a unified whole***.'" (*Id.*) The '112 patent describes

11   connecting the *cables* to the *body* via injection molding that merges the cables and the

12   body into a single structure and thereby forms a unified whole. (*Id.*) Notably, this is

13   the position that ATEN and its then expert Dr. Barker took at the ITC and earlier in

14   this litigation before the Texas district court. (*Id.*)

15   In contrast, ATEN <u>now</u> proposes that "integrated into" be construed as

16   "physically connected within the body, so that the cables have *the appearance of*

17   *being permanently attached to the body*." (emphasis added). ATEN's proposed

18   construction is incorrect for three reasons: (1) there is nothing in the '112 patent's

19   intrinsic record that would even remotely support an interpretation directed to the

20   ornamental "look and feel" of the claimed invention, namely, "the cables hav[ing] the

21   *appearance* of being permanently attached," (2) its essential premise that any

22   "physical connection" between the cables and the body is within the scope of

23   "integrated into" is inconsistent with the specification, and (3) its conflation of

24   *ornamental* features into the scope of the claimed *utility* invention renders the claims

25   indefinite under 35 U.S.C. 112 ¶ 2.[8]  (*Dezmelyk Decl.*, ¶¶ 105-107)

26   _____

27   [8] ATEN's proposed construction is incorrect because "it contemplates that any physical connection between the cables and the body is sufficient no matter its nature (which would include, for example, the ubiquitous prior art thumb screw connectors), which is inconsistent with the teachings of the specification and prosecution history."

28   *Dezmelyk Decl.* ¶¶ 108-111.  To repair this inconsistency with the specification,

10

### c. Fixedly Attached

| Belkin's Proposed Construction | ITC's Construction | ATEN's Proposed Construction |
|---|---|---|
| "Formed into a unified whole that is inseparable without disassembling the whole." | "Fastened, attached, or placed so as to be firm and not readily removable." | Physically connected within the body, so that the cables have the appearance of being permanently attached to the body. |

ATEN now asserts that this term should be construed the same as "integrated into." Belkin agrees for the purposes of this *Markman* construction. Belkin's expert also opines that the intrinsic evidence indicates that the two terms have the same scope, stating that, "As ATEN points out 'the ['112 patent] specification does not differentiate between cables that are 'integrated into' the body and those that are 'fixedly attached' to the body…. This is also supported by the fact that the phrase 'fixedly attached' nowhere appears in the original specification … but was later added by amendment to the claims." (*Dezmelyk Decl*. ¶¶ 108-111.)

The issue for the Court is what construction of "integrated" is appropriate. Plainly, ATEN's proposed construction should be rejected because it attempts to graft *design* patent concepts of *ornamentality* onto a *utility* patent. In addition to the ambiguity problems this creates (*see Datamize* case), it is Black Letter law that utility patents cover the useful aspects of a device, while a design patent attends to their appearance. ATEN's attempt to blend the two is wrong. Moreover, as Mr. Dezmelyk explains at length (¶¶ 89-111), Belkin's construction is entirely consistent with the intrinsic evidence and should be adopted.[9]

---

[8] ATEN seeks to augment the claim scope with "a subjective criteria of 'appearance.'" *Id*. However, to do so would render the claim indefinite since there is no metric by which to assess what does or does not look permanent. *Id*. *See, e.g.*, *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350–52 (Fed. Cir. 2005).

[9] Belkin's proposed constructions comport with the specification of U.S. Pat. No. 7,542,299, which is part of the intrinsic record because it incorporates the '112 patent's specification in full and claims priority thereto for which ATEN has relied-on in this litigation. (*See* Ex. C at 1:1-9.) The '299 patent was not considered by the ITC because it issued on June 2, 2009 after the conclusion of the ITC Investigation. Notably, the terms "*fixedly attached*" and "*integrated into*" are used interchangeably (*e.g.*, Ex. C (claim 1 and 8) compare Ex. A (claims 1 and 13).

11

## C.      THE '287 PATENT

The '287 patent is directed to a device that combines a KVM switch and a peripheral sharing switch.  According to the '287 patent, exemplary peripheral devices include USB hubs, USB printers, USB scanners and USB cameras.  (Ex. B, p. 24 at 2:9-13.)  As seen in Figure 1, which Belkin has annotated to the right, the '287 patent describes a KVM switch 10 (blue) connected to console devices 14, 16 and 18 (pink).[10]  PCs 121 and 122, (red) are also connected to the KVM switch 10. A peripheral device 20, which in this example is a printer 22 (green) is also connected to the switch 10.  *See* Ex. B at 3:60-4:11.

