1  John P. Schnurer (SBN 185725)
   jschnurer@perkinscoie.com
2  Matthew C. Bernstein (SBN 199240)
   mbernstein@perkinscoie.com
3  Cheng C. Ko (SBN 244630)
   jko@perkinscoie.com
4  Patrick J. McKeever (SBN 268763)
   pmckeever@perkiscoie.com
5  PERKINS COIE LLP
   11988 El Camino Real, #200
6  San Diego, CA 92130-3334
   Telephone:  858.720.5700
7  Facsimile:  858.720.5799

8  Attorneys for Plaintiffs
   ATEN INTERNATIONAL CO., LTD.
9  and ATEN TECHNOLOGY, INC.

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12                   SOUTHERN DIVISION

13

14  ATEN INTERNATIONAL CO., LTD.        Case No. 8:09-CV-843 AG (MLGx)
    and ATEN TECHNOLOGY, INC.,
15                                       PLAINTIFFS ATEN
                    Plaintiffs,          INTERNATIONAL CO., LTD. AND
16                                       ATEN TECHNOLOGY, INC.'S
            v.                           REPLY CLAIM CONSTRUCTION
17                                       BRIEF
    EMINE TECHNOLOGY CO., LTD.,
18  BELKIN INTERNATIONAL, INC.,          Date:      May 9, 2011
    and BELKIN, INC.,                    Time:      10:00 a.m.
19                                       Judge:     Hon. Andrew J. Guilford
                    Defendants.          Ctrm:      10D
20

21

22

23

24

25

26

27

28

I.    INTRODUCTION ...................................................................................... 1

II.    THE DISPUTED TERMS ......................................................................... 1

    A.    '112 Patent ..................................................................................... 1

        1.    "body" ................................................................................ 1

            a.    The Language of the Claims Supports ATEN's Construction of "Body" ....................................... 2

            b.    The '112 Patent Specification Supports ATEN's Construction ....................................................... 4

            c.    The Prosecution History Supports ATEN's "Body" Construction ............................................. 8

            d.    Belkin's Limited Authority Is Easily Distinguishable .... 10

        2.    "integrated into" / "integrating…into" / "fixedly attached" ....... 12

    B.    '287 Patent .................................................................................. 12

        1.    "wherein the console devices can be switched either synchronously or asynchronously with the one or more than one peripheral device to the same one of the plurality of computer systems or to different ones of the plurality of computer systems, without interruption of the signal to the one or more than one peripheral device" (Claim 1) ...................................... 12

        2.    "hub switch module" (Claim 1) ................................................. 16

        3.    "such that a signal passing from the hub switch module to the one or more than one peripheral device emulates origination from a computer" (Claim 1) ....................................................... 18

        4.    "means for switching the selected console device between the first channel and the third channel without interruption of the data flow through the second channel between the first selected computer system and the selected peripheral device" (Claim 7) .................................................................................. 19

            a.    The Federal Circuit says the claim language sets forth the function, yet Belkin tries to add additional limitations. ..................................................... 19

            b.    The structure is cleanly set forth in the '287 Patent, and Belkin's attempt to weight this simple structure down with extraneous limitations should be rejected. ..................... 20

        5.    "without interruption of the data flow through the second channel" (Claim 7) ..................................................................... 22

III.    CONCLUSION ......................................................................................... 23

1

## Table of Authorities

2

**Page(s)**

3

CASES

4

*Allvoice Computing PLC v. Nuance Communications, Inc.*,
    504 F.3d 1236 (Fed. Cir. 2007) ...................................................................... 4

5

6

*Aquatex Indus., Inc. v. Techniche Solutions*,
    419 F.3d 1374 (Fed. Cir. 2005) .................................................................... 11

7

8

*Astrazeneca AB v. Mutual Pharma. Co.*,
    384 F.3d 1333 (Fed. Cir. 2004) ............................................................. 10, 11

9

10

*Asyst Techs., Inc. v. Empak, Inc.*,
    268 F.3d 1364 (Fed. Cir. 2001) .................................................................... 22

11

12

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*,
    334 F.3d 1294 (Fed. Cir. 2003) ............................................................. 17, 19

13

14

*C.R. Bard v. U.S. Surgical Corp.*,
    388 F.3d 858 (Fed. Cir. 2004) ...................................................................... 11

15

16

*Ecolab, Inc. v. FMC Corp.*,
    569 F.3d 1335 (Fed. Cir. 2009) .................................................................... 14

17

18

*Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*,
    508 F.3d 1366 (Fed. Cir. 2007) .................................................................... 15

19

20

*EOLAS Techs. Inc. v. Microsoft Corp.*,
    399 F.3d 1325 (Fed. Cir. 2005) ................................................... 6, 16, 20, 21

21

22

*Eon Corp. IP Holdings, LLC v. Sensus USA Inc.*,
    No. 6:09-cv-116, 2010 WL 3199630 (E.D. Tex. Aug. 11, 2010) ................ 22

23

24

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*,
    No. C 03-1431, 2005 WL 6220105 (N.D. Cal. Mar. 2, 2005) ..................... 22

25

26

*Gemstar-TV Guide Int'l, Inc. v. ITC*,
    383 F.3d 1352 (Fed. Cir. 2004) .................................................................... 22

27

28

*Golight, Inc. v. Wal-Mart Stores, Inc.*,
    355 F.3d 1327 (Fed. Cir. 2004) ........................................................ 12, 13, 16, 19

*Hewlett-Packard Co. v. Bausch & Lomb Inc.*,
    909 F.2d 1464 (Fed. Cir. 1990) ................................................................. 18

*IMS Tech., Inc. v. Haas Automation, Inc.*,
    206 F.3d 1422 (Fed. Cir. 2000) ............................................................. 14, 15

*Kara Technology Inc. v. Stamps.com Inc.*,
    582 F.3d 1341 (Fed. Cir. 2009) ................................................................... 4

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004) ............................................................ passim

*MoneyIN, Inc. v. VeriSign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008) .................................................................. 22

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003) .................................................................. 19

*On Demand Machine Corp. v. Ingram Indus., Inc.*,
    442 F.3d 1331 (Fed. Cir. 2006) .................................................................. 12

*Paice LLC v. Toyota Motor Corp.*,
    504 F.3d 1293 (Fed. Cir. 2007) ................................................................. 7, 8

