Robert W. Dickerson (State Bar No. 89367)
dickersonr@dicksteinshapiro.com
Yasser M. El-Gamal (State Bar No. 189047)
elgamaly@dicksteinshapiro.com
DICKSTEIN SHAPIRO LLP
2049 Century Park East, Suite 700
Los Angeles, California  90067-3109
Telephone: (310) 772-8300
Facsimile: (310) 772-8301

Jeffrey A. Miller (State Bar No. 160602)
millerj@dicksteinshapiro.com
DICKSTEIN SHAPIRO LLP
303 Twin Dolphin Drive, Suite 600
Redwood City, CA 94065
Telephone: (650) 632-4328
Facsimile: (650) 632-4333

Attorneys for Defendants Belkin
International, Inc. and Belkin, Inc.

UNITED STATES DISTRICT

COURTCENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| ATEN INTERNATIONAL CO., LTD. and ATEN TECHNOLOGY, INC., | CASE NO. 8:09-CV-843 AG (MLGx) |
| Plaintiffs, | Hon. Andrew J. Guilford |
| v. | DEFENDANTS BELKIN INTERNATIONAL, INC. AND BELKIN, INC.'S CLAIM CONSTRUCTION HEARING PRESENTATION SLIDES |
| EMINE TECHNOLOGY CO., LTD., BELKIN INTERNATIONAL, INC., and BELKIN, INC., | |
| Defendants. | Date:   May 17, 2011 Time:   9:00 a.m. Ctrm:   10D |

1       Attached hereto as Exhibit 1 are the slides Defendant Belkin International, Inc.

2 and Belkin, Inc. presented at the *Markman* hearing held on May 17, 2011.

3

4 DATED:  May 18, 2011            DICKSTEIN SHAPIRO LLP

5

6                   By:   */s/ Jeffrey A. Miller*

7                       Robert W. Dickerson
                      Yasser M. El-Gamal

8                       Jeffrey A. Miller
                      Attorneys for Belkin International, Inc. and
                      Belkin, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# EXHIBIT 1



# Belkin's *Markman* Presentation

# What's Left in the Case:

- **Still in:**
  - '112 patent: but now only being asserted against the Belkin Version 1 products
  - '287 patent

- **Stayed:**
  - '275 patent:  in Re-exam, now on appeal

- **ATEN will be voluntarily dismissing:**
  - '299 patent
  - '854 patent

# '112 Patent



**Tutorial**

**POSA**

**Construction**

### CLAIM TERMS AT ISSUE

"body"

"integrated/integrating . . . into"

"fixedly attached"

# '287 Patent



**Tutorial**

**POSA**

**Construction**

"wherein the console devices can be switched either synchronously or asynchronously . . . without interruption of the signal to the one or more than one peripheral device"

"hub switch module"

"emulates origination from a computer"

"means for switching"

3



# '112 Patent Tutorial

## **Keyboard Video Mouse (KVM) Switches**

➤ Well-known, old technology from the early 1980's that allows a single set of console devices (keyboard, video, and mouse) to control multiple computers. *See ITC Initial Determination*, p. 4 (*El-Gamal Decl.*, Ex. G, p.410)(Dkt. No. 282-7)).



Fig. 1

# '112 Patent Tutorial



(12) **United States Patent**
Chen

(54) **AUTOMATIC SWITCH**

(75) Inventor: **Kevin Chen**, Shijr (TW)

(73) Assignee: **ATEN International Co., Ltd.**, Shijr

## BACKGROUND OF THE INVENTION

➤ **The '112 Patent describes the "invention" by contrasting it with the prior art conventional box-type enclosures:**

The present invention relates . . . particularly to an automatic switch that has an integrally injected-molded enclosure to provide good weather-resistance, impact-resistance, and absolute protection of the an internal circuit board . . .

FIG. 1 shows a conventional automatic switch 40 that is configured into a box 41. The box 41 is internally provided with a circuit board (not shown). Ports 42, 43, and 44 for various types of signal cable connectors are provided on peripheral walls of the box 41. Inmost cases, the box 41 includes outer walls that are made of metal material or rigid plastic material and assembled together by means of screws (not shown). The automatic switch 40 is normally positioned on a host enclosure of a computer configuration and tends to unexpectedly fall of the host enclosure to result in a damaged circuit board due to vibration. Moreover, when a high humidity exist, moisture in the air tends to attach to the circuit board to cause short circuit. Repair and maintenance of the circuit board is therefore required.



FIG.1

**PRIOR ART**

# '112 Patent Tutorial

## Representative Prior Art KVM Switch

### ATEN CS142

- **Housing**: Multi-part outer walls made of rigid plastic assembled with screws having no integral circuit protection

- **Cable Connection**: Standard PS/2 and thumbscrew connecters

- **Cable Config.**: 3-1-3



7

# '112 Patent Tutorial

## Representative Prior Art KVM Switch

### ATEN CS228

- **Housing: Multi-part outer walls made of metal assembled with screws having no integral circuit protection**

- **Cable Connection: DB25 Thumbscrew Connecters**

- **Cable Config.: 1-3**



8

# '112 Patent Tutorial

## Representative Prior Art Cable Connections



| JP Pat Pub. No. JP9-55155 | U.S. Pub. No. 2001/0023141 | U.S. Pat. No. 6,133,527 | KR Pat. Pub. No. 0073385 |
|---|---|---|---|
| Yamada (2/25/1997) | Chang (9/20/2001) | Park (10/17/2000) | Yu (12/05/2000) |

# '112 Patent Tutorial

(12) **United States Patent**
Chen

(10) Patent No.:    **US 7,035,112 B2**
(45) Date of Patent:    **Apr. 25, 2006**

## THE "INVENTION"

➢ **The '112 Patent consists of a mere 2 pages of text and 4 drawings that describe a <u>single</u> switch embodiment having an integral (injection molded) "body" providing circuit protection with cables molded thereto, *and no alternatives*.**

In brief, the automatic switch 10 of the **present invention** uses the main **body 20** having **cable-connected connector sets 30 <u>to replace</u> the conventional box-type switch 40**, enabling the switch 10 to be used in a more convenient manner. Moreover, the **enclosure of the main body 20 of the automatic switch 10 is integrally formed** through multiple times of injection molding to protect circuits provided on the internal circuit board **24**, making the automatic switch **10** safer and more convenient for use.



FIG.3

FIG.4

FIG.2

10

# '112 Patent Tutorial

## ATEN's Embodying Products Have The Claimed "Body"

### Aten CS62A

- **Body**: Integrally formed injection molded body.

- **Cable Connection**: Co-molded to the body.

- **Cable Config.**: 1 Plug/Connector to 3 Plugs



Co-molded Cables

Multi-layered Injected Molded Body

ATEN Model # CS62A

CPX 33

# '112 Patent Tutorial



(12) **United States Patent**
Chen

(10) Patent No.:    **US 7,035,112 B2**
(45) Date of Patent:    Apr. 25, 2006

(54) AUTOMATIC SWITCH

(75) Inventor: Kevin Chen, Shijr (TW)

(73) Assignee: ATEN International Co., Ltd. (TW)

## SUMMARY OF THE INVENTION

➢ The Summary Of The Invention of the '112 Patent is focused on the circuit-protecting, integral injection molded construction of the switch "body" to overcome the deficiencies in protection of the circuit board the patentee attributes to the prior art conventional box-type construction:

A primary object of the present invention is to provide a plug-type automatic switch for a user to access and control multiple computer configurations through one single switch. The automatic switch includes a main body externally provided with connector ports and enclosing an internal circuit board. The main body has an integrally injection-molded plastic enclosure to provide good weather-resistance, impact-resistance, and absolute protection of the internal circuit board and circuits thereon. ¶

The automatic switch of the present invention also includes more than one or two sets of cable-connected connectors directly extended from the main body and electrically connected to the internal circuit board via signal cables. ¶

The integrally injection-molded enclosure of the main body includes a circuit-protecting layer for enclosing the circuit board, an outer case enclosing the circuit-protecting layer, and an anti-slipping layer coating an outer surface of the outer case. ¶

The circuit-protecting layer of the main body is made of a plastic material having a low melting point to avoid damages to circuits provided on the circuit board during the injection molding. ¶

The outer case of the main body has good strength and high rigidity and therefore provides excellent protection to the internal circuit board and the entire main body of the automatic switch. ¶

The anti-slopping layer of the main body has soft surface to enable firm holding of the main body and convenient plugging and unplugging of signal cables in and from the main body.

12

# '112 Patent Tutorial



| (12) **United States Patent** | (10) Patent No.: | US 7,035,112 B2 |
|---|---|---|
| Chen | (45) Date of Patent: | Apr. 25, 2006 |

### PROBLEMS vs. SOLUTION
### CITED IN THE '112 PATENT

➤ As noted by the ITC:

"the Background of the Invention and the Summary of the Invention directly contrast the problems with the prior art with the solution presented by the inventor. They both begin by describing the function of the prior art; then they describe the structure of the prior art, and finally they describe, respectively, the problems with the prior art and the solution presented by the inventor": *ITC Final Determination*, **p. 4 (*El-Gamal Decl.*, Ex. H, p.496)(Dkt. No. 282-8)).**

# '112 Patent Tutorial

(12) **United States Patent**
    Chen

(10) Patent No.: **US 7,035,112 B2**
(45) Date of Patent:     **Apr. 25, 2006**

## PROBLEMS vs. SOLUTION CITED IN THE '112 PATENT

| | **Background of the Invention** | **Summary of the Invention** |
|---|---|---|
| **Prior Art Function** | "For people to access two or more computers at the same time, there is developed an automatic switch to enable a user to automatically switch among different signal paths." '112 patent, col. 1, ll. 16-18. | "A primary object of the present invention is to provide a plug-type automatic switch for a user to access and control multiple computer configurations through one single switch." '112 patent, col. 1, ll. 36-38. |
| **Prior Art Structure** | "FIG. 1 shows a conventional automatic switch 40 that is configured into a box 41. The box 41 is internally provided with a circuit board (not shown). Ports 42, 43, and 44 for various types of signal cable connectors are provided on peripheral walls of the box 41." '112 patent, col. 1, ll. 18-23. | "The automatic switch includes a main body externally provided with connector ports and enclosing an internal circuit board." '112 patent, col. 1, ll. 39-41. |
| **Problems/ Solution** | "In most [sic] cases, the box 41 includes outer walls that are made of metal material or rigid plastic material and assembled together by means of screws (not shown). The automatic switch 40 is normally positioned on a host enclosure of a computer configuration and tends to unexpectedly fall off the host enclosure to result in a damaged circuit board due to vibration. Moreover, when a high humidity exists, moisture in the air tends to attach to the circuit board to cause short circuit. Repair or maintenance of the circuit board is therefore required." '112 patent, col. 1, ll. 23-32. | "The main body has an integrally injection-molded plastic enclosure to provide good weather-resistance, impact-resistance, and absolute protection of the internal circuit board and circuits thereon." '112 patent, col. 1, ll. 41-44. |

*ITC Final Determination*, p. 4 (*El-Gamal Decl.*, Ex. H, p.496)(Dkt. No. 282-8)).

# '112 Patent Tutorial

## Accused BELKIN Products



**Accused CA-Product**

**Cables Are Not Co-Molded to the Housing/Are Seperable**

**Mult-part Plastic Housing Assembled With Screws**

CPX 35 /RPX

➤ All "include outer walls that are made of metal material or rigid plastic material and assembled together by means of screws" and no integral circuit protection

➤ All have cables that are <u>NOT</u> molded to the housing but are separable therefrom (i.e., use prior art strain reliefs).