The '287 patent states "[a] problem with current KVM switches is that if a USB peripheral, such as a printer, is connected to the switch, <u>data flow is interrupted to that peripheral when the switch is changed</u>." Ex. B at 1:21-24 (emphasis added).  This problem can be understood in the context of a PC sending a print job to a printer connected to a prior art KVM switch.  If the prior art KVM switch switches while the previously connected PC sends print data to the printer, the data flowing to the printer will be interrupted, *i.e.*, cut off, resulting in incomplete transmission of the print job data, causing the print job to fail.  *Dezmelyk Decl.* ¶ 29.



The '287 patent then states that "[w]hat is needed is a KVM switch that is also a peripheral sharing switch, which would allow all the computers connected to the switch to share any USB peripheral

---

[10] The console devices are video monitor 14, keyboard 16, and mouse 18.

devices <u>without interruption of data flow</u> to that peripheral when the switch is changed, and which would switch the KVM channels and peripheral channels to a common computer or to different computers either asynchronously or synchronously." Ex. B at 1:53-60 (emphasis added).[11]  The '287 patent says it solves the "interrupted data flow" problem by allowing the KVM switch to switch console devices and peripherals <u>both asynchronously and synchronously</u> without interrupting data flowing from the PC to the peripheral.  The "Summary Of Invention" of the '287 patent identifies this as "the present invention."[12]

### 1. The Prosecution History Confirms The Importance Of Uninterrupted Data Flow During Both Asynchronous And Synchronous Switching Of Console Devices And Peripherals

The '287 patent was filed on October 10, 2002.  On December 8, 2004, the PTO issued an Office Action rejecting all claims.  Ex. E, pp. 233-238.  In response, ATEN argued that its claims were patentable because what it called the "present invention" allowed both <u>asynchronous</u> and <u>synchronous</u> switching of console devices and peripherals <u>without interrupting data flow to peripherals</u>.[13]  This was so important that ATEN amended claim 1 to require this feature (the entire 'wherein' clause now being construed in Section III.C.2 below) and admitting that the amendment was made "to <u>better point out</u> and <u>distinctly claim the invention</u>."  Ex. E, pp. 251. (Emphasis added)

---

[11]      The '287 patent teaches that synchronous switching occurs when peripheral devices are switched <u>together with console devices</u> while asynchronous switching occurs when peripheral devices are switched <u>separately from console devices</u>.  Ex. B at 3:40-44.

[12]      The "Summary of Invention" of the '287 patent states "[t]he present invention meets this need by providing a KVM switch that is also a peripheral sharing switch, which allows all the computers connected to the switch to share any USB peripheral devices, and which can **switch the KVM channels and peripheral channels to a common computer or to different computers either asynchronously or synchronously without interruption of data flow to that peripheral when the switch is changed**." Ex. B at 1:64-2:4 (emphasis added).

[13]      ATEN argued "[t]he **present invention** meets this need by providing a KVM switch which can switch the KVM channels and peripheral channels (i) to a common computer or to different computers **either asynchronously or synchronously** and (ii) **without interruption of data flow to that peripheral when the switch is changed**." Ex. E, pp. 249-250 (03/06/2005 Amendment) (emphasis added).

Importantly, in the same Amendment, ATEN argued that synchronous and asynchronous switching of console and peripheral devices without interruption of dataflow to peripherals <u>distinguished</u> its invention from the prior art.  Under the heading "Dickens et al Do Not Teach Asynchronous/Synchronous Switching," ATEN told the Examiner that "[a] simple example will demonstrate the difference between Dickens et al. and the present invention."  Ex. E, pp. 255-257 (03/06/2005 Amendment).  ATEN's "simple" example of the "present invention" was that of a printer that could switch console devices and peripheral devices from a first computer to a second computer together (*i.e.*, synchronously) without interrupting printer data being sent by the first computer to that printer.[14]  ATEN then summarized the distinction between its claims and the cited prior art by arguing that the alleged invention of the '287 patent allowed switching console devices both <u>synchronously and asynchronously</u> with peripheral devices "without interruption of the signal" to the peripheral devices.[15]

**2. First Disputed Claim Term: Wherein the Console Devices can be Switched Either Synchronously or Asynchronously with the One or More than One Peripheral Device to the Same One of the Plurality of Computer Systems or to Different Ones of the Plurality of Computer Systems, Without Interruption of the Signal to the One or More than One Peripheral Device (Claim 1)**

---

[14] ATEN's "simple" example is as follows: "Here, the console devices are keyboard 16, mouse 18, and video monitor 14.  The peripheral device is a first printer 22.  There are first computer 121 and second computer 122.  By way of example, suppose that in an initial state, console devices (14, 16, 18) and printer 22 are connected to first computer 121, which is sending a signal through switch 10 to printer 22 (a document being spooled, for example).  The user now switches to a second state, in which **switch 10 synchronously connects console devices (14, 16, 18) and printer 22 to second computer 122.  The data stream coming from first computer at 121 at the time of the switching is left unaffected** (the document being spooled finished printing), but otherwise printer 22 is now connected to second computer 122…"  Ex. E, p. 257 (03/06/2005 Amendment).  (emphasis added)