*Paragon Solutions, LLC v. Timex Corp.*,
    566 F.3d 1075 (Fed. Cir. 2009) .................................................................. 18

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ........................................................... 2, 4, 10

*Saunders Group, Inc. v. Comfortrac, Inc.*,
    492 F.3d 1326 (Fed. Cir. 2007) ................................................................... 8

*SciMed Life Sys., Inc. v. Adv. Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001) ............................................................. 10, 17

*Stanacard, LLC v. Rebtel Networks, AB*,
    680 F. Supp. 2d 483 (S.D.N.Y. 2010) ......................................................... 22

*Texas Instruments Inc. v. Cypess Semiconductor Corp.*,
  90 F.3d 1558 (Fed. Cir. 1996) ......................................................................... 1

*Ventana Med. Sys. v. BioGenex Labs., Inc.*,
  473 F.3d 1173 (Fed. Cir. 2006) .................................................................. 5, 7

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
  503 F.3d 1295 (Fed. Cir. 2007) .................................................................. 15

**STATUTES**
  35 U.S.C. § 112(6) ........................................................................................ 21

**OTHER AUTHORITIES**
  S. Rep. No. 1298, 93d Cong., 2d Sess. 196 (1974), *reprinted in* 1974
  U.S.C.C.A.N. 7186 .......................................................................................... 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    **I.     INTRODUCTION**

2          Belkin ignores the claim language, specifications, and file histories of the

3    asserted patents.  Instead, Belkin merely wants the Court to rubber stamp the non-

4    binding decision of the ITC on the '112 patent, and wants the Court to read

5    unsupported and incomprehensible limitations into the claims of the '287 patent.

6    For the reasons set forth below, ATEN respectfully requests the Court construe the

7    terms-at-issue in a manner consistent with ATEN's requested constructions, a

8    manner consistent with the claim language and intrinsic evidence.

9    **II.    THE DISPUTED TERMS**

10         **A.     '112 Patent**

11                **1.     "body"**

12         The parties dispute what the simple term "body" means.  ATEN proposes a

13   construction of body that is consistent with the claim language, specification, and

14   file history:  "An enclosure having one or more connector port openings and an

15   internal switching circuit."

16         Belkin, on the other hand, ignores the claim language, the specification, and

17   prosecution history of the '112 patent.  In an attempt to confuse all involved, Belkin

18   does not even propose a construction for the term body, but instead merely

19   proposes what is *not* a body.[1]  Belkin's sole support for its non-construction is:  The

20   ITC did it, and so this Court must too.  Belkin is wrong.  *Texas Instruments Inc. v.*

21   *Cypess Semiconductor Corp.*, 90 F.3d 1558, 1568-69 (Fed. Cir. 1996) ("ITC

22   decisions are not binding on district courts."); S. Rep. No. 1298, 93d Cong., 2d

23   _____

24   [1] In passing in its brief, buried in footnote 6, Belkin appears to actually suggest a construction for "body" of:  "A single integral enclosure that encapsulates the internal circuit board."  If this is Belkin's actual proposed construction, then Belkin offers *no* support for it.  It is nonsensical and convoluted, and

25   would confuse the jury.  What is a "single integral enclosure" in Belkin's half-hearted proposal?  What does it mean to "encapsulate" in that proposal?  The only thing one can glean from Belkin is that it believes a fundamental purpose of the body is to protect the circuit board.  Belkin, moreover, fails to

26   advise the Court that this proposed construction is *not* the construction of the Commission in the ITC. While the ITC Commission did (incorrectly) find disavowal, it did *also* construe the term "body" as "an

27   enclosure for an internal circuit board."  Exh. 1 to Decl. of Michael J. Engle in Support of ATEN's Reply Claim Construction Brief ("Engle Decl."), Commission Decision at 7.  In summary, Belkin follows the

28   ITC decision only when it wants to.

1  Sess. 196 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7186, 7329 ("The Commission's
2  findings neither purport to be, nor can they be, regarded as binding interpretations
3  of the U.S. patent laws.").

4    **a.    The Language of the Claims Supports ATEN's Construction of "Body"**

5

6    Claims 1 and 21 claim a body.  It is not disputed that *in these two claims*
7  *themselves*, there is no further limitations on body.  It is also not disputed that *none*
8  of the claims in the '112 patent mention the word "screws."  Belkin's argument is
9  that statements in the specification limit the term body, and preclude the use of
10  screws in that body.  Belkin's position initially misses the mark because it fails to
11  recognize that "body" is a simple term as used in the '112 patent and its claims, and
12  should be construed as such.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed.
13  Cir. 2005) ("In some cases, the ordinary meaning of claim language as understood
14  by a person of skill in the art may be readily apparent even to lay judges, and claim
15  construction in such cases involves little more than the application of the widely
16  accepted meaning of commonly understood words.").  While KVMs may be new
17  technology to the Court, what the body of an electronic device is, is not.

18    While the parties do not dispute that the actual language of claims 1 and 21
19  does not impose any additional limitation on the term "body," the parties do dispute
20  the impact of the additional limitations on "body" found in certain dependent
21  claims.  For example, claims 2, 3, 4, 5, 6, and 7 all further define the term body.
22  ATEN contends that these additional limitations narrow independent claim 1 on
23  which these claims depend.  Belkin, however, contrary to the well established
24  doctrine of claim differentiation, contends that the additional language of these
25  dependent claims is *irrelevant*.

26    As discussed repeatedly throughout, the specification only mentions the word
27  "screws" once, in passing.  In order to make its disavowal argument, Belkin must
28  therefore point to statements in the specification concerning what it contends every

"body" of the '112 patent must look like or possess.  Belkin outlines these mandatory characteristics of a "body" on page 7 of its brief.

- In the first bullet point on page 7, Belkin says every body in the '112 patent must be made of injection-molded plastic.  Independent claim 1 (and 21) does not mention "injection-molded plastic."  Dependent claim 3, however, includes the "injection-molded plastic" limitation.

- In the second bullet point on page 7, Belkin says every body in the '112 patent must include a circuit protecting layer for enclosing the circuit board.  Independent claim 1 (and 21) does not mention a "circuit protecting layer for enclosing the circuit board."  Dependent claim 2, however, includes a "circuit-protecting layer surrounding the switching circuit."