15

# '112 Patent Tutorial

## Prior ITC Section 337 Investigation

### What is a Section 337 ITC Investigation?

- **ITC:  "International Trade Commission"**
  - Specialized tribunal that investigates cases involving importation of goods that allegedly infringe intellectual property (i.e., patents, trademarks and copyright).  19 U.S.C. §1337.
  - Handled hundreds of patent infringement complaints, dozens each year.
- **Decisions:**
  - Initial Determination by Administrative Law Judge
  - Final Determination (Commission Opinion)
- **Appeal:**
  - To Court of Appeals for the Federal Circuit
- **Effect of Decision:**
  - "District Court can attribute whatever persuasive value to the prior ITC decision that it considers <u>justified</u>."  *Texas Instruments v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1569 (Fed. Cir. 1996)(emphasis added).

# '112 Patent Tutorial

## Prior ITC Section 337 Investigation

### ATEN's Infringement Allegations Here Re
### The '112 Patent Are The SAME as in the ITC

| ITC | District Court |
|---|---|
| Claims Asserted: 1, 12-21 | Same |
| Accused Belkin Products: Flip and CA | Same (only Ver. 1) |
| Parties: ATEN, Belkin Emine, (JustCom and Ratoc settled before hearing) | Same |

# '112 Patent Tutorial

## Prior ITC Section 337 Investigation



### 3 – Way Litigation Structure

Discovery

**Complaintants:**
Aten Int'l (Taiwan)
Aten Tech., Inc. (US)

**Respondents:**
Belkin, Inc.
Emine (Taiwan)
Ratoc
JustCom

**ALJ**
Luckern
Charneski

Discovery

Discovery

**Office of Unfair Import Investigations** (i.e., ITC Staff Attorney)

# '112 Patent Tutorial

## Prior ITC Section 337 Investigation



# '112 Patent Tutorial

## Prior ITC Section 337 Investigation

### Unlimited Discovery

- **Depositions:**
  Approximately 40 days of deposition testimony
  27 deponents; approx. half in Taipei

- **Documents:**
  Produced:  30,000
  Received:   230,000

- **Interrogatories:**
  ATEN Served: 200+
  Belkin Responded to: 150+

- **Expert Reports:**
  4 Expert Reports

*ITC Record (**El-Gamal Decl.**, Ex. I)(Dkt. No. 282-9)).*

# '112 Patent Tutorial

## Prior ITC Section 337 Investigation

### ALJ's Initial Determination

- **No Infringement**

  – None of the accused products include a "body."

  – "Body" =
    ▶ An enclosure that provides good-weather resistance, impact resistance, and absolute protection of the internal circuit board and circuits thereon.
    ▶ [T]he "body" limitation . . . cannot be read on the prior art boxes identified in the '112 patent specification as unsuitable for the claimed KVM switch"
    *ITC Initial Determination*, p. 4 (*El-Gamal Decl.*, Ex. G, p.428)(Dkt. No. 282-7)).

- **Invalidity**

  – All of the asserted claims invalid if "body" construed broadly to encompass Belkin's accused products. *Id.*, at pp. 459-473.

21

# '112 Patent Tutorial

## Prior ITC Section 337 Investigation

### ITC's Final Determination/Commission Opinion Agreed with Initial Determination

- **No Infringement:**

  – None of the accused products include a "body."

  – "Body" =
    ‣ "An enclosure for an internal circuit board … [that] does not include the prior art box disclosed in the Background of the Invention…"
    ‣ "Therefore, insofar as an enclosure contains 'outer walls that are made of metal material or rigid plastic material and assembled together by means of screws' it is not a body…"
    *ITC Commission Opinion*, fn. 1, p. 7, 11 (*El-Gamal Decl.*, Ex. H, p. 493, 497 )(Dkt. No. 282-8)).

- **Invalidity**
  – All of the asserted claims invalid if "body" construed broadly to encompass Belkin's accused products. *Id*. at 504-511.

# '112 Patent Tutorial

## Prior ITC Section 337 Investigation

### APPEAL & RECORD

- **ATEN could have appealed, but didn't**

  – ATEN could have appealed the ITC Determination, including any claim construction rulings, to the U.S. Court of Appeals for the Federal Circuit, but decided not to.

- **ITC Record now in this Court**

  – Transferred to this Court on August 9, 2010. (*El-Gamal Decl.*, Ex. I) (Dkt. No. 282-9)).

  – Is admissible in this Action to the extent permitted under the Federal Rules of Evidence and Civil Procedure. 28 USC §1659(b).

  – This Court is entitled to adopt any part of the ITC Record.



# '112 Patent - POSA

Claim terms are to be construed as understood by a **P**erson of **O**rdinary **S**kill in the **A**rt (POSA) at the time of the invention when read in the context of the specification and prosecution history. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312-13 (Fed. Cir. 2005)(*en banc*).

# '112 Patent – Level of Ordinary Skill

**ATEN**:  None Provided  - None of ATEN's Opening Brief, Reply Brief or supporting declarations provide any criteria for the level of ordinary skill.

**Belkin**:  Proposes that the Court adopt ITC's and Belkin's definition of the Level of Ordinary Skill for the reasons set forth by the ITC, i.e., both packaging and technical/electronics applications of the switch.

# '112 Patent – Level Ordinary Skill

- ATEN's ITC expert and Belkin's expert here agree with the ITC that the technology at issue "relates to both the protection of the switch's internal circuitry" as well as the "electronic and information technologies."

| | |
|---|---|
| ➢ ***Dezmelyk Decl.*** | 35.   For the reasons set forth in the ITC determination, I am of the opinion that the ITC's and Belkin's definition of a person of ordinary skill in the art is more appropriate for the '112 patent than that of ATEN's. I base my opinion on my own experience in the field of electronic switching and peripherals during the relevant time frame, and my review of the '112 patent and its file history. This is also consistent with the typical educational and experience level of workers in this field at the time of the '112 patent. |
| ➢ **ID, Ex. G at 416. ATEN's Expert: Dr. Barker** | **C.  One of Ordinary Skill in the Relevant Art**<br><br>      ATEN advances its position as to one of ordinary skill in the art of KVM switches through the testimony of its expert witness, Dr. Barker. *See* ATEN Br. at 3. In Dr. Barker's view, such a person of ordinary skill in the art at the time of the '112 patent would have at least a Bachelor of Science degree in either mechanical or electrical engineering and at least two years of experience designing electrical connections and packaging for electronic consumer devices including computer peripherals. Barker Tr. 461-462. |

# '112 Patent – Level Ordinary Skill

**ATEN's expert Dr. Olivier:**

- Has **NOT** provided or identified <u>any</u> experience in <u>packaging</u> for consumer electronics.

- Has **NOT** reviewed the '112 patent file history or any of the ITC record.

  – Opinion should be given little or no weight.

**Belkin's expert Mr. Dezmelyk:**

- Significant experience in all relevant areas, including the exterior packaging of electronic devices using various technologies and techniques.  (*Dezmelyk Decl.*, ¶¶ 6, 11, 36)

- Opinion based on review of the '112 patent, file history and ITC determinations. (*Dezmelyk Decl.*, ¶ 2).

  – Opinion should be considered.



# '112 Patent - Construction

- **Two Issues**:

1. "**body**" - What is not a "body," and to the extent necessary, what is a "body?" *Phillips*, 415 F.3d at 1315 ("…the specification makes plain what the [inventor] did and did not invent…").

2. "**integrated/fixedly attached**" - What is the nature of the connection between the "cables" and the "body?"

# '112 Patent - Construction - "body"

## Not Disputed:

The term "body" is something <u>more</u> than just an enclosure for a switching circuit.

### COMPARISON OF '112 `PATENT CLAIM CONSTRUCTION
### (ITC v. EDTX v. CACD)

| TERMS | ITC[2] | BELKIN | ATEN |
|-------|--------|--------|------|
| "body" | "an enclosure for an internal circuit board that does not include [an enclosure containing] outer walls that are made of metal material or rigid plastic material and assembled together by means of screws"[3] | **ITC**: "is a single integral enclosure that is not assembled from separate parts, such as by the means of screws"<br><br>**TX**: Same as ITC's Def.<br><br>**CA**: Same as ITC's Def. | **ITC**: "the main, central, or principal part"<br><br><br><br>**TX**: "an enclosure for a switching circuit"<br><br>**CA**: "An enclosure having one or more connector port openings and an internal switching circuit." |

*Dezmelyk Decl.*, ¶ 46

**Note**: This is ATEN's 3rd proposed definition of "body"

# '112 Patent – Construction – "body"

## Not Disputed:

The term "body" is NOT a Term of Art.

> **E.   CONCLUSIONS**
>
> **1.   "Body"**
>
> 75.   With respect to the disputed claim term "***body***", I agree with all parties, the ITC, the inventor, and the experts (including Dr. Olivier) that have opined on this issue that the term "body" is <u>not</u> a term of art within the context of the subject matter of the claimed invention of the '112 Patent.  (*see, e.g.*, Ex. G, p. 421, Olivier Decl. at 3).

(*Dezmelyk Decl.*, ¶ 75).

**Note:** Where a claim term is not a term of art, the specification takes on even greater importance.  *Irdeto v. Echstar*, 383 F.3d at 1300.

## '112 Patent – Construction – "body"

**Not Disputed:**

There is only one "body" disclosed in the '112 patent and that "body" is an ***integral*** injection molded construction that provides circuit protection and is not assembled from separate parts such as by means of screws.

-"The main body has an ***integral*** enclosure formed through multiple times of injection molding . . ." (Ex. A at 10 (Abstract)

-"The present invention relates . . . more particularly to an automatic switch that has an ***integrally*** injection-molded enclosure" (Ex. A at 15, col. 1:5-8 (Background of the Invention))

-"The main body has an ***integrally*** injection-molded plastic enclosure . . ." (Ex. A at 15, col. 1:41-42 (Summary of the Invention));

-"The ***integrally*** injection-molded enclosure of the main body . . ." (Ex. A at 15, Col. 1:51 (Summary of the Invention));

-"The main body 20 has an ***integral*** enclosure that is formed through three times of injection molding to include a circuit protecting layer 21 . . ., an outer case 22 . . . and an anti-slipping layer 23 . . ." (Ex. A at 15, Col. 2:31-32 (Detailed Description)); and

- "The enclosure of the main body 20 of the automatic switch 10 is ***integrally*** formed through multiple times of injection molding . . ." (Ex. A at 16, Col. 3:13-14 (Detailed Description)).



FIG.4

**Note:** "The specification is the single best guide to the meaning of a disputed claim term." ***Philips v. AWH Corp.,*** 415 F.3d 1303, 1321 (Fed. Cir. 2005)(en banc).

# '112 Patent – Construction – "body"

## Not Disputed:

- The '112 patent distinguishes and criticizes the prior art *box-type* constructions.

  In fact, the '112 patent doesn't just criticize the prior art box, it expressly states that the claimed main body ***replaces*** the prior art box-type switches:

  > In brief, the automatic switch **10** of the present invention uses the main body **20** having cable-connected connector sets **30** to replace the conventional box-type switch **40**, enabling the switch **10** to be used in a more convenient manner. Moreover, the enclosure of the main body **20** of the automatic switch **10** is integrally formed through multiple times of injection molding to protect circuits provided on the internal circuit board **24**, making the automatic switch **10** safer and more convenient for use.

  *'112 patent, col. 3, lines 11-12*

# '112 Patent – Construction – "body"

## Not Disputed:

- The '112 patent repeatedly characterizes the described "body" as **the invention** throughout the specification:

  ▶ There are at least nine instances in which the '112 patent refers to the disclosed embodiment as "the invention"

  ▶ These references are in each part of the specification:
    - Background
    - Summary of Inventions
    - Brief Description of the Drawings
    - Detailed Description of the Preferred Embodiments

  ▶ There is no "expansive" language in the specification that even hints that this is not "the invention"

# '112 Patent – Construction – "body"

## Not Disputed:

All of the accused Belkin products have the prior art *box-type* construction that includes outer walls made of rigid plastic material assembled by means of screws, and no integral circuit protection that encapsulates the circuit board.