[15] ATEN stated: "Therefore, Dickens et al., neither alone nor in combination with Thomas et al., teach or fairly suggest switching the console devices **either synchronously or asynchronously** with one or more peripheral devices to the same one of a plurality of computer systems, or to different ones of the plurality of computer systems, **without interruption of the signal to the one or more peripheral devices**."  Ex. E, p. 258.  (emphasis added)

| Belkin's Proposed Construction | ATEN's Proposed Construction |
|---|---|
| Console devices are switched from a first computer system to another computer system either together (*i.e.*, synchronous switching) or separately from (*i.e.*, asynchronous switching) a peripheral device.  Both synchronous and asynchronous switching must be performed by the signal switch, and must be performed such that the data stream passing between the first computer system and the peripheral device is left unaffected at the time of switching. | Console devices can be switched among computer systems either together with the switching of peripheral devices (*i.e.*, synchronous switching) or independently (*i.e.*, asynchronous switching). Asynchronous switching may be performed without interrupting the signal from a computer system to a peripheral device. |

### a.  The Plain Language Of Claim 1 Supports Belkin

Belkin's construction is consistent with the plain language of the claim, as well as the specification and prosecution history.  As discussed, to construe this phrase, one starts with the claim language itself.  *Phillips*, 415 F.3d at 1312-13.  Here, the claim language could not be clearer.  Claim 1 states that "the console devices can be switched either <u>synchronously</u> or <u>asynchronously</u> with the one or more than one peripheral device to the same one of the plurality of computer systems or to different ones of the plurality of computer systems, <u>without interruption</u> of the signal to the one or more than one peripheral device."  Because the entire "without interruption" phrase follows a comma, the "without interruption" clause applies to the entire previous phrase (which contains no commas) and thus requires that the "without interruption" phrase applies to both synchronous *and* asynchronous switching.

Belkin's construction captures this plain meaning because it correctly states that synchronous switching takes place when console devices and peripherals are switched from a first computer to another computer "together."  Belkin's construction is also correct because it states that asynchronous switching takes place when console devices and peripherals are switched from a first computer to another computer "separately."  This is how the '287 patent expressly defines synchronous and asynchronous switching.  Ex. B at 3:42-44.

Belkin's construction also comports with the plain language of claim 1 because it requires that both synchronous and asynchronous switching "must be performed

15

such that the data stream passing between the first computer system and the peripheral device is left unaffected at the time of switching."  Again, this is exactly what the claim says.  *See*, *e.g.*, *800 Adept, Inc. v. Murex Securities, Ltd*, 539 F.3d 1354, 1363-1364 (Fed. Cir. 2008).[16]

### b.  The Specification Supports Belkin's Construction

As the Federal Circuit holds, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).  The specification completely supports Belkin's construction.  As discussed, the '287 patent states that a KVM switch was needed that could "share any USB peripheral devices <u>without interruption of data flow to that peripheral when the switch is changed</u>, and which would switch the KVM channels and peripheral channels to a common computer or to different computers either asynchronously or synchronously."  Ex. B at 1:53-60.

According to the '287 patent's "Summary of Invention," the "present invention meets this need by providing a KVM switch" that switches KVM channels (*i.e.*, console devices) and peripheral channels "either asynchronously or synchronously without interruption of data flow to that peripheral when the switch is changed."  *Id*. at 1:64-2:4.  By identifying "the present invention" as a KVM switch that asynchronously and synchronously switches without interruption of data flow to peripherals, claim 1 is properly construed to cover such a switch.  *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) (holding that claim term properly limited to what the patent identified as the 'present invention.').

---

[16] That claim 1 uses "either…or" language is irrelevant.  It is clear that claim 1 reads on a KVM switch capable of both asynchronously and synchronously switching without interrupting data flow to the peripheral, but that the switch will not synchronously and asynchronously switch at the same time.  This is the reason for the "either…or" terminology.  *Ameranth, Inc. v. Menusoft Systems Corp*., 2010 *Markman* 1610079, 2010 WL 1610079, *6–*7 (E.D. Tex. 2010), citing *Cyrix Corp. v. Intel Corp.*, 846 F.Supp. 522 (E.D. Tex. 1994), *aff'd*, 42 F.3d 1411 (Fed. Cir. 1994).