- In the third bullet point on page 7, Belkin says that every body in the '112 patent must include plastic material that has a circuit protecting layer with a low melting point.  Independent claim 1 (and 21) does not mention a low melting point.  Dependent claim 4 does, however, explicitly claim a circuit protecting layer with a low melting point.

- In the fourth bullet point on page 7, Belkin states that every body must have good strength and high rigidity.  Independent claim 1 (and 21) does not mention anything about strength or rigidity in the body.  Dependent claim 6, however, explicitly claims a rigid outer surface.

- In the fifth bullet point, Belkin states that every body in the '112 patent must have an anti-slipping layer.  Independent claim 1 (and 21) does not mention anything about an anti-slipping layer.  Dependent claims 7 and 8, however, explicitly claim an anti-slipping layer.

The above illustrates the inappropriateness of Belkin's claim construction position on body.  *All* of the things it contends must be part of a body, are specifically claimed in the *dependent* claims of the '112 patent.  If these limitations

were already found in the body of claim 1, as Belkin contends, then these dependent claims would be *completely irrelevant and completely superfluous*.  The Federal Circuit, however, *enforces a presumption* that each and every claim in a patent has a different scope.  *Allvoice Computing PLC v. Nuance Communications, Inc.*, 504 F.3d 1236, 1247-48 (Fed. Cir. 2007).  Where a dependent claim adds a particular limitation, there is a presumption that the limitation is not found in the independent claim.  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004).  Where the limitation is found in the dependent claim, and not the independent claim, and a party is trying to read the limitation into the independent claim, the doctrine of claim differentiation is at its strongest.  *Id.*  Independent claims should be given broader scope than a dependent claim in order to avoid rendering the dependent claim redundant.  *Phillips*, 415 F.3d at 1324-25.

When the '112 inventor wanted to restrict the claims to require a particular type of body or feature of a body, he did so explicitly, in dependent claims 2-7.  *See Kara Technology Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1347 (Fed. Cir. 2009).  If these particular types of bodies or features of bodies are construed to already be required by the term "body" in claim 1, then dependent claims 2-7 would be meaningless, contrary to law.  Given Belkin is proposing a construction for body that is contrary to law, it is not surprising that Belkin offers no explanation why claim differentiation does not sink its proposed construction for "body."

**b.     The '112 Patent Specification Supports ATEN's Construction**

The fight over "body" is really a fight over "screws."  Even though the term "screws" is used only once in passing in the '112 patent specification, and even though the term "screws" does not appear anywhere in the actual claims of the '112 patent, and even though the presence or absence of screws (or a body) was never an issue during prosecution because this was not the invention, Belkin has made this claim construction dispute, and really the entire '112 patent dispute, about "screws."

The specification does not support Belkin's contention that ATEN disavowed bodies with screws.  As mentioned, the specification mentions the word "screws" a single time, and does so in passing.  Specifically, the specification states:  "*In most cases*, the box 41 includes outer walls that are made of metal material or rigid plastic material and assembled together by means of screws (not shown)."  D.I. 274-2, '112 Patent at 1:23-25.  That's the only time the '112 patent references screws, unquestionably establishing this patent is *not* about body screws.[2]  Screws are so unimportant to the '112 patent that they were *not* even depicted in Figure 1.  There cannot be a disavowal of screws because nowhere is there any express and explicit disavowal of bodies containing screws.  *Liebel-Flarsheim*, 358 F.3d at 909.

Moreover, Belkin's argument that ATEN disavowed screws is rebutted because several of the explicitly described features of the box-style switch were quite clearly carried over into the new switch.  For example, like the box-style switch, the claimed switch includes an internal circuit board.  *See, e.g.,* D.I. 274-2, '112 Patent at 1:39-42 ("The automatic switch includes a main body … enclosing an internal circuit board.").  The claimed switch may also have connector ports on its peripheral walls.  *Id.* at 2:23-25 ("[T]he automatic switch 10 includes a main body 20 having connector ports provided on external walls thereof.").  The claimed switch could also be formed from rigid plastic material.  *Id.* at 2:53-55 ("The outer case 22 … is made of a plastic material that shows high strength and high rigidity.").  There is thus no reason to assume the inventor, having embraced several aspects of the box-style switch *in the preferred embodiment*, intended to reject any and all use of screws in the body of the claimed switches.  *See Ventana Med. Sys. v. BioGenex Labs., Inc.*, 473 F.3d 1173, 1180 (Fed. Cir. 2006) (finding patent's discussion of prior art usage of "sip and spit" dispensing did not amount to

---

[2] Tellingly, the specification does not say all prior art is as depicted but instead uses the word "in most cases," providing further proof that the applicant did not intend to disavow *all* bodies or *all* features of a particular type of body.

1    disavowal, especially where other expressly identified features of the prior art were

2    employed by the preferred embodiment).

3         Belkin also claims that the inventor's criticism of the prior art switch was so

4    significant that it gives rise to disavowal.  The specification, however, does not

5    support Belkin.  In the background of the invention, ATEN did describe a prior art

6    switch.  ATEN did not, however, compare the prior art switch to any features of the

7    claimed invention.  Instead, ATEN merely pointed out that the *shape* of the prior art

8    switches and how they tended to be positioned caused them to fall.  This has

9    nothing to do with the present case.  *See EOLAS Techs. Inc. v. Microsoft Corp.*, 399

10   F.3d 1325, 1337 (Fed. Cir. 2005) (finding no disclaimer based on statements merely

11   describing features of prior art reference where those features were not the basis for

12   distinguishing the prior art).  ATEN also pointed out that the prior art switches

13   *tended* to have problems with humidity.[3]  But this was only one of several

14   objectives of the '112 patent invention.  *See Liebel-Flarsheim*, 358 F.3d at 908-09

15   ("The fact that a patent asserts that an invention achieves several objectives does

16   not require that each of the claims be construed as limited to structures that are

17   capable of achieving all of the objectives.").

18        In the summary of the invention section, and throughout the rest of the

19   specification (and during prosecution as well), it is apparent that the primary aspect

20   of the '112 invention were the cables directly extending from the body (i.e., the

21   fixedly attached / integrated cables discussed below).  And in the *single instance*

22   where the specification specifically compares the prior art to the claimed invention,

23   the applicant stated:

24            In brief, the automatic switch 10 of the present invention
             uses the main body 20 *having cable-connected connector*
25            *sets* 30 *to replace* the conventional box-type switch 40,
             enabling the switch 10 to be used in a more convenience
26            manner.