# '112 Patent – Construction – "body"

- **ATEN's currently-proposed construction of "body" is not only unsupported, it is fatally inconsistent and only raises more issues**

  – ATEN now proposes "body" be construed as

    *"an enclosure having one or more connector port openings and an internal switching circuit"*

## '112 Patent – Construction – "body"

- **ATEN's currently proposed construction of "body" is not only unsupported, it is fatally inconsistent and only raises more issues**

  – Fatally inconsistent:  would include "switching circuit" within the "body," even though the next claim element in claim 1 is "a switching circuit contained in the body"

    ▸ Is that phrase now to be read out of the claim?

  – The next claim element in claim 1 is "a set of connector ports."

    ▸ Is that superfluous now too under ATEN's construction, or are "connector port openings" something different than a "connector port?"

      ▪ Not clear from the Specification

38

# '112 Patent – Construction – "body"

**ATEN's Proposed Construction in the present case, that the "body" has *connector port openings* and an *internal switching circuit*, is directly contrary to Its prior proposed construction**

3.  "Body" Means "The Main, Central, Or Principal Part" As Further Defined By The Claims (FOF Nos. 340 Through 356)

\* \* \*

Under Rule 1, one must see if the claims help to define the term body – they do. Claim 1 sets out a switch that is comprised of "a body, a switching circuit contained within the body, a set of connector ports electrically coupled to the switching circuit and a plurality of cables. . . ." JX-01 at 3:19-22. This language describes the switch, not the body, and tells us that a switch has three main components, (1) body; (2) switching circuit; and (3) connector ports. The plain language suggests that the body is distinct from the switching circuit and from the connector ports which the claim instructs should be added to the body in order to comprise the switch. Tr. (D. Barker, 07/17/07) at 467:06-09. Applying Rule 7 above, and considering the dependent claims, claim 9 recites that "the switching circuit includes a circuit board" (while "the body includes a circuit protection layer enclosing the circuit board") and thus the ALJ must presume that the circuit board is not part of the body. JX-01 at 3:47-48; Tr. (D. Barker, 07/17/07) at 467:16-19. Likewise, claim 10 recites that the circuit board includes a plurality of electronic elements and thus it is presumed that neither the circuit board nor the electronic elements (including the connector ports) are considered part of the body. JX-01 at 3:50-53; Tr. (D. Barker, 07/17/07) at 467:24-468:13. The proposed construction of "body" is summarized on CDX-515.

ATEN's ITC Post-Hearing Brief at pp. 9-10.

39

# '112 Patent – Misstatements in ATEN's Reply

- **ATEN's Reply Brief is rife with misstatements of fact and law**

- **A few of the more egregious misstatements will be addressed in the next few slides.**

# '112 Patent – Misstatements in ATEN's Reply

**ATEN states**: "Belkin, on the other hand, ignores the claim language, the specification, and prosecution history of the '112 patent." (Reply, Pg. 1, lines16-17)

**The facts**:

– Belkin's Brief discusses these things repeatedly on pages 4 to 8, including multiple references to the claim language, quotations from the specification, citations to the specification, and reprints of Figures from the patent.

(cont'd next slide)

# '112 Patent – Misstatements in ATEN's Reply

**The facts**, cont'd:

– Belkin's Brief also repeatedly cites to and relies on the Declaration of R. Dezmelyk, which extensively discusses the claim language, the specification and the prosecution history (*see, e.g.,* ¶¶ 57-66, 83-88, 93-99, 100, 111)

• ATEN's assertion that Belkin ignores the intrinsic evidence is patently false; rather it is ATEN that has almost completely run away from the intrinsic evidence.

## '112 Patent – Misstatements in ATEN's Reply

**ATEN states**:  "Belkin outlines these mandatory characteristics of a 'body' [in the bullet points] on page 7 of its Brief." (Reply, Pg. 3, lines 16-17)

**The facts**:

– The bullet points on page 7 of Belkin's Brief are citations to various parts of the specification that repeatedly stress that the circuit-protecting aspect of the "body" is "the invention" and that it "replaces" the prior art box-type enclosure

– Belkin's proposed construction does **not** include the various specific ways the specification lays out for accomplishing that goal.

– These are not "mandatory characteristics" of Belkin's claim construction for "body"

(cont'd next slide)

# '112 Patent – Misstatements in ATEN's Reply

**The facts**, cont'd:

- Rather, Belkin's position is that based upon the totality of the many such statements throughout the '112 specification, which establish that the claimed "body" cannot include the prior art "box."

- Among the many boxes that might be excluded, clearly excluded is the disparaged box made of rigid plastic or metal and held together by screws that the specification says is ***replaced*** by the disclosed "body."

- ATEN is plainly mischaracterizing Belkin's position, attempting to set up a straw man to knock down

44

# '112 Patent – Misstatements in ATEN's Reply

**ATEN states**:  "The fight over 'body' is really a fight over 'screws.'" (Reply, Pg. 4, lines 23, et seq.)

**The facts**:

– Belkin's arguments are not about "screws."

– As detailed in both Belkin's Brief and the Dezmelyk Declaration, the issue as to "body" is what one skilled in the art would understand the claimed "body" to mean, and conversely, NOT to mean.

– The repeated references in the '112 specification to the circuit protection features of "the invention," which the prior art "box" did not provide, leads to the correct construction.

• ATEN's straw man argument fails.

45

# '112 Patent – Misstatements in ATEN's Reply

**ATEN states**:  "Belkin merely wants the Court to rubber stamp the non-binding decision of the ITC on the '112 patent, . . .." "Belkin's sole support for its non-construction is: The ITC did it, and so this Court must too." (Reply, Pg. 1, lines 2-3, 19-20).

**The facts**:

– ATEN ignores Belkin's Brief and the Dezmelyk Declaration, both of which extensively discussed the reasons why the intrinsic and extrinsic evidence overwhelming support Belkin's construction of "body" which excludes the "replaced" box-type enclosure that ATEN's construction would include.

– For example, compare the extensive Dezmelyk Declaration with the sparse Olivier Declaration.

ATEN's gross misstatement is remarkable.

# '112 Patent – Misstatements in ATEN's Reply

**ATEN states**:  ". . .'body' is a simple term as used in the '112 patent and its claim, and should be construed as such (citing to *Phillips* for the proposition that "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges ….") (Reply, Pg. 2, lines 11-15, et seq.)

**The facts**:

– ATEN, Belkin, Mr. Dezmelyk, ATEN's experts Dr. Olivier and Dr. Barker, the ITC, and the ALJ, all AGREED that "body" has NO meaning in the art.

– "The term 'body' has no distinct meaning in the field of electrical engineering." (Olivier Decl., pg. 3, lines 10-1).

ATEN's statement is plainly wrong.

# '112 Patent – Misstatements in ATEN's Reply

**ATEN states**:  "Finally, to the extent the '112 patent includes *mild criticism* of box-type switches, such criticism is, at most, tangentially related to the use of screws to hold the box enclosure together.  Therefore, that criticism cannot serve to limit the claims to switches with screw-less bodies." (Reply, Pg. 8, lines 5-8, et seq.) (emphasis added).

**The facts**:

– The '112 patent does MUCH more than mildly criticize the prior art box-type enclosures.

– In fact, it goes to great length to explain their deficiencies, contrast those deficiencies with the invention, and then expressly states that the "body" of the claimed invention is intended to "**replace**" the prior art box-type enclosures.

ATEN's attempt to diminish the '112 patent's specification's many statements that support Belkin's construction plainly fails.

## '112 Patent – Construction – "body"

- **ATEN's Latest Attempt to Rely on Prosecution History Fails Completely**

  – ATEN's Reply (pgs 8-9) argues that an amendment and its silence in response to an Examiner's interpretation of "body" compels adoption of its proposed construction

    ▶ This Argument was briefed at the ITC, who deemed it worthy only of a footnote rejection:

      "*The inventor's silence when the examiner called the prior art box a body cannot be relied upon to broaden the scope of the claims.* (string citation omitted)."

ITC Final Decision, page 11, fn 5 (*El-Gamal Decl.*, Exhibit H, page 497).

# '112 Patent – Construction – "body"

- **ATEN's Latest Attempt to Rely on Prosecution History Fails Completely**

  – ATEN's attempt to shift focus from the patent's specification to an amendment it made during prosecution is also unavailing, as a similar attempt has been specifically rejected in another case:

    "The problem with  [plaintiff's] reliance on the prosecution history is that representations made by an applicant during prosecution cannot be used to enlarge the content of the specification."

    *Lydall Thermal/Accoustical, Inc., v. Federal Mogul Corp.*, 566 F.Supp. 602, 614-15 (E.D. Mich., 2008), *aff'd,* 344 Fed. Appx. 607, 2009 WL 2893190 (Fed.Cir. 2009)(unpub.)(citing to *Biogen, Inc. v. Berlex Labs., Inc.,* 318 F.3d 1132, 1140 (Fed.Cir. 2003)

## '112 Patent – Construction – "body"

# ATEN's Latest Attempt to Rely on Prosecution History Fails Completely

- The facts of *Lydall* are on point
  - Lydall had deleted "layers" by amendment from the claim in dispute, and had included a statement that it was doing so to clarify that the claim was not limited
  - District Court nonetheless construed claim 1 to include "layers" given the teachings of the specification:

- The Federal Circuit (2009 WL 2893190) agreed:

  "We also agree with the district court that Lydall's reliance on the prosecution history and the doctrine of claim differentiation is unpersuasive. 'Representations during prosecution cannot enlarge the content of the specification.' (citing to *Biogen*). Thus, when the prosecution history appears in conflict with the specification, any ambiguity must be resolved in favor of the specification. . . . Here, the specification is clear. The sole embodiment of the invention includes a batt that has three layers."

## '112 Patent – "body"

**CONCLUSION on "body":**

- That ATEN was compelled to make so many egregiously incorrect statements of fact and law, and take the unavailing position that its silence and amendment during prosecution trump the specification, only serve to underscore the weakness of its position.

# '112 Patent – Construction – "integrated/fixedly attached"

- **Next Claim Terms in the '112 patent**

    - "integrated"

    - "fixedly attached"

    - Both parties have agreed for the purposes of this Markman that the limitations should be construed the same, and should be construed as
        - "formed into a unified whole that is inseparable without disassembling the whole"

## '112 Patent – Construction – "integrated/fixedly attached"

- **Not Disputed:**

    - There is only one type of cable-body connection disclosed in the '112 patent, the nature of which corresponds to the one type of "body" disclosed in the '112 patent.

    - The specification as filed does not describe the connection as either *integrated* or *fixedly attached* but rather describes the connection as cable connected cables.

# '112 Patent – Construction – "integrated/fixedly attached"

- **Not Disputed:**

    - The term "integrated" is used in the '112 patent in the context of describing the *integral* injection molded "body."

    - Therefore, that is the context in which it must be construed

## '112 Patent – Construction – "integrated/fixedly attached"

- Belkin does not believe that the language:

    "*that is inseparable without disassembling the whole*"

    should in any way negate the requirement the **cables** and **body** be "<u>formed</u> into a unified whole."

    – This is the construction ATEN proposed in the ITC as well as when this case was pending in Texas.

    – This is also consistent with how the term "integral" is used in the '112 patent.  (*See Dezmelyk Decl.*, ¶¶ 89-107).