1  The only real difference between the language of claim 1 and the "Summary Of

2  Invention" is the reversal of the words "asynchronously" and "synchronously." This

3  reversal, however, demonstrates that Belkin's construction is correct since ATEN

4  cannot credibly argue that the ordering of the words "asynchronously" and

5  "synchronously" in claim 1 somehow affects the "without interruption" requirement or

6  makes the "without interruption" requirement apply only to asynchronous switching.

7  **c.  The Prosecution History Further Confirms That Both
    Synchronous And Asynchronous Switching Require
8  Uninterrupted Data Flow to Peripherals**

9  As discussed, the entirety of the 'wherein' clause being construed was added to

10 claim 1 to distinguish over the prior art. Ex. E, pp. 246, 251 (03/06/2005

11 Amendment). Moreover, in its remarks in the same Amendment, ATEN's attorney

12 repeatedly stressed that the invention required that asynchronous and synchronous

13 switching be performed without interrupting data flow to the peripherals. *See, e.g.*,

14 Ex. E, pp. 250-251; 255-257; 259 and 260.

15 **d.  ATEN's Construction Ignores The Claim Language, The
    Specification And The Prosecution History**

16

17 ATEN starts out by providing descriptions of synchronous and asynchronous

18 switching.[17] Incredibly, ATEN then asserts that the "without interruption" limitation

19 "refers only to asynchronous switching." ATEN Br., 18:21-22. ATEN, however,

20 never addresses the claim language and thus provides no discussion of how the words

21 of claim 1 support ATEN's construction that the "without interruption" requirement

22 applies only to asynchronous switching. As discussed above, there are no words or

23 _____

24 [17] Note that ATEN's description of "synchronous" switching is wrong. ATEN asserts
   that synchronous switching means that switching console devices and peripherals "has
25 the appearance of being done at the same time, or together." ATEN Br., 18:3-5.
   However, the portion of the '287 patent ATEN cites says nothing about synchronous
26 switching having the "appearance" of being done at the same time. Instead, the '287
   patent unambiguously states that synchronous switching means switching console
27 devices and peripherals "together." Ex. B at 3:42-44. ATEN also cites Dr. Olivier for
   support. Dr. Olivier, however, says nothing about synchronous switching having the
28 "appearance" of being done at the same time. *Olivier Decl.* ¶ 11.

17

punctuation in claim 1 that allow the "without interruption" requirement to apply only to asynchronous switching and not to synchronous switching.  By failing to even address the language of claim 1, ATEN has run afoul of Federal Circuit authority holding that claim construction starts with the claim language itself.  *Phillips*, 415 F.3d at 1313.

While ATEN ignores the claim language, it does point to two statements in the specification.  ATEN Br., 18:21-19:8.  Neither support ATEN.  The first cite, from '287 patent, 3:66-4:11, talks about switching console devices and peripherals without interruption of data flow, but does not limit the switching described to either asynchronous or synchronous switching.  That's not surprising given that the specification identified "the present invention" as a device that could switch console devices and peripherals <u>both</u> asynchronously and synchronously without interruption of data flow to peripherals.  Ex. B at 1:64-2:4.  The only other portion of the specification that ATEN cites, '287 patent, 4:29-35, describes a situation where the switch is asynchronously switching, but does not say anything about what happens during synchronous switching.  That the patent describes an asynchronous switching operation is not surprising but does not mean that that the 'without interruption' requirement in the claim applies only to such asynchronous switching.

Finally, ATEN completely ignores the prosecution history.  Given ATEN's numerous arguments during prosecution that both synchronous and asynchronous switching are performed without interruption of data flow to peripherals, ATEN's failure to address the prosecution history shows that ATEN's construction is wrong.

ATEN's last argument is that "[b]ecause synchronous switching includes switching the peripheral device, one would not expect synchronous switching to occur 'without interruption' of the signal to the peripheral device."  This is not supported by any evidence and is contradicted by claim language as well as the intrinsic evidence.[18]

---

[18] If ATEN is correct, and "one would not expect synchronous switching to occur 'without interruption' of the signal to the peripheral device," then ATEN misrepresented the technology described and claimed in the '287 patent when it

### e.  Second Diputed Claim Term:  Hub Switch Module

| Belkin's Proposed Construction | ATEN's Proposed Construction |
|---|---|
| A collection of USB hubs and one or more switches that switch USB signals from the computer systems' USB busses to the USB peripheral devices, and for passing the signals from the emulated console devices from the device control module through the USB hubs to the computer systems. | Bridge between one or more peripheral devices and one or more computers. |

### f.  The Language Of The Claim And The Specification Support Belkin

There is no dispute that the term "hub switch module" does not have an understood meaning in the KVM switch industry.  *Olivier Decl.* ¶ 12; *Dezmelyk Decl.* ¶ 124.  However, the words making up the term -- hub, switch, and module -- all have well understood meanings and demonstrate that Belkin's construction is correct.