27

28   _____
     [3] This particular problem was addressed by *dependent* claims 2-7.

1    D.I. 274-2, '112 Patent at 3:9-13.  While the paragraph does go on to discuss other

2    aspects of the invention, these are secondary to the above-quoted connected cables.

3    And tellingly, nowhere in this section is there any discussion of screws.

4         The "criticism" of the prior art in this case is similar to that in *Ventana*.  In

5    *Ventana*, the "BACKGROUND ART" section of the asserted patent included

6    general statements directed at the shortcomings of prior art devices including those

7    that practiced "sip and spit" dispensing method for staining microscope slides.

8    *Ventana*, 473 F.3d at 1181.  The specification further indicated that it was "an

9    object of the invention to provide a device which provides more rapid, reliable and

10   more reproducible results than standard methods." *Id.*  The Federal Circuit reversed

11   the district court, holding that the patentee had *not* disclaimed patent scope over

12   devices practicing "sip and spit" dispensing. *Id.*  Regarding the patent's statements

13   mildly criticizing "sip and spit" dispensing, the court concluded that "[s]uch general

14   statements, without more, will not be interpreted to disclaim every feature of every

15   prior art device discussed in the 'BACKGROUND ART' section of the patent." *Id.*;

16   *see also Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1309-10 (Fed. Cir.

17   2007) (finding no disavowal based on statements that prior art gear trains were

18   "quite complex and difficult to manufacture economically" because any distinction

19   on that basis was "clearly secondary and equivocal at best").

20        Even if the statements from the background section amount to mild criticism

21   of box-style switches (see above), those statements are not even directed

22   specifically at the use of screws.  First, the specification indicates that the damage

23   from vibration of the circuit board occurs because the box-style switch tends to fall

24   from its place of rest on top of a computer case.  This is a problem associated with

25   the shape of the box-style switch which invites its placement on top of a flat surface

26   such as a computer case.  This has nothing to do with the use of screws to hold

27   separate pieces of the box enclosure together.  Similarly, the humidity issue relates

28   to the amount of space within the enclosure of the box-style switch and the ability

of moist air to penetrate the box enclosure.  Again, this problem is not necessarily tied to the use of screws.  A screwed enclosure that more tightly fits, or otherwise reduces the amount of air around the circuit board would provide one means of combating the moisture problem.

Finally, to the extent the '112 patent includes mild criticism of box-style switches, such criticism is, at most, tangentially related to the use of screws to hold the box enclosure together.  Therefore that criticism cannot serve to limit the claims to switches with screw-less bodies.  *Saunders Group, Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1333 (Fed. Cir. 2007) ("[T]he '690 patent does not criticize prior art cylinders *based on their lack of pressure activated seals*.  The specification indicates that pneumatic cylinders 'typically' cannot maintain an adequate traction force, but the patent does not state that the only way to accomplish the goal of maintaining traction force is through the use of pressure activated seals.  Accordingly, the specification does not support the narrowing construction that the defendants propose.") (emphasis added); *Paice*, 504 F.3d at 1310 (noting it was "far from obvious which portion of the gear train is supposed to be 'quite complex and difficult to manufacture economically'" in rejecting defendant's narrowing construction).

### c.      The Prosecution History Supports ATEN's "Body" Construction

On pages 11 and 12 of its opening brief, ATEN discussed how early during prosecution of the '112 patent, ATEN canceled original claim 1 of the '112 patent.  In this amendment, ATEN specifically and unequivocally broadened what a body was by *removing* several limitations of a "body" from original claim 1 and replacing that language with a "body" that simply enclosed a circuit board, had connector ports, and had attached cables.  This amendment supports ATEN's construction.  *Liebel-Flarsheim*, 358 F.3d at 909.  In its brief, Belkin apparently concedes this point, as it does not address it.

A further review of the '112 patent file history establishes that both the USPTO examiner and ATEN understood "body" in a way consistent with ATEN's proposed construction, and not anywhere near as narrowly as Belkin's.  On one occasion, the examiner identified the following body as meeting the "body" limitation of what would become claim 1:



Fig. 2

*See* Exh. 2 to Engle Decl., Office Action at 3 (May 21, 2004).

On a second occasion, the examiner said the following met the body limitation of what would become claim 1 of the '112 patent:

*See* Exh. 3 to Engle Decl., Office Action at 3 (Feb. 25, 2005).

And lest there be any doubt, during prosecution the examiner confirmed that a "body" in the '112 patent claims could *include* the body type found in *Figure 1 of the '112 patent*.  *See* Exh. 4 to Engle Decl., Office Action at 2 (Oct. 20, 2004).

On each of these occasions, the examiner viewed the claimed body in the '112 patent consistent with the definition now proposed by ATEN. The applicant also took the same view, as it never distinguished this prior art by stating the '112 invention had a *different* body than Thomas, Chang, *or Figure 1 of the '112 patent*. This is highly relevant to the proper construction of "body" because "the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Philips*, 415 F.3d at 1317.

### d.    Belkin's Limited Authority Is Easily Distinguishable

None of the cases on which Belkin relies supports its position that there was a disavowal in this case.

The *SciMed* case is distinguishable for several reasons, including the applicant's express use of the "broad and unequivocal" language "all embodiments of the present invention." *SciMed Life Sys., Inc. v. Adv. Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001). The specification of the patent-at-issue in *SciMed* stated: "The intermediate sleeve structure defined above is the basic sleeve structure for *all embodiments of the present invention contemplated and disclosed herein*." *Id.* at 1343 (emphasis in original). The specification then goes on to describe coaxial lumens being the structure in *all embodiments*. *Id.* Based primarily on this, and other repeated and affirmative statements that the lumens must be coaxial instead of dual or side-by-side lumens, the Court concluded that all of the claims required a coaxial lumen. The specification in the '112 patent contains no such language. As discussed above, there is not even a single statement saying that a screw or screws *cannot* be used in the present invention. *Not a single statement*. There is also not even a statement that *all embodiments* must include an integral enclosure. As discussed above, *some* claims specifically claim an integral enclosure, and some do not.