# '112 Patent – Construction – "integrated/fixedly attached"

## CONCLUSON on "integrated/fixedly attached"

- **The construction is now agreed upon.**
- **It applies to the manner in which the cables are attached to the body, i.e., cables are co-molded to the body.**
- **"Formed into a unified whole" is primary.**

Next Up, Belkin's '287 Patent Claim Construction Presentation



# '287 Patent - Tutorial



*'287 Patent, (El-Gamal Decl., Ex. B (Dkt. No. 280-2))*

- When a KVM switch also switches peripheral devices, there can be two types of switching:
  - <u>Synchronous switching</u> (switching KVM devices and peripherals together)
  - <u>Asynchronous switching</u> (switching KVM devices and peripherals separately)
- According to the '287 patent, prior art KVM switches interrupted data flow when the peripheral device was switched from one connected PC to another connected PC.  *See* '287 patent, 1:21-24 (*El-Gamal Decl., Ex. B (Dkt. No. 280-2)). See also Dezmelyk Decl.*, ¶ 29.

# '287 Patent - Tutorial



*'287 Patent, Figure 1 (El-Gamal Decl., Ex. B (Dkt. No. 280-2))*

- The '287 patent is directed to a KVM switch that solves the problem of the prior art and allows switching of console devices (e.g., keyboards, mice) and peripherals (e.g., printers) either asynchronously or synchronously without interruption of data flow to the peripheral when the switch is changed.  *See* '287 patent, 1:67-2:4 (*El-Gamal Decl., Ex. B (Dkt. No. 280-2)). See also Dezmelyk Decl.*, ¶ 113.



# Level of Ordinary Skill In The Art

| Belkin | ATEN |
|---|---|
| Bachelor of Science Degree in Electrical Engineering, Computer Science or Computer Engineering with course work in communication systems and electronics, at least three years of post-graduate industrial experience in the communication equipment industry, and substantial experience (*e.g.*, 2 years or more) in programming and designing devices in accordance with USB and USB HID specifications. | None proposed |



## '287 Patent (switched either synchronously or asynchronously…, without interruption….)

…wherein the console devices can be switched either synchronously or asynchronously with the one or more than one peripheral device to the same one of the plurality of computer systems or to different ones of the plurality of computer systems, without interruption of the signal to the one or more than one peripheral device.

Found in Asserted Claim 1

| Belkin's Construction | ATEN's Construction |
| --- | --- |
| Console devices are switched from a first computer system to another computer system either together (i.e., synchronous switching) or separately from (i.e., asynchronous switching) a peripheral device. Both synchronous and asynchronous switching must be performed by the signal switch, and must be performed such that the data stream passing between the first computer system and the peripheral device is left unaffected at the time of switching | Console devices can be switched among computer systems either together with the switching of peripheral devices (i.e., synchronous switching) or independently (i.e., asynchronous switching). Asynchronous switching may be performed without interrupting the signal from a computer system to a peripheral device |

# '287 Patent (switched either synchronously or asynchronously…, without interruption….)

- To construe patent claims, Courts start by analyzing the words of the claims themselves. *Phillips*, 415 F.3d at 1312-13.

- The claims must be read in view of the specification, of which they are a part. *Phillips*, 415 F.3d at 1315, *citing Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

- The specification identifies "what the [inventor] did and did not invent…"). *Phillips*, 415 F.3d at 1315, quoting *In re Fout*, 675 F.2d 297, 300 (CCPA 1982).

- "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

# '287 Patent (switched either synchronously or asynchronously…, without interruption….)

- The Court should also consider the patent's prosecution history, if it is in evidence. *Phillips*, 415 F.3d at 1317.
  - Belkin submitted all relevant portions of the prosecution history at Exhibit E to the El-Gamal declaration.
- Extrinsic evidence (dictionaries, technical experts) can be useful when construing claims. *Phillips*, 415 F.3d at 1319.
- Extrinsic evidence cannot be used to vary or broaden construction of a term beyond that dictated by the intrinsic evidence (claim language, specification and prosecution history).  *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1348-49 (Fed. Cir. 2005).

# '287 Patent (switched either synchronously or asynchronously…, without interruption….)

**1.** A signal switch for sharing a video monitor, a plurality of console devices compliant with an industry standard and one or more than one peripheral device in any of a plurality of computer systems, comprising:

a CPU comprising a first memory for storing a management program for managing the signal switch;

a hub switch module connected to the CPU and configured to communicate with any of the plurality of computer systems, and the one or more than one peripheral device, such that a signal passing from the hub switch module to the one or more than one peripheral device emulates origination from a computer;

a device control module for emulating according to the industry standard the plurality of console devices, connected to the CPU and the hub switch module;

a host control module connected to the CPU and configured to communicate with the plurality of console devices; and

a video control module connected to the CPU and configured to communicate with a video monitor device;

wherein the console devices can be switched either synchronously or asynchronously with the one or more than one peripheral device to the same one of the plurality of computer systems or to different ones of the plurality of computer systems, without interruption of the signal to the one or more than one peripheral device.

## '287 Patent (switched either synchronously or asynchronously…, without interruption….)

> wherein the <u>console devices</u> can be <u>switched either synchronously or asynchronously</u> with the one or more than one <u>peripheral device</u> to the same one of the plurality of computer systems or to different ones of the plurality of computer systems, <u>without interruption of the signal</u> to the one or more than one <u>peripheral device</u>.

- Plain language of claim requires:
  - Console devices and peripherals are switched both synchronously and asynchronously [this is undisputed]; and
  - Switching, regardless of type, must be done without interruption of the signal to the peripheral.
  - Claim terms should be "read according to the rules of ordinary English grammar." *In re Hyatt*, 708 F.2d 712, 714 (Fed. Cir. 1993).

## '287 Patent (switched either synchronously or asynchronously…, without interruption…)

- ## **ATEN is rewriting the claim to either add a limitation…:**

  …wherein the console devices can be switched either synchronously or asynchronously with the one or more than one peripheral device to the same one of the plurality of computer systems or to different ones of the plurality of computer systems, **such that asynchronous switching of the console devices and the one or more than one peripheral device is performed** without interruption of the signal to the one or more than one peripheral device.

**'287 Patent (**switched either synchronously or asynchronously…, without interruption**…)**

- **… or delete a limitation:**

  …wherein the console devices can be switched ~~either synchronously or~~ asynchronously with the one or more than one peripheral device to the same one of the plurality of computer systems or to different ones of the plurality of computer systems, without interruption of the signal to the one or more than one peripheral device.

## '287 Patent (switched either synchronously or asynchronously…, without interruption…)

- ATEN's construction is inconsistent with plain meaning of the claim. *In re Hyatt*, 708 F.2d 712, 714 (Fed. Cir. 1993).

- There is also no support for ATEN's construction in the specification

## '287 Patent (switched either synchronously or asynchronously…, without interruption…)

- The patent identifies interruption of data flow to peripherals when switching as a problem

> A problem with current KVM switches is that if a USB peripheral, such as a printer, is connected to the switch, data flow is interrupted to that peripheral when the switch is changed.

*'287 Patent, 1:21-24 (El-Gamal Decl., Ex. B (Dkt. No. 280-2))*

73

## '287 Patent (switched either synchronously or asynchronously…, without interruption…)

- The <u>Summary of Invention</u> states that the "**present invention**" can switch console devices and peripherals either asynchronously or synchronously without interrupting data flow to the peripheral:

> ### SUMMARY OF INVENTION
>
> The present invention meets this need by providing a KVM switch that is also a peripheral sharing switch, which allows all the computers connected to the switch to share any USB peripheral devices, and <u>which can switch the KVM channels and peripheral channels</u> to a common computer or to different computers <u>either asynchronously or synchro-nously without interruption of data flow to that peripheral</u> when the switch is changed. USB peripherals may be

*'287 Patent, 1:64-2:4 (El-Gamal Decl., Ex. B (Dkt. No. 280-2) )*

## '287 Patent (switched either synchronously or asynchronously…, without interruption…)

- Contrary to the "**Summary of Invention**" in the '287 patent as shown on the prior slide, ATEN's Reply Brief makes the following statement:

| | |
|---|---|
| 13 | As explained in ATEN's opening brief, the specification describes only |
| 14 | asynchronous switching "without interruption of the signal." D.I. 274-3, '287 |
| 15 | Patent at 3:66-4:11, 4:29-35. <u>Belkin has not identified a single instance in the</u> |
| 16 | <u>specification where synchronous switching is described "without interruption."</u>  In |

*ATEN Reply 13:13-16 (Dkt. 286)*

- This statement **is false**.

## '287 Patent (switched either synchronously or asynchronously…, without interruption…)

| ATEN's Statement in Reply Br. | '287 Patent Specification |
|---|---|
| "  As explained in ATEN's opening brief, the specification describes only asynchronous switching "without interruption of the signal. [citations omitted] Belkin has not identified a single instance in the specification where synchronous switching is described "without interruption." *ATEN Reply 13:13-16 (Dkt. 286)* | "The present invention meets this need by providing a KVM switch that is also a peripheral sharing switch, which allows all the computers connected to the switch to share any USB peripheral devices, and which can switch the KVM channels and peripheral channels to a common computer or to different computers either asynchronously or synchronously without interruption of data flow to that peripheral when the switch is changed." *'287 Patent, 1:64-2:4* |

76

# '287 Patent (switched either synchronously or asynchronously…, without interruption…)

FIG. **1** illustrates one of the many ways in which the present invention may be used, in a simple configuration, a signal switch **10** according to the present invention permits a user to control a plurality of computer systems **12** (represented by first computer **121** and second computer **122**), and USB compatible peripherals **20** (as shown by first printer **22**) with a monitor **14**, first keyboard **16**, and first mouse **18**. In this example, control of the peripheral first printer **22** can be maintained by computer **121** even while monitor **14**, first keyboard **16** and first mouse **18** are controlling computer **122**. This is because switch **10** can switch between a first channel (not shown) connecting monitor **14**, first keyboard **16** and first mouse **18** to first computer **121** and a third channel (not shown) connecting monitor **14**, first keyboard **16** and first mouse **18** to second computer **122**, while maintaining a second channel (not shown) connecting first computer **121** to first printer **22** such that a first data flow between first computer **121** and first printer **22** is not interrupted.

*'287 Patent, 3:60-4:11 (El-Gamal Decl., Ex. B (Dkt. No. 280-2))*

- ATEN relies on this portion of specification to argue that patent only teaches that you can asynchronously switch without interruption.

- This teaching is <u>not</u> limited to asynchronous switching, as ATEN suggests.

- Consistent with "Summary of Invention," teaching applies to **<u>both</u>** asynchronous switching and synchronous switching

# '287 Patent (switched either synchronously or asynchronously…, without interruption…)

- ATEN's only other cite:

> Thus, <u>for example</u>, the first data flow between first computer **121** and first printer **22**, a second data flow between third computer **123** and scanner **241**, and a third data flow between fourth computer **124** and second printer **2421** all could be maintained without interruption while keyboard **16** and mouse **18**, and optionally monitor **14**, are switched among computer systems **12**.

*'287 Patent, 4:29-35  (El-Gamal Decl., Ex. B*
*(Dkt. No. 280-2))*

- While this teaching relates to asynchronous switching, it only confirms that asynchronous switching, takes place without interruption of data flow.
- Specification clearly states that this is only an "<u>example</u>."
- Does not say anything about what happens during synchronous switching.