The language of the term itself indicates that whatever the 'hub switch module' is, it must <u>switch</u> <u>hubs</u>.  Thus, the first issue is what type of hub is switched.  While the claim does not explicitly say that a '*USB* hub' is required, in the context of the '287 patent no other 'hub' makes sense.  There are only two commonly known "hubs."  The first hub provides connections to USB busses.  *See, e.g.*, Universal Serial Bus Specification (Ex. S, p. 672).  *See also*, *Dezmelyk Decl.* ¶ 125.  The other type of hub is used in Ethernet networks.  *Dezmelyk Decl.* ¶¶ 130-31. The only type of hub described in the patent is a USB hub.  Ex. B at 4:51-67; 5:1-13; 5:31-33.

Moreover, in the context of claim 1, the only conclusion that can be drawn is that the hub switch module is a '*USB* hub switch module.'  The reason is that claim 1 also recites a "device control module" and a "host control module."  In addition to the fact that the patent describes these two claim elements as USB devices (*see, e.g.*, Ex. B at 5:14, 5:20, 5:48; 5:53), there in fact are devices in the field known as "USB

provided its "simple example," quoted above, showing how its invention allowed synchronous switching of console devices and a printer (the peripheral) without interruption of the data stream to the printer.  *See* Ex. E, p. 257.

19

1    device controllers" and "USB host controllers.  *Dezmelyk Decl*. ¶¶ 126, 128 and Exs.

2    X, Y.  There are no analogous devices in Ethernet or other fields.  *Dezmelyk Decl*.

3    ¶¶ 130-32.  Claim terms must be read in the context of the entire claim, which here

4    demonstrates that the claim is limited to USB hubs.  *See Hockerson-Halberstadt, Inc.*

5    *v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999).

6            Finally, the patent states that the "present invention" is a KVM switch that can

7    "share any USB peripheral device."  Ex. B at 1:64-67.  A USB hub would be required

8    to share USB peripheral devices.  *Dezmelyk Decl*. ¶ 132.  Having defined its invention

9    in the "Summary of Invention," ATEN cannot attempt to construe its claim to cover

10   anything other than what the specification supports.  *Honeywell Int'l, Inc. v. ITT*

11   *Indus., Inc.*, 452 F.3d 1312, 1319-20 (Fed. Cir. 2006); *Microsoft Corp. v. Multi-Tech*

12   *Sys.*, 357 F.3d 1340, 1347-49 (Fed. Cir. 2004); *SciMed*, 242 F.3d at 1342-45.

13           The construction should also be consistent with the understanding of the word

14   "hub" in the field.  As discussed, the USB specification itself defines a "hub" as a

15   USB device that provides additional connections to the universal serial bus.  *See, e.g.*,

16   Ex. S, p. 672.  *See also*, *Dezmelyk Decl*. ¶ 125.  Belkin's construction incorporates this

17   understanding because it requires that the 'hub switch module' switch USB signals

18   from the computer systems' USB busses to the USB peripheral devices.

19           The next word in this term is "switch."  Given this, the construction must

20   include the concept of switching, which Belkin's construction includes (and ATEN

21   leaves out).

22           The final word in this claim term is "module."  An exemplary technical

23   dictionary defines a "module" as a "packaged assembly of wired components…"  *See*

24   Ex. R at 667.  This definition is consistent with the word's use by engineers.  *See*

25   *Dezmelyk Decl*. ¶ 124.  Belkin's construction incorporates this understanding of the

26   term "module" because it requires that the "hub switch module" be a "collection of

27   USB hubs and one or more switches."  Belkin's construction also comports with the

28   specification of the '287 patent, which states that the 'hub switch module' is made

20

with USB hubs and matrix analog switches.  Ex. B at 5:7-9.

Finally, claim 1 requires that the 'hub switch module' be connected to the "device control module."  Claim 1 states that the device control module emulates the console devices.  Ex. B at 8:1-3.  Because the device control module is connected to the hub switch module, it is clear that the emulated console device signals are sent to the hub switch module.  Since the 'hub' is the device within the 'hub switch module' that provides connections to the USB busses going to the computer systems, these hubs must pass the emulated console device data.  *Dezmelyk Decl.* ¶ 127.  This is seen in Figure 4, where the emulated console device signals are sent from the USB device control module 38 to the hub switch module 32, which in turn connects the emulated signals to a USB bus communicating with the computer systems.  *Id.* at ¶ 127.