While Belkin primarily relies on *SciMed*, it does cite other cases in passing, but these too are distinguishable. For example, in the *Astrazeneca* case, the

1   applicant gave a claim term a more narrow definition by explicitly defining the term

2   in a narrow way in the specification.  The applicant there stated: "[t]he solubilizers

3   suitable according to the invention *are defined below*."  *Astrazeneca AB v. Mutual*

4   *Pharma. Co.*, 384 F.3d 1333, 1339 (Fed. Cir. 2004) (emphasis in original).  The

5   word "define" or "defined" is not found anywhere in the '112 specification.  The

6   '112 patent does not define a body as an enclosure without screws.

7        The *Aquatex* case cited by Belkin is likewise different than the present case.

8   There, the applicant incorporated three patents by reference into the specification to

9   help explain the invention.  *Aquatex Indus., Inc. v. Techniche Solutions*, 419 F.3d

10  1374, 1378 (Fed. Cir. 2005).  All three of those patents defined the claim-term at

11  issue ("fiberfill batting material") in a consistent, narrow way.  *Id.*  The Federal

12  Circuit held a narrow construction of fiberfill batting material because of the

13  teachings of these three patents, because the only examples given of fiberfill were

14  of the narrow interpretation, and because technical dictionaries and other extrinsic

15  sources all supported a more narrow construction.  Here, the applicant did not

16  incorporate any patents into the specification.[4]  The extrinsic evidence here does not

17  support a narrow reading of body.  And the '112 patent specification is silent on the

18  use of a screw or screws in the body of the claimed invention.

19       The *C.R. Bard* case also is distinguishable because in that case, in addition to

20  repeated and affirmative statements in the specification that the claimed invention

21  required a pleated plug, the applicant specifically distinguished prior art by stating

22  the plug must be pleated.  *C.R. Bard v. U.S. Surgical Corp.*, 388 F.3d 858, 866-67

23  (Fed. Cir. 2004).  There are no affirmative statements in the '112 patent that a body

24  cannot have screws.  Screws have nothing to do with the invention.  The word

25  "screws" is mentioned just once in the '112 patent specification.  And significantly,

26  ATEN never distinguished the prior art during prosecution by stating a prior art

27

28       [4] As discussed above, when the examiner discussed certain patents and patent applications in the file history, he did *not* take a narrow view of body.

1 body had screws. To the contrary, as discussed above, both examiner and applicant

2 recognized during prosecution that bodies with screws could meet the body

3 limitation of the '112 patent claims.[5]

4       Finally, to the extent Belkin is stating that its claim construction position for

5 body is appropriate because it is supported by the only embodiment explicitly

6 discussed, the Federal Circuit has outright rejected this theory. *Golight, Inc. v.*

7 *Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1331 (Fed. Cir. 2004).

8       **2.**     **"integrated into" / "integrating…into" / "fixedly attached"**

9      Belkin proposes a construction for "integrated/integrating . . . into" and

10 "fixedly attached" of "formed into a unified whole that is inseparable without

11 disassembling the whole."[6] ATEN agrees to this construction. Had Belkin

12 provided this proposed construction to ATEN prior to the submission of ATEN's

13 opening brief, ATEN, Belkin, and the Court would have saved time and resources

14 drafting, reviewing, and analyzing these claim terms.

15    **B.**   **'287 Patent**

16      **1.**     **"wherein the console devices can be switched either**
17           **synchronously or asynchronously with the one or more than**
          **one peripheral device to the same one of the plurality of**
18           **computer systems or to different ones of the plurality of**
          **computer systems, without interruption of the signal to the**
19           **one or more than one peripheral device" (Claim 1)**

20       Again if Belkin had provided its proposed constructions in advance of

21 briefing, the parties likely could have significantly narrowed the issues for the

22 Court. The only remaining dispute appears to be whether the phrase "without

23 interruption of the signal to the one or more than one peripheral device" applies to

24

---

25      [5] Belkin's reliance on *On Demand* is equally distinguishable as in that case there were repeated and unambiguous statements that only retail consumers were meant by the term "customer" and where the
26 applicant repeatedly distinguished devices that were used by general customers. *On Demand Machine Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006). Neither fact exists here.
27      [6] Once again, Belkin demonstrates its willingness to move away from the ITC's claim constructions when it finds it convenient, as the ITC did not construe the terms "integrated/integrating . . . into" and "fixedly attached" the same.
28

1    synchronous switching.  Belkin's attempt to *require* that synchronous switching be

2    without interruption is unsupported by the specification or the prosecution history.

3         Claim 1 of the '287 Patent requires that the console devices can be switched

4    "either synchronously or asynchronously."  D.I. 274-3, '287 Patent at 8:9-10.  The

5    parties agree that this means the switch must be able to perform both synchronous

6    switching and asynchronous switching (albeit not at the same time).  Claim 1

7    separately requires that the console devices can be switched "without interruption

8    of the signal to the one or more than one peripheral device."  *Id.* at 8:13-14.  The

9    "either synchronously or asynchronously" and "without interruption" limitations are

10   separate requirements, as evidenced by the comma before introducing the "without

11   interruption" clause.  *Id.* at 8:13.  Moreover, the evidence shows that asynchronous

12   switching is how the '287 Patent accomplishes switching without interruption.

13        As explained in ATEN's opening brief, the specification describes only

14   asynchronous switching "without interruption of the signal."  D.I. 274-3, '287

15   Patent at 3:66-4:11, 4:29-35.  Belkin has not identified a single instance in the

16   specification where synchronous switching is described "without interruption."  In

17   fact, Belkin readily admits that the '287 Patent "does not say anything about what

18   happens during synchronous switching."  D.I. 280 at 18.  The '287 Patent neither

19   prohibits nor requires that synchronous switching be done without interruption.

20   Rather, asynchronous switching is how the '287 Patent accomplished switching

21   without interrupting the signal, and the '287 Patent does not care how synchronous

22   switching is accomplished

23        Kevin Chen and Sampson Yang, two named inventors of the '287 Patent,

24   both confirmed that asynchronous switching was the invention that accomplished

25   switching without interruption.  *See* Exh. 5 to Engle Decl., Chen Depo. Tr. 365:7-

26   10 ("Q.  So the way to prevent interrupting data flow to the peripherals would be to

27   switch the console devices and the peripheral devices at different times; right?  A.