# '287 Patent (switched either synchronously or asynchronously…, without interruption…)

- ATEN **mischaracterizes** what Belkin said about this quote:

| 16 | specification where synchronous switching is described "without interruption."  In |
|----|
| 17 | fact, Belkin readily admits that the '287 Patent "does not say anything about what |
| 18 | happens during synchronous switching."  D.I. 280 at 18.  The '287 Patent neither |
| 19 | prohibits nor requires that synchronous switching be done without interruption. |

*ATEN Reply 13:16-19 (Dkt. 286)*

- This is **what Belkin actually said**:

| 13 | of data flow to peripherals.  Ex. B at 1:64-2:4.  The only other portion of the |
|----|
| 14 | specification that ATEN cites, '287 patent, 4:29-35, describes a situation where the |
| 15 | switch is asynchronously switching, but does not say anything about what happens |
| 16 | during synchronous switching.  That the patent describes an asynchronous switching |
| 17 | operation is not surprising but does not mean that that the 'without interruption' |
| 18 | requirement in the claim applies only to such asynchronous switching. |

*Belkin Cl. Const. Br. 18:13-18 (Dkt. 280)*

- Belkin **never said** that the '287 patent does not "say anything" about what happens during synchronous switching.

- Belkin argued that **this one particular example** was describing an asynchronous switching operation.

## '287 Patent (switched either synchronously or asynchronously…, without interruption…)

- The prosecution history supports Belkin's construction.

- During prosecution, ATEN repeatedly told the Patent and Trademark Office that its invention allowed both <u>asynchronous</u> and <u>synchronous</u> switching of console devices and peripherals <u>without interrupting data flow to peripherals</u>.

  – ATEN **<u>distinguished its invention from the prior art</u>** on this basis.

# '287 Patent (switched either synchronously or asynchronously…, without interruption…)



December 8, 2004: Patent Office **rejects** claims 1-7 as being obvious in view of Thomas and Dickens.

---

### Claim Rejections - 35 USC § 103

4.      The following is a quotation of 35 U.S.C. § 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.  Patentability shall not be negatived by the manner in which the invention was made.

5.      Claims 1-7 are rejected under 35 U.S.C. § 103(a) as being unpatentable over Thomas et al. (US No. 6,671,756) in view of Dickens et al. (US No. 6,549,966).

*'287 Patent Office Action, December 8, 2004 (El-Gamal Decl., Ex. E, p. 235 (Dkt. No. 280-5))*

## '287 Patent (switched either synchronously or asynchronously…, without interruption…)

ATEN's first argument is that what it called the "**present invention**" allowed both <u>asynchronous</u> and <u>synchronous</u> switching of console devices and peripherals <u>without interrupting data flow to peripherals</u>.

**AMENDMENT TO CLAIMS**

As explained in the Description, a problem with current KVM switches is that if a USB peripheral, such as a printer, is connected to the KVM switch, data flow is interrupted to that peripheral when the switch is changed.  (¶ 0003)  The present invention meets this need by providing a KVM switch which can <u>switch the KVM channels and peripheral channels (i) to a common computer or to different computers either asynchronously or synchronously</u> and (ii) <u>without interruption of data flow to that peripheral</u> when the switch is changed.  (¶ 0007)

*'287 Patent Response And Amendment, March 6, 2005 (El-Gamal Decl., Ex. E, p. 249-250 (Dkt. No. 280-5))*

# '287 Patent (switched either synchronously or asynchronously…, without interruption…)

- Thus, ATEN argued that its invention required:

  > (i) switching the KVM channels (i.e., console devices) and peripheral channels either **asynchronously** or **synchronously**; **and**
  >
  > (ii) without interrupting data flow to the peripheral.

- ATEN's argument to the PTO **confirms** the plain English reading of the claim language.

- The "without interruption" requirement applies to both asynchronous and synchronous switching.

- If this is not what ATEN meant, it would not have used the word "**and**" between the first and second requirements.

**'287 Patent (**switched either synchronously or asynchronously…, without interruption**…)**

ATEN then stated that "to **better point out** and **distinctly claim the invention**," it was amending its claim to add the disputed claim language:

> In order to better point out and distinctly claim the invention, Claim 1 has been amended to add:
>
> > "wherein the console devices can be switched either synchronously or asynchronously with the one or more than one peripheral device to the same one of the plurality of computer systems or to different ones of the plurality of computer systems, without interruption of the signal to the one or more than one peripheral device."
>
> As noted above, there is clear support in the Description for this amendment.

*'287 Patent Response And Amendment, March 6, 2005 (El-Gamal Decl., Ex. E, p. 251 (Dkt. No. 280-5))*

## '287 Patent (switched either synchronously or asynchronously…, without interruption…)

The Amendment

**IN THE CLAIMS:**

1. (Currently amended)  A signal switch for sharing a video monitor, a plurality of console devices compliant with an industry standard and one or more than one peripheral device in any of a plurality of computer systems, comprising:

a CPU comprising a first memory for storing a management program for managing the signal switch;

a hub switch module connected to the CPU and configured to communicate with any of the plurality of computer systems, and the one or more than one  peripheral device, such that a signal passing from the hub switch module to the one or more than one peripheral device emulates origination from a computer;

a device control module for emulating according to the industry standard the plurality of console devices, connected to the CPU and the hub switch module;

a host control module connected to the CPU and configured to communicate with the plurality of console devices; and

a video control module connected to the CPU and configured to communicate with a video monitor device;

wherein the console devices can be switched either synchronously or asynchronously with the one or more than one peripheral device to the same one of the plurality of computer systems or to different ones of the plurality of computer systems, without interruption of the signal to the one or more than one peripheral device.

*'287 Patent Response And Amendment, March 6, 2005 (El-Gamal Decl., Ex. E, p. 246 (Dkt. No. 280-5))*

# '287 Patent (switched either synchronously or asynchronously…, without interruption…)

- ATEN then turned to the cited prior art.
- ATEN **distinguished** its invention from the prior art:

> **Dickens et al. Do Not Teach Asynchronous/ Synchronous Switching**
>
> The Office Action uses Dickens et al. as a secondary reference, and combines the teachings of Dickens et al. with Thomas et al. to purportedly meet the limitations of the claims that the Office Action acknowledges lack in Thomas et al. In view of the above-mentioned reasons, however, it is apparent that Thomas et al. lack much more than the claimed limitations of the device control module and the host control module. Further, there is no motivation cited for combining these references.

*'287 Patent Response And Amendment, March 6, 2005 (El-Gamal Decl., Ex. E, p. 255 (Dkt. No. 280-5))*

## '287 Patent (switched either synchronously or asynchronously…, without interruption…)



Dickens et al. teaches a routing device, not a switching device.  A simple example will demonstrate the difference between Dickens et al. and the present invention.  Figure 1 from the present invention is as follows:

Fig. 1

ATEN told the Examiner that "[a] simple example will demonstrate the difference between Dickens et al. and the present invention."

*'287 Patent Response And Amendment, March 6, 2005 (El-Gamal Decl., Ex. E, p. 256 (Dkt. No. 280-5))*

## '287 Patent (switched either synchronously or asynchronously…, without interruption…)

Here, the console devices are keyboard 16, mouse 18, and video monitor 14. The peripheral device is first printer 22. There are first computer 121 and second computer 122. By way of example, suppose that in an initial state, console devices (14, 16, 18) and printer 22 are connected to first computer 121, which is sending a signal through switch 10 to printer 22 (a document being spooled, for example). The user now switches to a second state, in which switch 10 synchronously connects console devices (14, 16, 18) and printer 22 to second computer 122. The data stream coming from first computer 121 at the time of the switching is left unaffected (the document being spooled finished printing), but otherwise printer 22 is now connected to second computer 122:

*'287 Patent Response And Amendment, March 6, 2005 (El-Gamal Decl., Ex. E, p. 257 (Dkt. No. 280-5))*

**ATEN admits in its Reply Brief that this "simple example" describes <u>synchronous switching without interruption</u> of data flow to the peripheral.**

| 9 | The fact that the particular example provided by the applicant was |
|---|---|
| 10 | synchronous switching or that the switching was without interruption is irrelevant. |

*ATEN Reply 15:9-10 (Dkt. 286)*

**'287 Patent (**switched either synchronously or asynchronously…, without interruption**…)**

ATEN summarized the distinction between its claims and the cited prior art by arguing that the alleged invention of the '287 patent allowed switching console devices both **synchronously and asynchronously** with peripheral devices "**without interruption of the signal**" to the peripheral devices.

> Dickens et al. do not allow the user to switch the peripherals synchronously with the console devices; rather they remain connected to a "network" and the host computers contend for the channel to the peripheral independent of the console device connections. Therefore, Dickens et al., neither alone nor in combination with Thomas et al., teach or fairly suggest switching the console devices <u>either synchronously or asynchronously</u> with one or more peripheral devices to the same one of a plurality of computer systems, or to different ones of the plurality of computer systems, <u>without interruption of the signal</u> to <u>the one or more peripheral devices.</u>"

*'287 Patent Response And Amendment, March 6, 2005 (El-Gamal Decl., Ex. E, p. 258 (Dkt. No. 280-5))*

# '287 Patent (switched either synchronously or asynchronously…, without interruption…)

- ATEN's argument regarding <u>routing</u> as opposed to <u>switching</u> is a red herring and underscores that Belkin's construction is correct.

- During prosecution, <u>ATEN argued</u> that Dickens <u>did not synchronously/asynchronously switch without interruption</u> because it used a routing device that used arbitration to avoid conflicts:

> In contrast, Dickens et al. functions like a router, *e.g.*, more like a network.
>
> Switch 10 of the present invention is replaced by a data routing device 100. Dickens et al. teach a system of arbitration to avoid conflicts when the computers send data to the printer:
>
> > "Unresolved conflicts would therefore occur if more than one USB host was connected to the same USB peripheral bus without providing a system of arbitration." (c.1, ll. 60-62).
> >
> > . . . .

*'287 Patent Response And Amendment, March 6, 2005 (El-Gamal Decl., Ex. E, p. 257 (Dkt. No. 280-5))*

## '287 Patent (switched either synchronously or asynchronously…, without interruption…)

- ATEN then summarized the distinction between the claims and Dickens by arguing that **Dickens does not synchronously switch** and that therefore, neither Dickens nor Thomas teach or suggest switching console devices both **synchronously and asynchronously** with peripheral devices "**without interruption of the signal**" to the peripheral devices.

> Dickens et al. do not allow the user to switch the peripherals synchronously with the console devices; rather they remain connected to a "network" and the host computers contend for the channel to the peripheral independent of the console device connections. Therefore, Dickens et al., neither alone nor in combination with Thomas et al., teach or fairly suggest switching the console devices either synchronously or asynchronously with one or more peripheral devices to the same one of a plurality of computer systems, or to different ones of the plurality of computer systems, without interruption of the signal to the one or more peripheral devices."

*'287 Patent Response And Amendment, March 6, 2005 (El-Gamal Decl., Ex. E, p. 258 (Dkt. No. 280-5))*

- ATEN cannot now argue that its claims cover a device that synchronously switches console devices and peripherals **with** interruption of data flow to peripherals.

# '287 Patent (switched either synchronously or asynchronously…, without interruption…)

- The prosecution history confirms the plain English meaning of claim 1.

- Because the claim language is so clear, the Court need not determine whether "prosecution disavowal" took place here.

- However, because ATEN repeatedly distinguished its claims by arguing that Dickens does not teach asynchronously/synchronously switching without interruption, a disavowal plainly occurred.

- *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1307 (Fed. Cir. 2007), is one example of many finding prosecution disavowal when patentee distinguished its claims from prior art.

  - Claim term at issue "localized wireless gateway system"

    - "The applicants gained allowance of the claims of the '291 application after stating that the prior art systems 'all appear to be directed to non-localized systems,' and that the 'present invention,' by contrast, was 'restricted to operate within a few feet from a base station (i.e. wireless handsets).'"

    - "… the district court erred in failing to construe the localized system as requiring a range of a few feet."