### g.  ATEN's Construction Ignores The Claim Language, The Specification And The Prosecution History

ATEN's construction is nothing more than an incomplete quote from the specification that ignores the words of the term, the context of claim 1 and the purpose of the hub switch module.  ATEN's most obvious error is ignoring that the term 'hub switch module,' *by its own words*, requires 'switching.'

ATEN argues that the hub switch module should not be limited to a USB hub switch module.  While ATEN admits that the '287 patent only discloses a *USB* hub switch module, it argues that the claim only recites a "generic" hub switch module.  ATEN Br. 20:4-5.  While ATEN's brief is silent in this regard, its expert says that the claim might be directed to an Ethernet hub switch module.  *Olivier Decl.* ¶ 12.  Dr. Olivier, however, never attempts to show how an "Ethernet hub switch module" would work.  Suffice to say, there is no way an Ethernet device could operate as required by claim 1, as Mr. Dezmelyk explains.  *Dezmelyk Decl.* ¶¶ 130-32.

Finally, ATEN's construction ignores the fact that the signals from the console devices have to get to the computer systems and that the patent teaches that the only way to do that is through the hubs in the USB hub switch module.  Ex. B at 5:1-41.

### 3. Third Disputed Claim Term:  Such that a Signal Passing from the Hub Switch Module to the One or More than One Peripheral Device Emulates Origination from a Computer

| Belkin's Proposed Construction | ATEN's Proposed Construction |
|---|---|
| The signal passing from the hub switch module to the peripheral device imitates the signal originating from the connected computer system and is generated by a computer program built into the CPU. | Such that the signal passing from the hub switch module to a peripheral device has the appearance of originating from a connected computer system. |

#### a. The Claim Language And The Specification Supports Belkin

Claim 1 states that *signals* passing from the hub switch module to the peripherals "emulates origination from a computer.  Even putting aside the impossibility of "a signal" emulating anything (rather, a hardware device running an emulation computer program "emulates", *Dezmelyk Decl.* ¶ 133), claim 1 must require that *something* be done to the signal before it is sent to the peripheral so that it looks like it came from a computer.  To the extent the claim term makes any sense at all, Belkin's construction captures the bizarre concept of the claim term because Belkin's construction requires that the signal "imitates" the signal originating from the connected computer system.  In the electrical engineering field, "emulation" means "imitate".  *See* Ex. V, p. 725.

The specification also supports Belkin because it teaches that "a USB emulation program suitable to make a switch appear as a PC to peripheral devices, and enable the switch to communicate with USB devices or USB PCs at the same time."  Ex. B at 7:40-45.  Given that the claim language requires that signals emulate origination from a computer, and the fact that signals cannot emulate anything, reference to the specification for guidance is appropriate to resolve the ambiguity.  *Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1336 (Fed. Cir. 2006) ("Where claim terms are ambiguous or disputed, then we turn to the specification….").[19]

---

[19] The only other possibility is that the term is indefinite, rendering claim 7 invalid.

### b. ATEN's Construction Ignores The Claim Language, The Specification And The Prosecution History

ATEN's construction is wrong because it reads out the limitation.  By construing the phrase to mean that signals passing from the hub switch module to the peripheral "have the appearance of originating from a connected computer system," ATEN's construction covers the <u>actual</u> signal sent from the computer since a signal sent from the computer system would "have the appearance of originating from a connected computer system" but would not "emulate origination from a computer" since it in fact came from the computer.  ATEN's proposed construction is thus nonsensical.

### 4.   Fourth Disputed Claim Term:  Means for Switching the Selected Console Device Between the First Channel and the Third Channel Without Interruption of the Data Flow Through the Second Channel Between the First Selected Computer System and the Selected Peripheral Device

| Belkin's Proposed Construction | ATEN's Proposed Construction |
|---|---|
| Function: Switching, both synchronously and asynchronously, the selected console device between the first channel and the third channel without interruption of the data flow through the second channel between the first selected computer system and the selected peripheral Structure:<br><br>(i) a USB hub switch module (32), which is a plurality of USB hubs interconnected with a matrix analog switch, under the control of firmware executing in the CPU (30);<br><br>(ii) a USB device control module (38), which is one USB device controller, which emulates the console devices, for each host PC connection, under the control of firmware executing in the CPU (30);<br><br>(iii) a USB host control module (44), including a root hub (46) which is a USB host controller chip, under the control of the firmware executing in CPU (3), | Function:  switching the selected console device between the first channel and the third channel without interruption of the data flow through the second channel between the first selected computer system and the selected peripheral device<br><br>Structure:  Either: (1) the combination of a KVM switch and a peripheral sharing switch; or (2) the combination of a hub switch module, a device control module and a CPU. |

23

| | |
|---|---|
| where the firmware has the algorithm depicted in Figure 5; and | |
| (iv) a CPU (30) running firmware, where most of the algorithm of is not disclosed. | |

### a.  Construction Of Means Plus Function Claim Terms

The 'means for switching' element of claim 7 is written in "means plus function" form pursuant to 35 U.S.C. § 112 ¶ 6.  Construction of a means plus function limitation requires (1) identifying the claimed function, and (2) determining the corresponding structure disclosed in the specification.  *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1308 (Fed. Cir. 1998).