28   Correct."); Exh. 6 to Engle Decl., Yang Depo. Tr. 61:7-62:16 ("[T]he capability to

1    switch separately, leaving the CD burner, as an example, to continue to be

2    connected to the computer, will maintain the data flow.").

3         The prosecution history does not support Belkin's arguments either.  Belkin

4    itself quotes the prosecution history that clearly identifies the "either

5    asynchronously or synchronously" and "without interruption" limitations as

6    *separate* requirements: "The present invention meets this need by providing a KVM

7    switch which can switch the KVM channels and peripheral channels (i) to a

8    common computer or to different computers either asynchronously or

9    synchronously and (ii) without interruption of data flow to that peripheral when the

10   switch is changed."  Exh. 7 to Engle Decl., Response & Amendment at 6-7 (Apr. 6,

11   2005); D.I. 280 at 13 n.13.  Again, asynchronous switching is how the '287 Patent

12   accomplishes the second requirement of "without interruption."

13        Belkin's reliance on a single "example" provided in the prosecution history is

14   equally misplaced.  In particular, Belkin relies exclusively upon a few sentences

15   excerpted from a much larger discussion regarding a prior art reference Dickens.

16   First, Belkin makes the fatal mistake of ignoring the context of the full discussion.

17   *See, e.g.*, *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1343 (Fed. Cir. 2009) (finding

18   any alleged disclaimer must be "considered in the context of the prosecution history

19   as a whole"); *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1433-34

20   (Fed. Cir. 2000) (same).  Reading the discussion in context makes clear that the

21   distinction the applicant was making was that "Dickens et al. teaches a routing

22   device, not a switching device."  Exh. 7 to Engle Decl., Response & Amendment at

23   13 (Apr. 6, 2005) (emphasis in original).  The next sentence says, "A simple

24   example will demonstrate the difference between Dickens et al. and the present

25   invention."  *Id.*  The paragraph that Belkin cites describes an example of switching.

26   *Id.* at 14 ("The user now switches to a second state, in which switch 10

27   synchronously connects console devices (14, 16, 18) and printer 22 to second

28   computer 122.").  The applicant then distinguishes Dickens by saying, "In contrast,

Dickens et al. functions like a router, *e.g.*, more like a network.  Switch 10 of the present invention is replaced by a data routing device 100." *Id.*  "Dickens et al. do not allow the user to switch the peripherals synchronously with the console devices; rather they remain connected to a 'network' and the host computers contend for the channel to the peripheral independent of the console device connections." *Id.* at 15.  In all instances, the distinction between Dickens and claim 1 of the '287 Patent is whether Dickens performs *switching*, not whether that switching is "without interruption to the signal."

The fact that the particular example provided by the applicant was synchronous switching or that the switching was without interruption is irrelevant.  The applicant explained in the paragraph immediately prior that it was merely "a simple example" to demonstrate "switching" as opposed to "routing" like Dickens.  *Id.* at 13.  Nowhere does the prosecution history remotely say—let alone clearly and unambiguously state—the claim *requires* that synchronous switching be without interruption to the signal.  *See Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1372-73 (Fed. Cir. 2007) (requiring that any disclaimer be clear and unmistakable).  Instead, the prosecution history, when read in context, merely states that the present invention requires *switching*, not routing.

This stands in sharp contrast to the case that Belkin cites.  In that case, the applicant stated that "the prior art references all appear to be directed to non-localized systems" and "'wireless' does not mean 'local wireless,' as claimed by the present invention, in the sense of a cordless phone that is *restricted to operate within a few feet from a base station*." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1307 (Fed. Cir. 2007) (quotation omitted).  Thus, the applicant in that case expressly defined "local wireless" to mean "restricted to operate within a few feet from the base station" in order to avoid prior art that was directed to "non-localized systems."  By contrast, in the present case, the applicant distinguished the prior art Dickens as *routing* rather than *switching*.  There was no

1    distinction made related to "without interruption of the signal," and thus there can

2    be no clear and unambiguous disclaimer.  *See also EOLAS*, 399 F.3d at 1337

3    (finding no disclaimer based on statements merely describing features where those

4    features were not the basis for distinguishing the prior art).

### 2.    "hub switch module" (Claim 1)

6        The term "hub switch module" should be construed to mean simply "bridge

7    between one or more peripheral devices and one or more computers."  ATEN's

8    construction comes straight from the '287 Patent.  In describing one embodiment,

9    the specifications says, "The USB hub switch module 32 is a bridge between

10   peripheral devices 20 and computer systems 12."  D.I. 274-3, '287 Patent at 5:1-7.

11       Belkin's bloated construction attempts to add numerous extraneous

12   limitations from various embodiments.  First, Belkin improperly attempts to limit

13   the term to USB.  To do this, Belkin points to phrases such as "The present

14   invention utilizes USB emulation programs to emulate the HID (Human Interface

15   Devices) specification."  *Id.* at 3:45-46.  Belkin apparently ignores the entire next

16   paragraph: "Although *an embodiment* is described with reference to the current

17   HID specification [i.e., USB], it will be apparent to those skilled in the art with

18   reference to this disclosure that *the invention may be implemented with any*

19   *specification for device interfacing*."  *Id.* at 3:55-59 (emphasis added).  The

20   applicant could not have been more clear that the invention was not limited to USB.

21       Moreover, Belkin's assertion that the term should be limited to USB because

22   only USB embodiments are described is directly contrary to the law.  The Federal

23   Circuit has "outright rejected the notion that disclosure of a single embodiment

24   necessarily limits the claims."  *Golight*, 355 F.3d at 1331.  "The statements from the

25   description of the preferred embodiment are simply that—descriptions of a

26   preferred embodiment…Those statements do not indicate that the invention can

27   only be used in such a manner.  Absent a clear disclaimer of particular subject

28   matter, the fact that the inventor anticipated that the invention may be used in a

1  particular manner does not limit the scope to that narrow context." *Brookhill-Wilk*

2  *1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1301 (Fed. Cir. 2003).

3      Belkin repeatedly violates this maxim in its numerous other limitations as

4  well.  For example, Belkin admits its limitation of "a collection of USB hubs and

5  one or more switches" comes from the patent's description of a particular

6  embodiment: "*In **one** preferred embodiment*, the USB hub switch module includes

7  4 USB hubs and matrix analog switches which are controlled by CPU firmware."