# '287 Patent (switched either synchronously or asynchronously…, without interruption…)

- Inventor Chen and Yang's testimony is not relevant

- The testimony of an inventor cannot be relied on to change the meaning of the claims. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 983 (Fed. Cir. 1995) (en banc), *aff'd, 517 U.S. 370*; *see also Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1580 (Fed. Cir. 1996) ("*Markman* requires us to give no deference to the testimony of the inventor about the meaning of the claims.").

- This is especially true with respect to inventors Chen and Yang (the CEOs of the respective plaintiffs), who repeatedly testified that they did not know what their invention was:*

\*    Note: The third inventor, Mr. Lou, was not deposed, as he could not be located.

# '287 Patent (switched either synchronously or asynchronously…, without interruption…)

```
 8        Q.  Is the Exhibit 16, which is the '287 patent,
 9    one of the documents you reviewed to prepare for your
10    deposition today?                              11:06:17
11        A.  Yes.
12        Q.  In your own words, can you tell me what you
13    understand the invention of the '287 patent to be?
14            MR. BERNSTEIN:  Objection.  Vague and
15    ambiguous.  Calls for legal conclusion and expert  11:06:50
16    opinion.  Calls for speculation.
17            THE WITNESS:  I think my patent is exactly
18    the content of this document.
19        Q.  BY MR. MILLER:  If you wanted to explain to
20    somebody what you understood your invention that's  11:07:29
21    described in the '287 patent to be, what would you tell
22    them?
23            MR. BERNSTEIN:  Objection.  Vague and
24    ambiguous.  Calls for a legal conclusion and expert
25    opinion.                                        11:07:45
```

*Chen Depo. Tr., 26:8-27:25*

```
 1            THE WITNESS:  I'm not a professional
 2    counselor so I cannot use the legal term to define this
 3    patent.
 4        Q.  BY MR. MILLER:  I'm certainly not asking for
 5    a legal conclusion, I just want to know what your  11:08:15
 6    understanding is.
 7            MR. BERNSTEIN:  You're asking for his
 8    understanding of the patent, your understanding of his
 9    invention of the invention, you're asking for his
10    understanding of what?                          11:08:32
11            MR. MILLER:  I just -- my question stands for
12    itself:  If you had to explain to somebody what the
13    invention is in the '287 patent, what would you tell
14    them?
15            CHECK INTERPRETER:  Correction of the Chinese  11:08:56
16    translation (Mandarin).
17            MR. BERNSTEIN:  Objection.  Vague and
18    ambiguous.  Calls for a legal conclusion and expert
19    opinion.
20            THE WITNESS:  Because patent is patent.    11:09:12
21    Since I'm not a counselor, so I cannot define this
22    patent.
23        Q.  BY MR. MILLER:  So if somebody say at ATEN,
24    asked you what the invention was in the '287 patent, you
25    wouldn't be able to tell them?                  11:09:49
```

94

# '287 Patent (switched either synchronously or asynchronously…, without interruption…)

| 09:12 13 | Q | Do you know what the '287 patent is? |
| 09:12 14 | A | Not exactly. |

**Yang Depo. Tr., 11:13-14 (Jan. 25 ,2011)**

| 09:35 23 | BY MR. BROOKS: |
| 09:35 24 | Q    You've finished the review of the '287 |
| 09:35 25 | patent, Mr. Yang? |
| | 18 |

**Yang Depo. Tr., 18:23-19:13 (Jan. 25, 2011)**

| 09:35 1 | A    I pretty much have gone through the entire |
| 09:35 2 | document. |
| 09:35 3 | Q    Does that refresh your recollection about |
| 09:35 4 | the disclosure in this '287 patent document? |
| 09:35 5 | MR. BERNSTEIN:  Vague and ambiguous as to |
| 09:35 6 | "disclosure." |
| 09:35 7 | THE WITNESS:   It doesn't actually help. |
| 09:35 8 | This document is very, very technical.  There's a |
| 09:35 9 | lot of terms that don't mean anything to me.  There |
| 09:35 10 | is also reference to a Web site for more |
| 09:35 11 | information, and I believe it's not -- it's not |
| 09:35 12 | here.  So -- but I will try to -- I will try my best |
| 09:35 13 | to answer your questions. |

# '287 Patent (switched either synchronously or asynchronously…, without interruption…)

```
09:36  7        Q    Having reviewed the '287 patent, Mr. Yang,
09:36  8   can you now answer my question as to what it is you
09:36  9   contributed to the technology disclosed in this
09:36 10   patent?
09:36 11        MR. BERNSTEIN:  Objection.  Vague and
09:36 12   ambiguous as to "disclosed" --
09:36 13        THE WITNESS:  No.
09:36 14        MR. BERNSTEIN:  -- and "contributed."
09:36 15   BY MR. BROOKS:
09:36 16        Q    You don't -- you don't know what you
09:36 17   contributed?
09:36 18        A    I am not sure.
09:36 19        Q    Do you have any understanding at all of
09:37 20   what it is you contributed?
09:37 21        MR. BERNSTEIN:  Same objections.
09:37 22        THE WITNESS:  No.
09:37 23   BY MR. BROOKS:
09:37 24        Q    Do you have any idea why you are named as a
09:37 25   co-inventor on this patent?

                          20
```

*Yang Depo. Tr., 20:7-22 (Jan. 25, 2011)*

```
09:46 25             Do you have any understanding of why you
09:46  1   were named as a co-inventor?
09:46  2        MR. BERNSTEIN:  Objection.  Calls for a
09:46  3   legal conclusion, calls for speculation.
09:46  4        THE WITNESS:  No.
```

*Yang Depo. Tr., 24:25-25:4 (Jan. 25, 2011)*

## '287 Patent (switched either synchronously or asynchronously…, without interruption…)

- In sum:

  - The plain language of the claim supports Belkin.

  - The specification supports Belkin's construction because it teaches that both asynchronous and synchronous switching are performed without interrupting data flow to the peripheral.

  - The prosecution history supports Belkin because ATEN repeatedly argued that the ability to switch asynchronously and synchronously without interruption of data flow to peripherals distinguished its invention from the prior art.

# '287 Patent (means for switching … without interruption …)

**…means for switching … without interruption …**

**Found in asserted claim 7**

| Belkin's Construction | ATEN's Construction |
|---|---|
| Function: Switching, both synchronously and asynchronously, the selected console device between the first channel and the third channel without interruption of the data flow through the second channel between the first selected computer system and the selected peripheral<br><br>Structure:<br><br>(i) a USB hub switch module (32), which is a plurality of USB hubs interconnected with a matrix analog switch, under the control of firmware executing in the CPU (30);<br><br>(ii) a USB device control module (38), which is one USB device controller, which emulates the console devices, for each host PC connection, under the control of firmware executing in the CPU (30);<br><br>(iii) a USB host control module (44), including a root hub (46) which is a USB host controller chip, under the control of the firmware executing in CPU (3), where the firmware has the algorithm depicted in Figure 5; and<br><br>(iv) a CPU (30) running firmware, where most of the algorithm of is not disclosed. | Function:  switching the selected console device between the first channel and the third channel without interruption of the data flow through the second channel between the first selected computer system and the selected peripheral device<br><br>Structure:  Either: (1) the combination of a KVM switch and a peripheral sharing switch; or (2) the combination of a hub switch module, a device control module and a CPU. |

# '287 Patent (means for switching … without interruption …)

- Section 112, ¶ 6 states:
    - "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."
- Construction of a means plus function limitation requires:
    - Identifying the claimed function, and
    - Determining the corresponding structure disclosed in the specification. *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1308 (Fed. Cir. 1998).

# '287 Patent (means for switching … without interruption …)

- Function:
  - The function is the full functionality allowed by the recitation in the claim. See e.g.:
    - *Generation II Orthotics, Inc. v. Med. Tech., Inc., 263 F.3d 1356, 1364-65 (Fed. Cir. 2001)* (the function in term "joint means in the brace for allowing <u>controlled</u> medial and lateral inclination of each arm relative to the pivotable joint" construed to allow for both "<u>static control</u>" and "<u>dynamic control</u>.")
    - *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1257 (Fed. Cir. 1999) (the function in the term "weighing means for determining the weights of selected additives dispensed by said dispensing means from said storage means" construed to cover all types of weighing.

## '287 Patent (means for switching … without interruption …)

- Structure:
  - The structure disclosed in the specification is "corresponding" structure only if the **specification or prosecution history clearly links or associates that structure to the function** recited in the claim.
    - ▸ *B. Braun Med., Inc. v. Abbott Labs.,* 124 F.3d 1419, 1424 (Fed.Cir.1997) ("We hold that, pursuant to this provision, structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim. This duty to link or associate structure to function is the *quid pro quo* for the convenience of employing § 112, ¶ 6.")
  - The "corresponding" structure is limited to the structure disclosed in the specification and its equivalents.
    - ▸ *Pressure Products Medical Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1316-17 (Fed. Cir. 2010) ("**Section 112 requires that the corresponding structure must be 'described in the specification.'**")

**'287 Patent (means for switching …)**

# Function of "means for switching…"

- Disputed issue is whether the recited function requires both asynchronous and synchronous switching.

- ATEN's construction does not specify what type of switching the function requires
  - Does the function include synchronous switching?
  - Does the function include asynchronous switching?

- ATEN's opening brief says that claim 7 describes asynchronous switching:

| 3 | Claim 7 describes asynchronous switching, the switching between host |
|---|---|
| 4 | computers without also switching the peripheral device. This is supported in the |

*ATEN Claim Construction Br. 25:3-4 (Dkt. 274)*

- ATEN criticizes Belkin for explicitly stating that the function includes asynchronous switching. *ATEN Reply*, 19:27-20:20:3.

- Regardless, ATEN's construction does not limit its construction to asynchronous switching.

## '287 Patent **(means for switching …)**

# Function of "means for switching…"

- The recited function also includes synchronous switching without interruption of data flow:

… means for switching the selected console device between the <u>first channel</u> and the <u>third channel</u> without interruption of the data flow through the <u>second channel</u> between the first selected computer system and the selected peripheral device.



*'287 Patent, Fig. 4 (El-Gamal Decl., Ex. B (Dkt. No. 280-2))*

## '287 Patent (means for switching …)

# Function of "means for switching…"

- Recited function simply says that when console devices are switched between the first and third channel, data flow through the second channel is not interrupted.

- Nothing in the recited function limits the kind of switching performed (asynchronous or synchronous).

- Thus, the recited function comports with the teaching in the specification that console devices and peripherals are switched "either asynchronously or synchronously without interruption of data flow to that peripheral when the switch is changed." ('287 patent, 2:2-4)

## '287 Patent (means for switching …)

# Function of "means for switching…"

- The prosecution history makes it crystal clear that the "means for switching" includes synchronous switching without interruption:

**Claim 7**

Claim 7 was not separately addressed in the Office Action, and it is respectfully noted that the claim is drawn to switching the selected console device "without interruption of the data flow" between the selected computer system and the selected peripheral device.

As noted above, neither Thomas et al. nor Dickens et al., alone or in combination, teach nor fairly suggest a switch wherein the console devices can be switched synchronously with peripherals, without interruption of the signal to the peripheral devices. Therefore, neither Thomas et al. nor Dickens et al., alone or in combination,

ATEN clearly and unambiguously distinguishes the claim from the prior art by pointing out that the claim requires synchronous switching without interruption

*'287 Patent Response And Amendment, March 6, 2005 (El-Gamal Decl., Ex. E, p. 260 (Dkt. No. 280-5))*

## '287 Patent (means for switching …)

# Function of "means for switching…"

- Examiner allowed claim 7 because it required asynchronous **and** synchronous switching without interruption:

**Allowable Subject Matter**

1.   Claims 1-7 are allowable over the prior art of records.

2.   The instant application is deemed to be directed to an unobvious improvement over the invention patented Pat. No. 6,671,756 and 6,549,966. The improvement features of a signal switch for sharing a video monitor, a plurality of console devices complaint with an industrial standard and one or more than one peripheral device  in any of a plurality of computer system include a console device can be switched either synchronously or asynchronously with one or more than one peripheral device to the same one of the plurality of computer system or to different ones of the plurality of computer systems, without interruption of the signal to one ore more than one peripheral device (claims 1 and 7); the step of emulating one or more of the console devices, determining whether any of the plurality console devices is connected to the root hub, or any downstream ports and if so, then enumerating each connected device (claim 5).