The only difference between the parties' identification of function is that Belkin requires the "means for switching" to <u>both</u> asynchronously and synchronously switch console devices and peripherals without interruption of signal flow through the second channel while ATEN is silent in this regard.  However, as discussed above, every embodiment in the '287 patent requires both asynchronous and synchronous switching of console devices and peripherals without interruption of signal flow, and no words in claim 7 limit the switching to either synchronous or asynchronous switching.

The prosecution history further compels this construction.  In particular, when faced with the PTO's obviousness rejection of claim 7, ATEN argued that the 'means for switching' included synchronous switching[20] without interrupting data flow to the peripheral.[21]  ATEN's argument led to allowance of claim 7, with the Examiner explicitly saying this is why claim 7 was allowed.[22]

---

[20] The words of the 'means for switching' also cover asynchronous switching.

[21] Aten argued "… neither Thomas et al. nor Dickens et al., alone or in combination, teach nor fairly suggest a switch wherein the console devices **can be switched synchronously** with peripherals, **without interruption of the signal to the peripheral devices**" (emphasis added).  Ex. E, at 260.

[22] The Examiner's "Reasons for Allowance" were that "[t]he instant application is deemed to be directed to an unobvious improvement over [Thomas and Dickens].  The improvement features … a plurality of console devices compliant with an industrial standard and one or more than one peripheral device in any of a plurality of computer

24

1    Having successfully argued that the 'means for switching' in claim 7 requires

2   synchronous switching without interruption of signals to the peripheral, ATEN cannot

3   now argue that the element does not require this functionality.  *Graham v. John Deere*

4   *Co.*, 383 U.S. 1, 33 (1966) ("claims that have been narrowed in order to obtain the

5   issuance of a patent by distinguishing the prior art cannot be sustained to cover that

6   which was previously by limitation eliminated from the patent"); *see also*, *Housey*

7   *Pharms., Inc. v. Astrazeneca UK Ltd.*, 366 F.3d 1348, 1354 (Fed. Cir. 2004).

8    In an apparent attempt to remove the asynchronous/synchronous switching

9   'without interruption' functionality, ATEN has treated the 'without interruption'

10   language separately from the 'means plus function' language. ATEN Br., 24:1-25:14.

11   Regardless of the impropriety of this, ATEN's analysis does not stand up to scrutiny.

12   Firstly, the claim language itself is not limited to either asynchronous or synchronous

13   switching.  The language only refers to switching the console devices from a first

14   channel to a third channel without interrupting data flow through the second channel

15   (*i.e.*, the data sent to the peripheral).  Nowhere in the claim are there any words

16   limiting this to asynchronous switching, as ATEN suggests.  Moreover, ATEN's sole

17   citation to the specification (ATEN Br., 25:3-14) does not help it, as this quote says

18   nothing about whether the switching described there is limited to asynchronous or

19   synchronous switching, or whether it applies to both.

20    Finally, ATEN fails to cite to anything from the prosecution history.  This is

21   understandable since the prosecution history completely contradicts ATEN's position.

22    With respect to the structure, the proper construction is required by law to be the

23   identical structure described in the patent for performing the recited function (and

24   equivalents thereof).  35 U.S.C. § 112, ¶ 6; *see also Commonwealth Sci. & Indus.*

25

26   system include a console device can be **switched either synchronously or
**asynchronously** with one or more than one peripheral device to the same one of the
27   plurality of computer system or to different ones of the plurality of computer systems,
**without interruption** of the signal to one ore [sic] more than one peripheral device
28   (**claims** 1 **and 7**)  (emphasis added)  Ex. E, p. 277.

25

1   *Research Organisation v. Buffalo Tech. (USA), Inc.*, 542 F.3d 1363, 1383 (Fed. Cir.

2   2008). Claim 7's 'means for switching' switches console devices and peripherals

3   between the recited first, second and third channels. Because of this, the structure

4   must include all the structures involved in switching these channels, which are the

5   specific structures identified for the USB hub switch module 32, USB device control

6   module 38, USB host control module 44, and CPU 30. *Dezmelyk Decl.* ¶ 139.