8  D.I. 274-3, '287 Patent at 5:7-9 (emphasis added).  Belkin's attempt to use the

9  figures or the descriptions of those figures as limitations is especially without basis.

10  The figures are all examples of *an* embodiment, not *all* embodiments.  The

11  specification expressly says this: "FIG. 1 illustrates ***one of*** *the many ways* in which

12  the present invention may be used" (3:60-61); "With reference to FIG. 2, ***a** more*

13  *robust use* is shown" (4:12); "With reference to FIG. 3, in ***a** still further use* of the

14  present invention, *by way of example*…" (4:41-42); "FIG. 4 is **a** block diagram of

15  the signal switch " (3:23-24); "With reference to FIG. 5, the process of a portion of

16  ***a*** management program 42 *suitable for use* in the present invention *may* proceed as

17  follows" (6:19-21) (emphasis added).  By the very terms of the specification, Figure

18  4 cannot be the *only* embodiment because the figure is repeatedly described as

19  being "by way of example only" (4:60, 4:65, 5:33) and containing "optional"

20  components (6:6, 6:8, 6:10, 6:11, 6:17).

21      The cases cited by Belkin do not even support its position.  For example, the

22  court in *SciMed* found a disclaimer not because of the words "present invention,"

23  but rather because the applicant said that the "intermediate sleeve structure defined

24  above is the basic sleeve structure for *all embodiments of the present invention*

25  *contemplated and disclosed herein*."  *SciMed*, 357 F.3d at 1343; *see also Liebel-*

26  *Flarsheim*, 358 F.3d at 906 (explaining *SciMed*).  There are no such statement

27  about "all embodiments" in this case.  Quite the contrary, the patent repeatedly

28  references "an embodiment" or "one of the many ways" the invention may be used.

1    Finally, Belkin's construction attempts to add a *functional* limitation ("for

2    passing the signals from the emulated console devices from the device control

3    module through the USB hubs to the computer systems") to identify "the purpose of

4    the hub switch module."  D.I. 280 at 21.  Adding functional limitations to apparatus

5    claims makes no sense.  "[A]pparatus claims cover what a device is, not what a

6    device does."  *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1468

7    (Fed. Cir. 1990).  As the Federal Circuit has explained, "[c]onstruing a non-

8    functional term in an apparatus claim in a way that makes direct infringement turn

9    on the use to which an accused apparatus is later put confuses rather than clarifies,

10   frustrates the ability of both the patentee and potential infringers to ascertain the

11   propriety of particular activities, and is inconsistent with the notice function central

12   to the patent system."  *Paragon Solutions, LLC v. Timex Corp.*, 566 F.3d 1075,

13   1091 (Fed. Cir. 2009).

14       Belkin's functional limitation is also inappropriate given that claim 1 itself

15   goes on to require that the hub switch module be "configured to communicate with

16   any of the plurality of computer systems, and the one or more than one peripheral

17   device, such that a signal passing from the hub switch module to the one or more

18   than one peripheral device emulates origination from a computer."  D.I. 274-3, '287

19   Patent at 7:62-67.  Any additional elements Belkin's functional limitation includes

20   beyond what the claim already requires are just that—not required by the claim.

21            **3.    "such that a signal passing from the hub switch module to**
              **the one or more than one peripheral device emulates**
22            **origination from a computer" (Claim 1)**

23       Yet again, if Belkin had provided its proposed constructions in advance of

24   briefing as ATEN requested, the parties could have narrowed the issues (and pages

25   of briefing) for the Court.  Given that "imitate" means "having the appearance of,"

26   the parties appear to agree on the meaning of "emulates."  The only remaining

27   dispute is Belkin's extraneous limitation of "is generated by a computer program

28   built into the CPU."  Oddly, Belkin's brief never explains this limitation.  Though

1   Belkin's brief does not even cite to it, the declaration of Belkin's expert includes

2   only a single sentence on this additional limitation: "Each instance of emulation

3   described in the specification relies on a software program, operating on the CPU,

4   to perform the emulation."  D.I. 280-1 ¶ 136.  As discussed at length above, the

5   Federal Circuit has "outright rejected the notion that disclosure of a single

6   embodiment necessarily limits the claims."  *Golight*, 355 F.3d at 1331.  "Absent a

7   clear disclaimer of particular subject matter, the fact that the inventor anticipated

8   that the invention may be used in a particular manner does not limit the scope to

9   that narrow context."  *Brookhill-Wilk 1*, 334 F.3d at 1301.  Belkin's extraneous

10   limitation should therefore be rejected as unsupported and contrary to law.

11         **4.**    **"means for switching the selected console device between the first channel and the third channel without interruption of the data flow through the second channel between the first selected computer system and the selected peripheral device" (Claim 7)**

14        The parties agree this term is a means-plus-function limitation, but disagree

15   as to what the function and structure are.

16          **a.**    **The Federal Circuit says the claim language sets forth the function, yet Belkin tries to add additional limitations.**

18        ATEN believes the function of this term is unambiguously set forth in the

19   term itself.  Inexplicably, Belkin attempts to add the clause "both synchronously

20   and asynchronously" to that function.  The Federal Circuit has said that "[w]hen

21   construing the functional statement in a means-plus-function limitation, we must

22   take great care not to impermissibly limit the function by adopting a function

23   different from that explicitly recited in the claim."  *Omega Eng'g, Inc. v. Raytek

24   Corp.*, 334 F.3d 1314, 1322 (Fed. Cir. 2003) (quotation omitted).  That is especially

25   true in this case.

26        Unlike Claim 1, Claim 7 never includes the words "synchronously" or

27   "asynchronously."  While Belkin points to the prosecution history of Claim 7 for

28   support, the word "asynchronous" never appears there either and Belkin's only

argument on that point is a single sentence footnote that says, "The words of the 'means for switching' also cover asynchronous switching."  D.I. 280 at 24 n.20. Belkin provides no argument and no support for that assertion.  Belkin's reliance on the examiner allowing Claims 1 and 7 at the same time while reciting the language from Claim 1 is equally unpersuasive.  D.I. 280 at 24-25 n.22.  Finally, without explicitly stating as much Belkin seems to argue that there was a disclaimer during prosecution to distinguish Claim 7 from the prior art.  D.I. 280 at 25.  However, as discussed at length above, the distinction made was between *switching* and *routing*, which has nothing to do with whether the switching is "synchronous" or "asynchronous" (let alone both).  *See, e.g.*, Exh. 7 to Engle Decl., Response & Amendment at 13 (Apr. 6, 2005) ("Dickens et al. teaches a <u>routing</u> device, not a <u>switching</u> device.") (emphasis in original); *EOLAS*, 399 F.3d at 1337 (finding no prosecution disclaimer based on statements merely describing features where those features were not the basis for distinguishing the prior art).  The function for this term is set forth in the claim and Belkin's unsupported attempt to modify it should be rejected.