*'287 Patent Notice of Allowability, June 17, 2005 (El-Gamal Decl., Ex. E, p. 277 (Dkt. No. 280-5))*

## '287 Patent **(means for switching …)**

# Function of "means for switching…"

- The "means for switching…" in the '287 patent is analogous to *Generation II Orthotics*.

  – The recited function reads on both asynchronous without interruption and synchronous switching without interruption, just as the recited function in *Generation II Orthotics* read on both static control and dynamic control.

  – The function should not be limited to one or the other.

- Not only does the plain language of the recited function support Belkin -- synchronous switching without interruption is required -- but the prosecution history does as well.

- ATEN's prosecution disavowal requires that the function include synchronous switching without interruption of data flow.

  – *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1327 (Fed. Cir. 2003) (Since the patentee offered a narrower construction of the verb 'to visibly outline' in the disputed function, it clearly and unmistakably disclaimed claim scope.)

## '287 Patent **(means for switching …)**

# Structure of "means for switching…"



*'287 Patent, Fig. 4 (El-Gamal Decl., Ex. B (Dkt. No. 280-2))*

## '287 Patent **(means for switching …)**

## Structure of "means for switching…" (hub switch module)

- The parties agree that the structure requires a "hub switch module."

- "Hub switch module" has <u>no meaning to persons skilled in the art</u>.  See *Olivier Decl*. ¶ 12.

  - Only disclosed "hub switch module" is "**USB** hub switch module."

- The specification describes the structure of the hub switch module:

> The <u>USB hub switch module **32**</u> is a bridge between peripheral devices **20** and computer systems **12** and allows the signal switch **10** to connect each of a plurality of computer systems to one or more than one peripheral device. Construction of a circuit suitable as a USB hub switch module is well known in the art with reference to this disclosure. In <u>one preferred embodiment, the USB hub switch module includes 4 USB hubs and matrix analog switches which are controlled by CPU firmware.</u> Texas Instruments(r) manufactures USB Hub chips that are suitable for this module, and the module can be constructed using Application Specific Integrated Circuit (ASIC) design methodology.

- Only disclosed Structure:
  - USB hubs;
  - Matrix analog switches;
  - CPU; and
  - CPU firmware that controls USB hubs and matrix analog switches

*'287 Patent, 5:1-13  (El-Gamal Decl., Ex. B (Dkt. No. 280-2))*

# '287 Patent (means for switching …)

## Structure of "means for switching…" (device control module)

- The parties agree that the structure requires a "device control module."
  - Only disclosed "device control module" is a "**USB** Device Control Module."

- "Device control module" has no meaning to persons skilled in the art.  See *Olivier Decl.* ¶ 12.

- The specification describes the structure of the device control module:

> A USB device control module **38** for controlling signals is connected to the CPU **30** and the USB HUB switch module **32**. The USB device control module **38** comprises USB device chips that are used to emulate the console devices, such as first keyboard **16** and first mouse **18**, for the first output ports **34**. In other words, by having a USB device chip emulate console devices attached to a first computer system, actual console devices may be switched to a second or different computer system, leaving any channels between the first computer system and peripherals connected, any data flow in such channels uninterrupted, and the first computer system still processing as if the actual console devices, now emulated, were still connected. These chips are controlled by CPU **30** firmware. One device chip is required for each computer system **12**. Construction of a circuit suitable as a USB device control module is well known in the art with reference to this disclosure.

- Only disclosed Structure:
  - USB device chips that emulate console devices;
  - CPU; and
  - CPU firmware that controls USB device chips

*'287 Patent, 5:14-30  (El-Gamal Decl., Ex. B (Dkt. No. 280-2))*

# '287 Patent **(means for switching …)**

## Structure of "means for switching…" (host control module)

- The "host control module" is required.
  - Only disclosed "host control module" is a "**USB** host control module."
- The recited function requires switching the console devices between the first channel and the third channel.
- First and third channels pass through the host control module and are therefore part of the structure.

A <u>USB host control module</u> **44** is configured to communicate with a plurality of console devices and is <u>connected to the CPU</u> **30**. Construction of a circuit suitable as a USB host control module is well known in the art with reference to this disclosure. The USB host control module **44** itself comprises a root hub **46** for communicating with one or more than one console devices or downstream hubs, through third output ports **48**. The root hub is a USB compatible hub, which is well known in the art with reference to this disclosure.

**'287 Patent, 5:48-57  (El-Gamal Decl., Ex. B (Dkt. No. 280-2))**

- Structure:
  - USB host controller and root hub (see Dezmelyk Decl., ¶ 140);
  - CPU; and
  - CPU firmware depicted in Figure 5 that controls USB host controller

## '287 Patent (means for switching …)

# Structure of "means for switching…" (USB)

- The only disclosed structures are **USB** hub switch module, **USB** device control module and **USB** host control module.

- The '287 patent discloses NO STRUCTURES OTHER THAN USB.

- ATEN attempts to broaden the claim beyond USB by pointing to a generic statement in the '287 patent:

| 9 | As discussed at length above, there is no reason to limit the structure to USB. |
| 10 | The '287 Patent expressly says, "Although an embodiment is described with |
| 11 | reference to the current HID specification [i.e., USB], it will be apparent to those |
| 12 | skilled in the art with reference to this disclosure that *the invention may be* |
| 13 | *implemented with any specification for device interfacing*." *Id.* at 3:55-59 |
| 14 | (emphasis added).  Thus, the '287 Patent expressly disclosed using device interfaces |
| 15 | other than USB.  Moreover, 35 U.S.C. § 112(6) provides that a means-plus-function |

*ATEN Claim Construction Br. 21:9-15 (Dkt. 274)*

- "[D]evice interfaces other than USB" is not a "structure" because such a statement does not specify an actual structure.

## '287 Patent (means for switching …)

# Structure of "means for switching…" (USB)

- Disclosing that "any" specification can be used is not a disclosure of structure. *Pressure Products Medical Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1316-17 (Fed. Cir. 2010) ("In the context of the corresponding structure to independent claim 1 of the Lee patents, the trial court erred in expanding the definition of "score line" to include structures not disclosed in the specifications of the *1317 Lee patents. **Section 112 requires that the corresponding structure must be "described in the specification."** The Lee patents give a laundry list of prior art references. [citations omitted] The trial court included the structures disclosed within that list of prior art references as corresponding structures for claim 1 by including them in its definition of "score line." In doing so, the trial court impermissibly expanded the corresponding structure of claim 1 to include structures not described in the specification.")

## '287 Patent (means for switching …)

# Structure of "means for switching…" (CPU)

- The parties agree that the structure requires a "CPU" ("central processing unit").

- A CPU can do nothing unless it runs an algorithm.

> Referring to FIG. **4**, the CPU **30** comprises a first memory **40** for storing a management program **42** for managing the operation of the signal switch **10**. A flowchart of the function of a portion of management program **42** suitable for use in the present invention is illustrated in FIG. **5**, and described below.

**'287 Patent, 5:42-47  (El-Gamal Decl., Ex. B (Dkt. No. 280-2))**

- Each component states that it is under the control of CPU firmware and is thus part of the structure.

- Structure for a means-plus-function limitation implemented by a CPU must include not only the CPU, but also the algorithm disclosed in the specification that runs on a CPU for performing the claimed function. *WMS Gaming, Inc. v. International Game Tech.*, 184 F.3d 1339, 1348-9 (Fed. Cir. 1999);

**'287 Patent (means for switching …)**

## Structure of "means for switching…" (algorithm)

- ATEN did not cite any Federal Circuit authority to support its position that "an algorithm is *only* required when the only disclosed structure is a general purpose computer."  *ATEN Reply*, 22:6-7.

- *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359 (Fed. Cir. 2008), says nothing about what happens when the structure is more than a CPU (and the claims were found invalid as indefinite because, like here, no algorithm was disclosed.)

- Issue was never raised in *Gemstar-TV Guide Int'l, Inc. v. ITC*, 383 F.3d 1352, 1361 (Fed. Cir. 2004), meaning case is inapposite.

- In *In re Katz*, ___ F.3d. ___ 2011 WL 607381 (Fed. Cir. 2011), claim reciting "processing means ... for receiving customer number data entered by a caller and for storing the customer number data ... and based on a condition coupling an incoming call to the operator terminal, the processing means visually displaying the customer number data" was found indefinite even though the recited function required a display. 2011 WL 607381, note 12.

115

## '287 Patent (means for switching …)

## Structure of "means for switching…" (algorithm)

- Ultimate inquiry is whether a specially programmed CPU is used to perform the switching functionality required by claim. *In re Katz*, ___ F.3d. ___ 2011 WL 607381 *(Fed. Cir. 2011),

- The '287 patent **explicitly says** that the USB hub switch module and USB device control module are "**controlled by CPU firmware**."

- The USB hub switch module and USB device control module cannot perform any switching without the CPU as programmed by firmware.

    The USB hub switch module 32 is a bridge between peripheral devices 20 and computer systems 12 and allows the signal switch 10 to connect each of a plurality of computer systems to one or more than one peripheral device. Construction of a circuit suitable as a USB hub switch module is well known in the art with reference to this disclosure. In one preferred embodiment, the USB hub switch module includes 4 USB hubs and matrix analog switches which are controlled by CPU firmware. Texas Instruments(r) manufactures USB Hub chips that are suitable for this module, and the module can be constructed using Application Specific Integrated Circuit (ASIC) design methodology.

    A USB device control module 38 for controlling signals is connected to the CPU 30 and the USB HUB switch module 32. The USB device control module 38 comprises USB device chips that are used to emulate the console devices, such as first keyboard 16 and first mouse 18, for the first output ports 34. In other words, by having a USB device chip emulate console devices attached to a first computer system, actual console devices may be switched to a second or different computer system, leaving any channels between the first computer system and peripherals connected, any data flow in such channels uninterrupted, and the first computer system still processing as if the actual console devices, now emulated, were still connected. These chips are controlled by CPU 30 firmware. One device chip is required for each computer system 12. Construction of a circuit suitable as a USB device control module is well known in the art with reference to this disclosure.

- The USB hub switch module and USB device control module cannot perform any switching without the CPU as programmed by firmware (i.e., an algorithm).

# '287 Patent (means for switching …)

## Structure of "means for switching…" (ATEN's alternative proposal)

- ATEN's alternative structure is the combination of a KVM switch and a peripheral sharing switch.  This so-called "structure" is mentioned in passing in the '287 patent (3:31-29):

> The present invention is directed to a signal switch for sharing one or more than one video monitor, keyboard, mouse and peripheral device. The signal switch of the present invention is the combination of a KVM (keyboard video mouse) switch and a peripheral sharing switch. KVM switches are well known in the art with reference to this disclosure. The signal switch according to the present invention allows all computers connected to the switch to share all USB peripheral devices connected to the switch.