7   This is seen in annotated Figure 4 to the right, where the first channel is shown

8   in purple, the second channel is

9   shown in orange, and the third

10  channel is shown in blue. Figure

11  4 shows black boxes for each

12  component making up the 'means

13  for switching." However, the

14  specification describes the details

15  of these black boxes. In

16  particular, the patent states that

17  the USB hub switch module 32 is

18  made up of USB hubs and matrix

19  analog switches, which are

20  controlled by CPU firmware.



21  '287 patent, 5:7-9. *See also*,

22  *Dezmelyk Decl.* ¶ 143. The patent discloses that USB device control module is

23  constructed with USB device chips (*i.e.*, USB device controllers) controlled by CPU

24  firmware. Ex. B at 5:14-27. *See also*, *Dezmelyk Decl.* ¶ 139. The '287 patent does

25  not specifically identify what structure makes up the USB host control module 44.

26  However, USB host controller chips were well known at the time the '287 patent was

27  filed and Belkin assumes this is what ATEN meant. *See Dezmelyk Decl.* ¶ 140-141.

28  A significant problem with the '287 patent is that the patent teaches that the

1   USB hub switch module and the USB device control module are controlled by CPU

2   firmware (*i.e.*, an algorithm running in the CPU) (Ex. B at 5:1-41), but does not

3   disclose any algorithm for the switching functionality required by the claim.[23]   Yet, the

4   Federal Circuit holds that the structure for a means-plus-function limitation

5   implemented by a CPU must include not only the CPU, but also the algorithm

6   disclosed in the specification that runs on a CPU for performing the claimed function.

7   *WMS Gaming, Inc. v. International Game Tech*., 184 F.3d 1339, 1348-9 (Fed. Cir.

8   1999); *see also Harris Corp. v. Ericsson Inc*., 417 F.3d 1241, 1253 (Fed. Cir. 2005).

9   CPU-implemented means plus function elements cannot be construed to cover either

10  the CPU alone or the CPU configured with any arbitrary algorithm.  *Harris*, 417 F.3d

11  at 1254; *WMS Gaming*, 184 F.3d at 1348.

12          **(1)   ATEN's Identification Of Structure Is Incorrect**

13          Both of ATEN's proposed possible structures are incorrect.  ATEN's first

14  proposed "structure"—a combination of a KVM switch and a peripheral sharing

15  switch—is smoke and mirrors.  The patent says nothing about what structures (*i.e.*,

16  specific components) actually make up the KVM and peripheral sharing switches.

17  *Dezmelyk Decl*. ¶¶ 140-41.  The figures are equally silent, with Figure 1 only showing

18  a black box switch 10.  *Id*.  Thus, the first "structure" ATEN identifies cannot perform

19  the recited functionality since it is impossible to know what the structure actually is.

20          ATEN's second "structure" is similar to Belkin's in that it requires a hub switch

21  module, a device control module and a CPU.  However, ATEN's 'structure' is

22  incomplete.  ATEN's own expert admits that the term "hub switch module" has no

23  specific meaning to those in the field.  *Olivier Decl*. ¶ 12.  This means that the term

24  "hub switch module" does not connote a particular structure and reference to the

25  specification is required.  *Novartis Pharms. Corp. v. Abbott Labs*., 375 F.3d 1328,

26  _____

27  [23] In contrast with the hub switch and device control modules, the '287 patent does disclose the firmware's algorithm that controls the host control module.  *See* Ex. B at Fig. 5 and 6:19-7:4.  This algorithm is part of Belkin's recitation of the required

28  structure for the host control module.  *See Dezmelyk Decl*. ¶ 146.

1334 (Fed. Cir. 2004).  Belkin's construction is thus correct, because it identifies the disclosed USB hubs and matrix analog switches along with the CPU firmware as the structure.  The same is true for the "device control module" in that it has no meaning to those in the field.  *Dezmelyk Decl*. ¶ 141.  Thus, the <u>specific</u> structure disclosed in the '287 patent, *i.e.*, the device controller chips under the control of CPU firmware must define the structure.  Finally, ATEN's structure is also incomplete because while it identifies the CPU, ATEN fails to identify the algorithm running on the CPU that performs the claimed function.  *WMS Gaming*, 184 F.3d at 1348-9.

Finally, ATEN's construction does not include the USB host control module 44. This is plainly wrong, since it is not possible to establish either a first or third channel from the console devices to the computers without them.

## IV.   CONCLUSION

For the reasons discussed in this brief, Belkin respectfully requests that the Court adopt Belkin's proposed claim constructions.

DATED:  April 18, 2011                    DICKSTEIN SHAPIRO LLP


                                           By:   */s/ Jeffrey A. Miller*
                                                 Robert W. Dickerson
                                                 Yasser M. El-Gamal
                                                 Jeffrey A. Miller
                                                 Attorneys for Belkin International, Inc. and
                                                 Belkin, Inc.