> **b.    The structure is cleanly set forth in the '287 Patent, and Belkin's attempt to weight this simple structure down with extraneous limitations should be rejected.**

ATEN believes the structure of this element can be either (1) the combination of a KVM switch and a peripheral sharing switch, or (2) the combination of a hub switch module, a device control module, and a CPU.  The first combination comes directly from the '287 Patent: "The signal switch of the present invention is the combination of a KVM (keyboard video mouse) switch and a peripheral sharing switch."  D.I. 274-3, '287 Patent at 3:33-35.  The very next sentence even says "KVM switches are well known in the art," and it is unclear what additional structure Belkin would demand when something is already well-known.  *Id.* at 3:35-36.

1    Belkin identifies a structure vaguely similar to ATEN's second combination

2    but with a myriad of additional limitations.  Belkin identifies the structure as (i) a

3    USB hub switch module, (ii) a USB device control module, (iii) a USB host control

4    module, and (iv) a CPU.  Belkin then goes on to propose constructions for each of

5    those four items.  Curiously, Belkin's proposed sub-construction for a USB hub

6    switch module does not even match its proposed construction for the term "hub

7    switch module."  Belkin also requires that each of these structures include

8    firmware, specifically firmware with the algorithm set forth in Figure 5.

9    As discussed at length above, there is no reason to limit the structure to USB.

10   The '287 Patent expressly says, "Although an embodiment is described with

11   reference to the current HID specification [i.e., USB], it will be apparent to those

12   skilled in the art with reference to this disclosure that *the invention may be*

13   *implemented with _any specification_ for device interfacing*."  *Id.* at 3:55-59

14   (emphasis added).  Thus, the '287 Patent expressly disclosed using device interfaces

15   other than USB.  Moreover, 35 U.S.C. § 112(6) provides that a means-plus-function

16   claim "shall be construed to cover the corresponding structure, material, or acts

17   described in the specification and equivalents thereof."  While ATEN believes "any

18   specification for device interfacing" is expressly disclosed in the '287 Patent, device

19   interfaces other than USB would certainly also be covered as equivalents.

20   Belkin spends only one sentence on explaining its inclusion of the host

21   control module as necessary structure, saying "it is not possible to establish either a

22   first or third channel from the console devices to the computers without them."

23   Belkin provides no explanation or citation.  For example, under Belkin's broad

24   reasoning, it would also be necessary to include the first output ports, second output

25   ports, third output ports, and the wiring between all the components as necessary

26   structure because the same statement could be made that it is "not possible to

27   establish [a connection] without them."  However, the Federal Circuit has said that

28   the corresponding structure "must actually perform the recited function, not merely

enable the pertinent structure to operate as intended." *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364 (Fed. Cir. 2001).  The host control module, like the ports or wiring, is just channeling the signals in from other devices.  Thus, while the host control module may enable the switching by providing the necessary signals, it is not *performing* the switching function.

Finally, neither firmware nor algorithms are required.  An algorithm is only required when the *only* disclosed structure is a general purpose computer.  *See MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008) ("[W]e have consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor.") (quotation omitted).  When the disclosed structure consists of more than just a processor or general purpose computer, no algorithm is necessary.  For example, in *Gemstar*, the Federal Circuit did not even bother looking for an algorithm when the disclosed structure was "the CPU, the video display generator, and the video switcher."  *Gemstar-TV Guide Int'l, Inc. v. ITC*, 383 F.3d 1352, 1361 (Fed. Cir. 2004).  District courts have similarly not required algorithms when structure other than a processor or general purpose computer is disclosed.  *See, e.g.*, *Stanacard, LLC v. Rebtel Networks, AB*, 680 F. Supp. 2d 483, 501 (S.D.N.Y. 2010) ("[A] 'module' is not a general purpose computer.  Rather, it is a special purpose hardware device or software component, readily identifiable to a person of skill in the art, and which can serve as the corresponding structure for a means plus function limitation."); *Eon Corp. IP Holdings, LLC v. Sensus USA Inc.*, No. 6:09-cv-116, 2010 WL 3199630, at *3 (E.D. Tex. Aug. 11, 2010); *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, No. C 03-1431, 2005 WL 6220105, at *3-4 (N.D. Cal. Mar. 2, 2005).

### 5.   "without interruption of the data flow through the second channel" (Claim 7)

Belkin does not even propose a construction for this term.  Therefore, the Court should give this phrase its plain and ordinary meaning.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**III.    CONCLUSION**

For the reasons set forth above, ATEN requests the Court construe the terms consistent with ATEN's proposed constructions.


DATED:      April 25, 2011            PERKINS COIE LLP


                                By:    *s/Michael J. Engle*
                                       John P. Schnurer, Bar No. 185725
                                       JSchnurer@perkinscoie.com
                                       Matthew C. Bernstein, Bar No. 199240
                                       MBernstein@perkinscoie.com
                                       Cheng C. (Jack) Ko, Bar No. 244630
                                       JKo@perkinscoie.com
                                       Michael J. Engle, Bar No. 259476
                                       MEngle@perkinscoie.com
                                       Attorneys for Plaintiffs
                                       ATEN INTERNATIONAL CO., LTD.
                                       and ATEN TECHNOLOGY, INC.

1

## CERTIFICATE OF SERVICE

2          The undersigned hereby certifies that a true and correct copy of the above

3   and foregoing document has been served on April 25, 2011 to all counsel of record

4   who are deemed to have consented to electronic service via the Court's CM/ECF

5   system.

6          Any other counsel of record will be served by electronic mail.

7

8                                              */s/ Michael J. Engle*
                                               Michael J. Engle
9                                              MEngle@perkinscoie.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

09074-0002/LEGAL20684702.1                  -1-                    PROOF OF SERVICE
                                                                   8:09-CV-843 AG (MLGx)