*'287 Patent, 3:31-39  (El-Gamal Decl., Ex. B (Dkt. No. 280-2))*

## '287 Patent **(means for switching …)**

### Structure of "means for switching…" (ATEN's alternative proposal)

- As discussed, the structure disclosed in the specification is "corresponding" structure only if the **specification or prosecution history clearly links or associates that structure to the function** recited in the claim.  *B. Braun Med., Inc. v. Abbott Labs.,* 124 F.3d 1419, 1424 (Fed.Cir.1997).

- Unlike the USB hub switch module, USB device control module, USB host control module and CPU, this alternative proposed "structure" is not clearly linked to the switching functionality in claim 7.

- The "structure" recited is nothing but a vague mention of two black boxes. *Dezmelyk Decl.*, ¶¶ 147, 148.

- The specification only says that KVM switches are well known in the art but says nothing about the multitude of structures that might make up such a KVM switch or how such undisclosed structures could perform the recited function. *Dezmelyk Decl.*, ¶ 147.

- The patent does not say anything about what the alleged peripheral sharing switch is or what kind of structure it might be so that it could perform the recited function.  *Dezmelyk Decl.*, ¶ 147.

## '287 Patent (hub switch module)

## Hub Switch Module

Found in Asserted Claim 1

| Belkin's Construction | ATEN's Construction |
|---|---|
| A collection of USB hubs and one or more switches that switch USB signals from the computer systems' USB busses to the USB peripheral devices, and for passing the signals from the emulated console devices from the device control module through the USB hubs to the computer systems. | Bridge between one or more peripheral devices and one or more computers. |

## '287 Patent (hub switch module)

## The "hub switch module" must switch USB hubs

- The term "hub switch module" does not have an understood meaning in the KVM switch industry.  *Olivier Decl.* ¶ 12; *Dezmelyk Decl.* ¶ 124.

- The terms "hub," "switch," and "module" all have well understood meanings.

- By its own words, the hub switch module must *switch hubs*.
  - ATEN's construction says nothing about switching, which demonstrates that ATEN's construction is wrong.

- ATEN's construction is based on a statement from the specification explaining the function of the hub switch module as a bridge between peripheral devices and computers.

- ATEN's construction creates more questions than it answers and will therefore require the Court to construe the construction.
  - What is a "bridge?"

120

## '287 Patent (hub switch module)

## The "hub switch module" must be made up of USB hubs and switches

The USB hub switch module **32** is a bridge between peripheral devices **20** and computer systems **12** and allows the signal switch **10** to connect each of a plurality of computer systems to one or more than one peripheral device. Construction of a circuit suitable as a USB hub switch module is well known in the art with reference to this disclosure. In one preferred embodiment, the USB hub switch module includes 4 USB hubs and matrix analog switches which are controlled by CPU firmware. Texas Instruments(r) manufactures USB Hub chips that are suitable for this module, and the module can be constructed using Application Specific Integrated Circuit (ASIC) design methodology.

*'287 Patent, 5:1-13  (El-Gamal Decl., Ex. B (Dkt. No. 280-2))*

- When a claim term has no understood meaning in the art, **construing the term in view of the disclosed embodiment is proper**. *Honeywell Intern. Inc. v. Universal Avionics Systems Corp.*, 488 F.3d 982, 991 (Fed. Cir. 2007). ("Without a customary meaning of a term within the art, the specification usually supplies the best context for deciphering claim meaning."); *Irdeto Access, inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004)

- The '287 patent only describes a single embodiment for a "hub switch module."
  - The only disposed embodiment is comprised of USB hubs and matrix analog switches.

## '287 Patent (hub switch module)

The "hub switch module" must be a "USB hub switch module"

- There are only two types of hubs.
  - USB (*Dezmelyk Decl.*, ¶ 12) and Ethernet (*Dezmelyk Decl.*, ¶¶ 131-132).
    - ▶ Dr. Olivier agrees.  *Olivier Decl.*, ¶ 12.
- USB hubs are well known. *El-Gamal Decl.*, Ex. X.
- Ethernet hubs are not used to connect console devices to computers.  *Dezmelyk Decl.*, ¶ 130.
- '287 patent only discloses USB hubs.
- Claim recites a "device control module" and a "host control module," both of which are USB terms and concepts. *Dezmelyk Decl.* ¶¶ 126, 128 and *El-Gamal Decl.*, Ex. Y (USB device controller), Ex. Z (USB host controller).

# '287 Patent (hub switch module)

**The "hub switch module" must pass the signals from the emulated console devices from the device control module through the USB hubs to the computer systems.**

1. A signal switch for sharing a video monitor, a plurality of console devices compliant with an industry standard and one or more than one peripheral device in any of a plurality of computer systems, comprising:

a CPU comprising a first memory for storing a management program for managing the signal switch;

a hub switch module connected to the CPU and configured to communicate with any of the plurality of computer systems, and the one or more than one peripheral device, such that a signal passing from the hub switch module to the one or more than one peripheral device emulates origination from a computer;

a device control module for emulating according to the industry standard the plurality of console devices, connected to the CPU and the hub switch module;

a host control module connected to the CPU and configured to communicate with the plurality of console devices; and

a video control module connected to the CPU and configured to communicate with a video monitor device; wherein the console devices can be switched either synchronously or asynchronously with the one or more than one peripheral device to the same one of the plurality of computer systems or to different ones of the plurality of computer systems, without interruption of the signal to the one or more than one peripheral device.

- Claim 1 states that the "hub switch module" is connected to the "device control module" and that the "device control module" emulates console devices.

  – Thus, console devices that have been emulated by the device control module are sent to the hub switch module.

123

# '287 Patent (hub switch module)

The "hub switch module" must pass the signals from the emulated console devices from the device control module through the USB hubs to the computer systems.

- The hub switch module is connected to the USB busses going to the computer systems.

- Thus, the hub switch module must pass emulated console device signals from the device control module through the USB hubs to the computer systems.

- Without this, it is not possible to switch both peripherals and console devices, as the claim's wherein clause requires.



*'287 Patent, Fig. 4 (El-Gamal Decl., Ex. B (Dkt. No. 280-2))*

## '287 Patent (hub switch module)

The "hub switch module" must pass the signals from the emulated console devices from the device control module through the USB hubs to the computer systems.

- ATEN's complaint that Belkin's construction has functional requirements is ironic, given that its construction is entirely functional ("Bridge between one or more peripheral devices and one or more computers").

- Moreover, ATEN's use of the word "bridge" simply replaces one unknown term with another.

- Regardless, there is no problem with construing a claim term by explaining what it does. *Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1366 (Fed. Cir. 2010) ("The use of comparative and functional language to construe and explain a claim term is not improper. A description of what a component does may add clarity and understanding to the meaning and scope of the claim.").

## '287 Patent (hub switch module)

The "hub switch module" must pass the signals from the emulated console devices from the device control module through the USB hubs to the computer systems.

- ATEN's case law is all inapposite.

- *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990).

  – Issue was whether prior art that operated differently but had the same structure as the claim-in-suit could invalidate a claim.

  – The issue of whether a disputed claim term could be construed to cover the function of the claim limitation was not at issue.

## '287 Patent (hub switch module)

The "hub switch module" must pass the signals from the emulated console devices from the device control module through the USB hubs to the computer systems.

- *Paragon Solutions, LLC v. Timex Corp.*, 566 F.3d 1075, 1091 (Fed. Cir. 2009).
  - Issue was whether claim term "displaying real-time data" required displaying the data "without contextually meaningful delay so that the information is displayed in a time frame experienced by people."
  - Federal Circuit held that absent an express limitation to the contrary, *any* use of a device that meets all of the limitations of an apparatus claim written in structural terms infringes that apparatus claim.
  - The issue with the erroneous construction in Paragon was that whether or not there was infringement would turn on how the accused device was used, which is not how apparatus claims are construed.
  - Apparatus claims are construed so that they are infringed by any use of the apparatus.  *Paragon*, 566 F.3d at 1091, *citing Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.,* 289 F.3d 801, 809 (Fed.Cir.2002).

# '287 Patent (hub switch module)

The "hub switch module" must pass the signals from the emulated console devices from the device control module through the USB hubs to the computer systems.

- *Paragon Solutions, Continued.*
  - Belkin's construction does not depend on how a KVM switch is used.
  - To infringe, signals from the emulated console devices from the device control module must pass through the USB hubs to the computer systems.
  - The manner in which the KVM switch is used has no bearing on this requirement.

# …such that a Signal Passing from the Hub Switch Module to the One or More than One Peripheral Device Emulates Origination from a Computer

Found in Asserted Claim 1

| Belkin's Construction | ATEN's Construction |
|---|---|
| The signal passing from the hub switch module to the peripheral device imitates the signal originating from the connected computer system and is generated by a computer program built into the CPU. | Such that the signal passing from the hub switch module to a peripheral device has the appearance of originating from a connected computer system. |

# '287 Patent (…such that a signal passing from the hub switch module … emulates origination from a computer)

**1**. A signal switch for sharing a video monitor, a plurality of console devices compliant with an industry standard and one or more than one peripheral device in any of a plurality of computer systems, comprising:

    a CPU comprising a first memory for storing a management program for managing the signal switch;

    a hub switch module connected to the CPU and configured to communicate with any of the plurality of computer systems, and the one or more than one peripheral device, <u>such that a signal passing from the hub switch module to the one or more than one peripheral device emulates origination from a computer;</u>

    a device control module for emulating according to the industry standard the plurality of console devices, connected to the CPU and the hub switch module;

    a host control module connected to the CPU and configured to communicate with the plurality of console devices; and

    a video control module connected to the CPU and configured to communicate with a video monitor device;

wherein the console devices can be switched either synchronously or asynchronously with the one or more than one peripheral device to the same one of the plurality of computer systems or to different ones of the plurality of computer systems, without interruption of the signal to the one or more than one peripheral device.

- Grammatical structure of phrase requires that the "<u>signal … emulates origination from a computer</u>"
  - "signal" is subject of phrase.
  - "emulates" is the verb.
- Disputed claim language requires that <u>something</u> be done to the signals sent by PCs before they are sent to the peripheral so that the signal looks like it came from a computer.

## '287 Patent (…such that a signal passing from the hub switch module … emulates origination from a computer)

- ATEN's construction, "Such that the signal passing from the hub switch module to a peripheral device has the appearance of originating from a connected computer system," cannot be correct.

- ATEN's construction covers the <u>actual</u> signal sent from the computer since a signal sent from the computer system would "have the appearance of originating from a connected computer system."

  – Note: When the specification talks about "appear[ance]," it is referring to making the switch appear as a PC to the peripherals:

> PROM). One skilled art with reference to this disclosure and following the referenced specifications will be able to write a USB emulation program suitable to <u>make a switch appear as a PC to peripheral devices</u>, and enable the switch to communicate with USB devices or USB PCs at the same time.

'287 Patent, 7:40-45  (El-Gamal Decl., Ex. B (Dkt. No. 280-2))

  – Thus, ATEN's construction is not consistent with the specification, as ATEN suggests.

# '287 Patent (…such that a signal passing from the hub switch module … emulates origination from a computer)

**emulate.**  (1) (ISO) To imitate one *system* with another, primarily by *hardware*, so that the imitating system accepts the same *data*, *executes* the same *computer programs*, and achieves the same result as the imitated system.  (2) Contrast with *simulate.*

**emulation.**  (1) (ISO) The imitation of all or part of one *system* by another, primarily by *hardware*, so that the imitating system accepts the same *data*, *executes* the same *computer programs*, and achieves the same results as the imitated system.  (2) Contrast with *simulation.*

American National Standards Institute Dictionary for Information Systems (July 19, 1990) *(El-Gamal Decl., Ex. V (Dkt. No. 280-23), p. 725)*

- In the electrical engineering field, "emulate" means "imitate"

- Thus, "emulated" peripheral signals must "imitate" actual peripheral signals

# Thank You

