1
2
3
4
5
6
7
8                    UNITED  STATES  DISTRICT  COURT

9            FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA

10
11   ATEN INTERNATIONAL CO., LTD. )          CASE NO. SACV 09-0843 AG
     and ATEN TECHNOLOGY, INC.,   )          (MLGx)
12                                )
                Plaintiffs,       )
13                                )          CLAIM CONSTRUCTION ORDER
             v.                   )
14                                )
     EMINE TECHNOLOGY CO., LTD.,  )
15   BELKIN INTERNATIONAL, INC.,  )
     and BELKIN, INC.             )
16                                )
                Defendants.       )
17                                )
18   _____ )

19
20        Before the Court are the claim construction arguments of the parties.  Extensive materials

21   and many arguments were presented in the filings and at oral argument.  The Court has

22   determined the proper claim construction of each disputed term and responds in this Order to key

23   arguments.

24
25   **BACKGROUND**

26
27        Plaintiffs Aten International Co., Ltd., and Aten Technology, Inc. ("Plaintiffs") allege that

28   Defendants Belkin International Inc, et. al ("Defendants") have infringed two of their patents,

U.S. Patent No. 7,035,112 (the "'112 Patent") and U.S. Patent No. 6,957,287 (the "'287 Patent"). The patents concern technology for switches that allow users to control multiple computers and peripheral devices from a single console.

The two patents concern two types of switches. The first type of switch, reflected in the '112 Patent, is a "keyboard, video, mouse" switch ("KVM switch"). A KVM switch allows users to switch between and control multiple computers while using a single keyboard, video, and mouse. In other words, with a KVM switch, users at a console controlling computer A can flip a KVM switch and immediately control computer B instead.

The second type, reflected in the '287 Patent, is a "keyboard, video, mouse, peripheral" switch ("KVMP switch"). A KVMP switch is the same as a KVM switch, but it also allows switching between peripheral devices like printers and scanners. Switching with a KVMP switch can be done synchronously or asynchronously. Specifically, users can switch from Computer A to Computer B and have a printer follow and also be controlled by computer B (synchronous), or users can perform the same switching but have the printer remain connected to Computer A (asynchronous).

Plaintiff is not the inventor of KVM technology, but it has invented apparent improvements for KVM switches. The '112 Patent teaches a physical improvement to KVM switches, and the '287 Patent teaches an improvement in switching capabilities. The parties dispute the claim construction for multiple terms in these two patents.

**LEGAL STANDARD**

Claim construction is an issue of law "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). Such construction begins with an analysis of the claim language itself, *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001), since the claims define the scope of the claimed invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). In construing claim language, the Court begins with the principle that "the words of a claim are generally given their ordinary and

1  customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal

2  quotation marks omitted).

3       The ordinary and customary meaning "is the meaning that the [claim] term would have to

4  a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313.  "[T]he

5  person of ordinary skill in the art is deemed to read the claim term not only in the context of the

6  particular claim in which the disputed term appears, but in the context of the entire patent,

7  including the specification." *Id.*  Thus, in determining the ordinary meaning of a claim term,

8  courts must read the claim term in the context of the entire patent.  Where the patent itself does

9  not make clear the meaning of a claim term, courts may look to "those sources available to the

10 public that show what a person of skill in the art would have understood the disputed claim

11 language to mean," including the prosecution history and "extrinsic evidence concerning

12 relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* at

13 1314.

14      "In some cases, the ordinary meaning of claim language as understood by a person of

15 skill in the art may be readily apparent even to lay judges, and claim construction in such cases

16 involves little more than the application of the widely accepted meaning of commonly

17 understood words.  In such circumstances general purpose dictionaries may be helpful." *Id.* at

18 1314.  In other cases, claim terms will not be given their ordinary meaning because the

19 specification defines the term to mean something else.  *Novartis Pharms. Corp. v. Abbott Labs.*,

20 375 F.3d 1328, 1334 (Fed. Cir. 2004); *Kumar v. Ovonic Battery Co., Inc.*, 351 F.3d 1364, 1368

21 (Fed. Cir. 2003).  For a specification to define a term to mean something other than its ordinary

22 meaning, it must set out its definition in a manner sufficient to provide notice of the meaning to a

23 person of ordinary skill in the art.  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

24

25

26

27

28

## ANALYSIS

Some of the terms in the two asserted patents are repeated throughout the patents.  The Court construes them each once, but those constructions apply to all appearances of the term, unless stated otherwise.

## 1.    '112 PATENT

As noted, the '112 Patent concerns the physical configuration of KVM switches.  The parties initially disputed two sets of terms from the '112 Patent: (1) "Body"; and (2) "Integrated/Integrating Into and Fixedly Attached."  Although the parties still dispute the proper construction for "body," the parties now agree that both "Integrated/Integrating Into" and "Fixedly Attached" should be construed as "formed into a unified whole that is inseparable without disassembling the whole."  The Court agrees that this construction is appropriate, and the Court adopts this construction.

The Court now turns to its discussion of the proper construction for "body."

### 1.1    Introduction

"Body" is used throughout the '112 Patent, including in claim 1:

1.  A switch comprising: a body;

a switching circuit contained within the body;

a set of connector ports electrically coupled to the switching circuit; and,

a plurality of cables fixedly attached to and extending from the body, each cable in the plurality of cables having a plurality of connector plugs, wherein each connector plug in the plurality of connector plugs for one of the cables in the plurality of cables are matched a respective connector plug in another one of the cables in the plurality of cables, and wherein the switching circuit switches to connect each of the set of connector ports to one of the plurality of cables.

4

'112 Patent at 1:19-32.

Plaintiffs argue that here, a "body" is "an enclosure having one or more connector port openings and an internal switching circuit." (Defendants' Brief at 4:25-28 (Defendants' Brief includes both Plaintiffs' and Defendants' proposed construction for each disputed term, and for simplicity the Court consistently cites to this Brief when stating the parties' respective claim constructions.).) Meanwhile, Defendants' main construction argument is simply that "'[b]ody' does not include outer walls that are made of metal material or rigid plastic material and assembled together by means of screws." (*Id.*) Defendants are much less concerned with what "body" actually does include, but Defendants do state in a footnote that a proper construction accompanying its exclusionary language would be "[a] single integral enclosure that encapsulates the internal circuit board." (*Id.* at 9 n.6.)

The Court rules that a "body" is "an enclosure containing a switching circuit, but 'body' does not include outer walls that are made of metal material or rigid plastic material and assembled together by means of screws." The Court now turns to an explanation of this construction, beginning with a review of what the '112 Patent excludes from the term "body."

### 1.2     What a Body *Doesn't* Include

The parties appear to agree that there is no accepted meaning of "body" to a person of ordinary skill in the art, and therefore the meaning of "body" "must be found elsewhere in the patent," namely, in the specification. *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004).

The primary focus of the '112 Patent specification concerns the invention's body and its high level of durability. The specification of the '112 Patent criticizes prior art for lacking the described durability of the present body. It states that "[i]n most cases, the box 41 [that is used in prior art configurations] includes outer walls that are made of metal material or rigid plastic material and assembled together by means of screws." ('112 Patent at 1:23-32.) It goes on to state that this typical configuration does not prevent the automatic switch from "unexpectedly

1   falling off the host enclosure, [resulting] in a damaged circuit board due to vibration.  Moreover,

2   when a high humidity exists, moisture in the air tends to attach to the circuit board to cause short

3   circuit."  (*Id.* at 1:29-32.)

4          The '112 Patent discloses a body that avoids these problems.  The present invention has

5   an integrally injection molded enclosure to provide improve durability and resistance to the

6   elements.  (*Id.* at 2:28-36.)  And the specification shows that this configuration is meant to

7   replace the inferior box-type configuration from the prior art, stating that "the automatic switch

8   10 of the present invention uses the main body 20 having cable-connected connector sets 30 *to*

9   *replace the conventional box-type switch 40*, enabling the switch 10 to be used in a more

10  convenient manner." '112 Patent at 3:9-11 (emphasis added).  The '112 Patent uses a new term,

11  "body," instead of the prior art term "box."  The use of this new term confirms the invention's

12  disavowal the prior art, which includes "outer walls that are made of metal material or rigid

13  plastic material and assembled together by means of screws."  *See CAE Screenplates Inc. v.*

14  *Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) (different terms

15  presumptively have different meanings).

16         The International Trade Commission ("ITC") agrees that the '112 Patent disavows the

17  prior art box configuration.  *In re Certain Switches and Products Containing Same*, Inv. No.

18  337-TA-589, 2010 WL 1278863 (March 2010) (Final).  *In re Certain Switches* specifically noted

19  that the "inventor's contrast between the problems and solutions—vibration problems and

20  impact resistance as well as moisture problems and weather resistance—and his description of

21  the solution as a change to the body (from the box), effects a disavowal of the prior art box." *Id.*

22         "The district court can attribute whatever persuasive value to the prior ITC decision that it

23  considers justified." *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558,

24  1569 (Fed. Cir. 1996).  Here, the Court agrees with the ITC that the '112 Patent's criticism of the

25  prior art box, and its teaching of a replacement of the box, clearly shows the present invention's

26  disavowal of the prior art box configuration.  *On Demand Machine Corp. v. Ingram Indus., Inc.*,

27  384 F.3d 1333, 1340 (Fed. Cir. 2004) (stating that where the general summary or description of

28

1  the invention describes a feature of the invention and criticizes other products that lack the same

2  feature, this operates as a clear disavowal of the other products).

3  　　　Plaintiffs argue that "[t]he fight over 'body' is really a fight over 'screws.'  Even though

4  the terms 'screws' is used only once in passing in the '112 patent specification . . . Belkin has

5  made this claim construction dispute, and really the entire '112 patent dispute, about 'screws.'"

6  (Reply at 4:23-28.)  But Plaintiffs' argument is off point.  Defendants are not arguing about

7  screws, they are arguing about whether Plaintiffs have disavowed the prior art box configuration,

8  which uses screws for its assembly.  And as noted, the '112 Patent specifically criticizes the

9  prior art's lack of durability due to its configuration.  Defendants' argument concerning the '112

10  Patent's disavowal of the prior art is simply not as narrow as Plaintiffs argue.

11  　　　Plaintiffs cite *Ventana Medical Systems, Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173 (Fed.

12  Cir. 2006) to support their argument that the specification did not disavow the prior art.  (Reply

13  at 7:4.)  In *Ventana*, Biogenix cited "general statements by the inventors" showing an intent to

14  improve on prior staining methods:  "The previously known devices are limited in their

15  performance and unable to satisfy the needs for automated, high precision immunohistology.  It

16  is an object of this invention to provide a device which provides more rapid, reliable and more

17  reproducible results than standard methods . . . ."  *Id.* at 1181.  The *Ventana* Court ruled that

18  "[s]uch general statements, without more, will not be interpreted to disclaim every feature of

19  every prior art device discussed in the 'BACKGROUND ART' section of the patent."  *Id.*

20  　　　But unlike in *Ventana*, the inventor here made *specific* statements concerning the

21  shortcomings of the prior art configuration, the problems caused by these shortcomings, and the

22  means to correct the shortcomings.  '112 Patent at 1:23-32; 3:8-11 (stating that "[i]n most cases,

23  the box 41 includes outer walls that are made of metal material or rigid plastic material and

24  assembled together by means of screws . . . ," that this configuration does not prevent damage

25  from vibration and humidity, and that "[t]he automatic switch 10 of the present invention uses

26  the main body 20 having cable-connected connector sets 30 *to replace the conventional box-type*

27  *switch 40 . . . .*" (emphasis added)).  These specific statements "reveal an intentional disclaimer,

28  or disavowal, of claim scope by the inventor" of the prior art, *Phillips*, 415 F.3d at 1316, and

7

1  therefore this court "interprets the claim more narrowly than it otherwise would to give effect to

2  the inventor's intent to disavow a broader claim scope." *Ventana*, 473 F.3d at 1181; *see id.*

3      Plaintiffs also argue that the prosecution history supports their "body" construction.

4  (Reply at 8.)  Plaintiffs first argue that during prosecution of the '112 Patent, they amended

5  original claim 1 and removed several original limitations of "body."  (Reply at 8:21-24;

6  Bernstein Decl. Ex. H.)  Plaintiffs argue that this broadening shows that "body" does not include

7  various limitations, apparently including the limitations concerning "outer walls that are made of

8  metal material or rigid plastic material and assembled together by means of screws."  (*See id.*)

9  And to support this proposition, Plaintiffs cite *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d

10  898 (Fed. Cir. 2004).

11      In *Liebel-Flarsheim*, "the applicants replaced claims that had included references to a

12  pressure jacket with a new set of claims, many of which did not include the pressure jacket

13  limitation." *Id.* at 909.  The *Liebel-Flarsheim* Court held that the omission of reference to a

14  pressure jacket in many of the claims of the applications that matured into two patents was "a

15  strong indication that the applicants intended those claims to reach injectors that did not use

16  pressure jackets." *Id.*

17      *Liebel-Flarsheim* doesn't help Plaintiff here.  Original claim 1 never referenced the "outer

18  walls that are made of metal material or rigid plastic material and assembled together by means

19  of screws" that Plaintiff now wishes to include in the coverage of "body."  By contrast, the

20  original claim in *Liebel-Flarsheim* specifically discussed pressure jackets.  *Liebel-Flarsheim* at

21  909.  In fact, in *Liebel-Flarsheim*, "in a paper filed during the prosecution of the '261 patent, the

22  applicants clearly stated that '[i]n the claims as amended herein, the locking structure is not

23  necessarily at the front end of the syringe, *nor is there necessarily a pressure jacket*.'" *Id.*

24  (emphasis added).  Plaintiffs provide no such filing here.

25      Plaintiffs argue that the Examiner confirmed that a "body" in the '112 Patent could

26  include configurations such as the prior art "box."  (Reply at 8-9.)  Plaintiff cite multiple

27  instances during the prosecution history where the Examiner referenced figures showing

28  invention configurations and described each of them as a "body."  (*Id.*)  But as the ITC correctly

noted, the inventor's silence when the examiner called the prior art box a body cannot be relied upon to broaden the scope of the claims.  *In re Certain Switches*, 2010 WL 1278863, at n.5 (citations omitted); *see also Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1556 (Fed. Cir. 1997), overruled on other grounds by *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc); *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005).  And as previously discussed, the specification clearly narrows the scope of claim 1 such that it disavows the prior art box.

In sum, "body" does not include "outer walls that are made of metal material or rigid plastic material and assembled together by means of screws."

### 1.3   What a Body *Does* Include

Although this Order has now stated what "body" *doesn't* include, it doesn't yet state what "body" *does* include.  For this part of the claim construction, we first turn back to the claim language.  As noted, claim 1 of the '112 Patent reads as follows:

> 1.  A switch comprising: a body;
>
> a switching circuit contained within the body;
>
> a set of connector ports electrically coupled to the switching circuit; and,
>
> a plurality of cables fixedly attached to and extending from the body, each cable in the plurality of cables having a plurality of connector plugs, wherein each connector plug in the plurality of connector plugs for one of the cables in the plurality of cables are matched a respective connector plug in another one of the cables in the plurality of cables, and wherein the switching circuit switches to connect each of the set of connector ports to one of the plurality of cables.

'112 Patent at 3:19-32.

The first two lines of this claim show that the "body" is an enclosure that contains a switching circuit.  *See id.*  This construction is supported by claim 21, which claims "[a] method comprising the steps of providing a body; enclosing a switching circuit within the body . . . ." '112 Patent at 4:23-26.  And although Plaintiffs' proposed construction includes language

1    concerning "connector port openings," neither the claims nor the specification show that this

2    additional limitation on the construction is warranted.  The claims and specification show that

3    connector ports interact with the body, but this mere interaction does not mean that they should

4    be included as a limitation in the construction.  Similarly, Defendants have not justified their

5    proposed limitation, mentioned in a footnote in their Brief, making the "enclosure" a  "single

6    integral" enclosure.  (*See* Defendants' Brief at 9 n.6.)

7         In sum, in addition to the previously-discussed exclusionary language for this term,

8    "body" is "an enclosure containing a switching circuit."

9

10        **1.4      Conclusion**

11

12        A "body" is "an enclosure containing a switching circuit, but 'body' does not include

13    outer walls that are made of metal material or rigid plastic material and assembled together by

14    means of screws."  Having construed the disputed terms for the '112 Patent, the Court now turns

15    to the '287 Patent.

16

17    **2.      THE '287 PATENT**

18

19        As noted, the '287 Patent concerns the switching capabilities of KVMP switches.  The

20    parties dispute multiple terms from the '287 Patent, and the Court now reviews these disputes.

21

22        **2.1      Synchronous and Asynchronous Switching Without Interruption**

23

24        The parties dispute whether claim 1 of the '287 Patent requires that both asynchronous

25    and synchronous switching be performed without interruption of the data signal to peripheral

26    devices.  Plaintiffs argue that switching must be performed without data interruption only for

27    asynchronous switching, but Defendants assert that data flow must be uninterrupted for both

28    synchronous and asynchronous switching.  The Court agrees with Defendants.

1    Claim 1 deals with whether switching must be performed without data interruption.  It

2    states:

>    1.  A signal switch for sharing a video monitor, a plurality of console
>    devices compliant with an industry standard and one or more than
>    one peripheral device in any of a plurality of computer systems,
>    comprising: . . .
>
>    a device control module for emulating according to the industry
>    standard the plurality of console devices, connected to the CPU and
>    the hub switch module;
>
>    a host control module connected to the CPU and configured to
>    communicate with the plurality of console devices;
>
>    and a video control module connected to the CPU and configured to
>    communicate with a video monitor device;
>
>    wherein the console devices can be switched either synchronously or
>    asynchronously with the one or more than one peripheral device to
>    the same one of the plurality of computer systems or to different
>    ones of the plurality of computer systems, without interruption of the
>    signal to the one or more than one peripheral device.

14   '287 Patent at 7:57-8:13.

15   For the last portion of claim 1, which deals with whether data flow must be interrupted

16   during switching, Plaintiffs propose a construction stating "[c]onsole devices can be switched

17   among computer systems either together with the switching of peripheral devices (i.e.,

18   synchronous switching) or independently (i.e., asynchronous switching).  Asynchronous

19   switching may be performed without interrupting the signal from a computer system to a

20   peripheral device."  (Defendants' Brief at 15:1-7.)  Defendants propose a contrary construction

21   stating "[c]onsole devices are switched from a computer system to another computer system

22   either together (*i.e.*, synchronous switching) or separately from (*i.e.*, asynchronous switching) a

23   peripheral device.  Both synchronous and asynchronous switching must be performed by the

24   signal switch, and must be performed such that the data stream passing between the first

25   computer system and the peripheral device is left unaffected at the time of switching."  (*Id.*)

26   The parties largely agree on the first part of the construction—they both agree that

27   switching may be performed synchronously or asynchronously.  As for the second part,

28

Defendants are correct that "without interruption" in claim 1 applies to both synchronous and asynchronous switching.

The plain language of claim 1 verifies this.  Claim 1 has three parts.  It first states that switching can be done synchronously or asynchronously:

> wherein the console devices can be switched either synchronously or asynchronously with the one or more than one peripheral device . . . .

It then contains an additional explanatory section:

> to the same one of the plurality of computer systems or to different ones of the plurality of computer systems, . . . .

And then it states that the switching is done without interruption:

> without interruption of the signal to the one or more than one peripheral device**.**

'287 Patent at 8:8-8:14.

Here's the payoff for the three-part breakdown.  Since the claim language first states the two choices for switching, and then provides additional description for the switching choices in the second part, "without interruption" in the final part must apply to both types of switching noted in the first part.

As a simple example, if a sentence states "Katie is going to drive or walk, without stopping," the sentence could at least possibly mean that Katie is not stopping only if she walks.  But if the sentence states "Katie going to drive or walk with her car or with her two feet, without stopping," it takes a very strained reading to apply the "without stopping" only to the walking.  The same logic applies here.

The specification also confirms that "without interruption" applies to both asynchronous and synchronous switching, stating that the "present invention"

> can switch the KVM channels and peripheral channels to a common computer or to different computers either asynchronously or synchronously without interruption of data flow to that peripheral when the switch is changed.

'287 Patent at 2:1-5.  Compared with claim 1, this passage both (1) reverses the order of "asynchronously" and "synchronously" and (2) drops the comma before "without interruption." This clearly shows that the invention discloses both synchronous and asynchronous switching without interruption of data flow, and by Plaintiffs' proposed construction this specification language would be inaccurate.

Trying to bolster their argument, Plaintiffs argue that the specification only teaches asynchronous switching without interruption, and not synchronous switching without interruption.  (Plaintiffs' Brief at 18.)  But the few stray examples in the specification that Plaintiffs cite are not enough to refute the plain claim and specification language previously noted.  *See, e.g.*, *Phillips*, 415 F.3d at 1312.

Plaintiffs also argue that "because synchronous switching includes switching the peripheral device, one would not expect synchronous switching to occur without interruption of the signal to the peripheral device."  (*Id.* at 19:12-14.)  But this argument is directly refuted by the prosecution history.  In their Office Response, Plaintiffs clearly discuss synchronous switching without interruption of data flow.  (*E.g.*, Office Response and Amendment, El-Gamal Decl., Ex. E, at 257 ("[S]witch 10 synchronously connects console devices (14, 16, 18) and printer 22 to second computer 122.  The data stream coming from first computer 121 at the time of the switching is left unaffected.")

In fact, the prosecution history is filled with evidence showing claim 1 requires uninterrupted data flow for both synchronous and asynchronous switching.  Here's a brief summary.  On December 8, 2004, the PTO rejected claims 1-7 of the '287 Patent as being obvious in view of two prior art patents, Thomas and Dickens.  (Office Action, El-Gamal Decl., Ex. E., at 235.)  Plaintiff responded by stating that its KVM switch has the ability "to switch the KVM channels and peripheral channels (i) to a common computer or to different computers either asynchronously or synchronously *and* (ii) without interruption of data flow to that peripheral when the switch is changed."  (Office Response and Amendment, El-Gamal Decl., Ex. E., at 249-50 (emphasis added).)  The use of the word "and" clearly shows that the "without

1   interruption" requirement applies to both types of switching.  Plaintiffs' previously discussed

2   amendment to its application corroborates its response:

3        wherein the console devices can be switched either synchronously or
         asynchronously with the one or more than one peripheral device to
4        the same one of the plurality of computer systems or to different
         ones of the plurality of computer systems, without interruption of the
5        signal to the one or more than one peripheral device.

6   (*Id.* at 246.)

7        Plaintiffs argue that despite its PTO correspondence and its amendment, it simply sought

8   to distinguish the '287 Patent from the prior art patents based on the '287 Patent's use of

9   switches rather than routers.  This argument is unpersuasive.  Plaintiffs' Office Response focuses

10  heavily on the '287 Patent's ability to perform switching without data flow interruption, and

11  Plaintiffs clearly state this capability as an improvement over previous KVM switches and the

12  prior art patents.  (*See id.* at 249-257 ("a problem with current KVM switches is that . . . data

13  flow is interrupted to [peripherals] when the switch is changed"; "switch 10 synchronously

14  connects console devices (14, 16, 18) and printer 22 to second computer 122.  The data stream

15  coming from first computer 121 at the time of the switching is left unaffected.";  "Dickens et al.

16  Do Not Teach Asynchronous/Synchronous Switching").  Therefore, it is clear that the ability to

17  switch synchronously and asynchronously without interrupting data flow is the crucial

18  distinction from the prior art, not simply the distinction between switches and routers.

19       Plaintiff's remaining arguments are unpersuasive.  The proper construction is "[c]onsole

20  devices can be switched among computer systems either together with the switching of

21  peripheral devices (i.e., synchronous switching) or independently (i.e., asynchronous switching).

22  Both synchronous and asynchronous switching must be performed such that the data stream

23  passing between the first computer system and the peripheral device is left uninterrupted at the

24  time of switching."

25

26

27

28

1

## 2.2    "Hub Switch Module"

2

3       The parties dispute whether (1) the hub switch module claimed in the '287 Patent is

4   limited to *USB* hub switch modules and (2) whether various additional limitations for the hub

5   switch module construction are appropriate.  Defendants seek to include these limitations in the

6   claim construction while Plaintiffs seek a construction without them.  The Court rules that most

7   of Defendants' proposed limitations, including the USB limitation, are not appropriate.

8       Claim 1, which includes the hub switch module, reads as follows:

9           1.  A signal switch for sharing a video monitor, a plurality of console
            devices compliant with an industry standard and one or more than
10          one peripheral device in any of a plurality of computer systems,
            comprising:

11

12          a CPU comprising a first memory for storing a management program
            for managing the signal switch;

13          a hub switch module connected to the CPU and configured to
            communicate with any of the plurality of computer systems, and the
14          one or more than one peripheral device, such that a signal passing
            from the hub switch module to the one or more than one peripheral
15          device emulates origination from a computer; . . .

16          a device control module for emulating according to the industry
            standard the plurality of console devices, connected to the CPU and
17          the hub switch module; . . .

18   '287 Patent at 7:57-8:14.

19       Plaintiffs propose a claim construction for "hub switch module" of "[b]ridge between one

20   or more peripheral devices and one or more computers."  (Defendants' Brief at 19:2-6.)

21   Defendants's proposed construction is "[a] collection of USB hubs and one or more switches

22   that switch USB signals from the computer systems' USB busses to the USB peripheral devices,

23   and for passing the signals from the emulated console devices from the device control module

24   through the USB hubs to the computer systems."  (*Id.*)

25       The parties agree that "hub switch module" has no accepted meaning to a person of

26   ordinary skill in the art, and therefore the Court must first look at the specification for a proper

27   construction.  *Irdeto*, 383 F.3d at 1300.  Indeed, Plaintiffs' proposed construction comes straight

28   from the specification.  The relevant specification language states:

> The USB hub switch module 32 *is a bridge between peripheral devices 20 and computer systems 12* and allows the signal switch 10 to connect each of a plurality of computer systems to one or more than one peripheral device.

'287 Patent at 5:1-7 (emphasis added).

With Plaintiffs' proposed construction existing nearly word for word in the specification, Defendants face an uphill battle in moving significantly away from this language for the claim construction. And here, Defendants fail to show why most of their proposed limitations should be added.

Concerning Defendants' attempt to add the "USB" limitation, Plaintiffs' specification contemplates non-USB hub modules:

> Although an embodiment is described with reference to the current [Human Interface Devices] specification, it will be apparent to those skilled in the art with reference to this disclosure that the invention may be implemented with any specification for device interfacing.

*Id.* at 3:55-59. This language clearly shows that the '287 Patent contemplates an invention that may not use USB technology, and a person of ordinary skill in the art could certainly utilize comparable technology with the invention. The "USB" limitation is not appropriate.

As for the rest of the construction, although Plaintiffs' construction comes directly from the specification, Defendants are correct that it is incomplete. The disputed term itself states that it is a "hub switch module," yet no mention is made in Plaintiffs' construction of the module enabling switching or of its connectivity capabilities. Instead, Plaintiffs propose a simple construction essentially stating that the hub switch module is a connection between peripheral devices and computer systems. But a simple cable could fall into this description, and therefore this description provides little assistance in construing the claim. Given the additional functionality of the hub switch module, a proper construction here includes more than a simple statement that the module is a bridge between a system and a peripheral device. *See Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1366 (Fed. Cir. 2010) ("The use of . . . functional language to construe and explain a claim term is not improper. A description of what a component does may add clarity and understanding to the meaning and scope of the claim.").

16

1    The specification provides helpful information for developing a more detailed claim

2    construction.  First, as noted, the specification states that the module "allows the signal switch 10

3    to connect each of a plurality of computer systems to one or more than one peripheral device."

4    '287 Patent at 5:1-4.  This language makes it immediately apparent that the module enables

5    switching and connectivity between multiple systems and devices.  The specification's preferred

6    embodiment of a hub switch module confirms this, stating "the USB hub switch module includes

7    4 USB hubs and matrix analog switches which are controlled by CPU firmware."  *Id.* at 5:7-9.

8    Given the functionality and disclosed configuration of the hub switch module, an

9    appropriate construction for hub switch module is "a bridge between peripheral devices and

10   computer systems allowing the signal switch to connect each of a plurality of computer systems

11   to one or more than one peripheral device."  Like Plaintiffs' proposed construction, this

12   construction also comes directly from the specification of the '287 Patent, but it is a more

13   complete and accurate construction of the term.

14

15   **2.3**   **"Such That a Signal Passing From the Hub Switch Module to the One or**

16          **More Than One Peripheral Device Emulates Origination From a Computer"**

17

18   The parties mostly agree on the claim construction for this term.  Defendants propose a

19   construction stating "[t]he signal passing from the hub switch module to the peripheral device

20   imitates the signal originating from the connected computer system and is generated by a

21   computer program built into the CPU."  Before the *Markman* hearing in this matter, Plaintiffs

22   proposed very similar language, but they argued that the language "and is generated by a

23   computer program built into the CPU" should be omitted.  And at the *Markman* hearing,

24   Plaintiffs agreed to Defendants' construction aside from the CPU language.  (Plaintiffs' Claim

25   Construction Slides, Unnumbered.)  The Court rules that Plaintiffs' latest proposed construction

26   is appropriate.

27   Defendants do not sufficiently support their requested limitation for this term in their

28   claim construction brief, nor did they do so at the *Markman* hearing.  Defendant simply cites

17

fleeting language in the specification to support its argument that the imitated signal must be generated by a computer program.  (Defendant's Brief at 22:18-25 (citing '287 Patent at 7:40-45.))  But the specification makes clear that this means for signal emulation is described in a preferred embodiment of the invention, and Defendant does not sufficiently show that this limitation is appropriate due to this disclosure of a single embodiment.  *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1331 (Fed. Cir. 2004).

The Court rules that the appropriate claim construction is "[t]he signal passing from the hub switch module to the peripheral device imitates the signal originating from the connected computer system."

### 2.4    "Means for Switching the Selected Console Device Between the First Channel and the Third Channel Without Interruption of the Data Flow Through the Second Channel Between the First Selected Computer and the Selected Peripheral Device"

The parties agree that this term is part of a a means-plus-function limitation that must be construed according to 35 U.S.C. § 112, ¶ 6.  The Court now turns to the proper construction of this term.

#### 2.4.1   Introduction

This disputed term is found in claim 7 of the '287 Patent.  This means-plus-function claim reads as follows:

> 7.  A signal switch for sharing one or more console devices and one or more peripheral devices in any of a plurality of computer systems, comprising:
>
> a first channel for connecting a selected console device from the one or more console devices to a first selected computer system from the plurality of computer systems;

1   a second channel connecting the first selected computer system to a
2   selected peripheral device from the one or more peripheral devices,
    the second channel having a data flow between the first selected
    computer system and the selected peripheral device;
3
    a third channel for connecting the selected console device to a
4   second selected computer system from the plurality of computer
    systems; and
5
    means for switching the selected console device between the first
6   channel and the third channel without interruption of the data flow
    through the second channel between the first selected computer
7   system and the selected peripheral device.

8   '287 Patent at 8:48-65.

9          Means-plus-function limitations are a statutory exception to the rule that claim language

10  carries its ordinary and customary meaning.  Specifically, under 35 U.S.C. § 112, ¶ 6, claim

11  limitations using the word "means," followed by a functional recitation, "shall be construed to

12  cover the corresponding structure . . . described in the specification and equivalents thereof." *Id.*

13  When construing a means-plus-function limitation, a court must identify, first, the claimed

14  function, and second, the corresponding structure disclosed in the written description that

15  performs that function. *Medical Instrumentation and Diagnostics Corp. v. Elekta AP*, 344 F.3d

16  1205, 1210 (Fed. Cir. 2003); *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324,

17  1332 (Fed. Cir. 2006).  When interpreting the language used to describe the function, courts

18  apply ordinary principals of claim construction. *Cardiac Pacemakers, Inc. v. St. Jude Med.,*

19  *Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002).  When determining the corresponding structure

20  disclosed by the patent as performing the identified function, a court must include "all structure

21  that actually performs the recited function." *Default Proof Credit Card Sys., Inc. v. Home Depot*

22  *U.S.A., Inc.*, 412 F.3d 1291, 1298 (2005).  "In order to qualify as corresponding, the structure

23  must not only perform the claimed function, but the specification must clearly associate the

24  structure with performance of the function." *JVW Enterprises, Inc. v. Interact Accessories, Inc.*,

25  424 F.3d 1324, 1332 (Fed. Cir. 2005) (quoting *Cardiac Pacemakers, Inc.*, 296 F.3d at 1113).

26

27

28

2.4.2   Function

The function disclosed by this claim is "switching the selected console device between the first channel and the third channel without interruption of the data flow through the second channel between the first selected computer system and the selected peripheral device." But the parties dispute exactly what limitations are included in this phrase. Defendants contend that switching must occur without data interruption for both synchronous and asynchronous switching, while Plaintiffs argue that this limitation is not appropriate. The Court agrees with Defendants.

As previously discussed, both synchronous and asynchronous switching is required by claim 1 of the '287 Patent. And although language discussing both synchronous and asynchronous switching is not directly in claim 7 (while it is in claim 1), the prosecution history shows that claim 7 also includes this limitation. In their Office Response, Plaintiffs specifically argued that, much like for claim 1, claim 7 concerns a "switch wherein the console device can be switched synchronously with peripherals, without interruption of the signal to the peripheral device." (Office Response, Ex. E, at 260.) In fact, for claim 7, Plaintiffs largely adopt the arguments they made during prosecution to support the nonobviousness of claim 1. *See id.* Defendants are correct that claim 7, like claim 1, requires uninterrupted data flow for both synchronous and asynchronous switching.

As in their arguments concerning claim 1, Plaintiffs argue that in their Office Response, they distinguish their *switching* device from previous *routing* devices, and their discussion of synchronous rather than asynchronous switching is a secondary example, not a distinction from prior art. But this argument fails. As previously discussed, it is clear that Plaintiffs focused on the prior art's failure to teach both synchronous and asynchronous switching without data interruption, regardless of the technology differences between switching and routing. In other words, the relevant portion of the Office Response is not a distinction between switch and router, it's the argument that the prior art doesn't teach both types of switching with uninterrupted data flow. The Examiner agreed in the Reasons for Allowance, noting the '287 Patent's

1  improvement over the prior art with the uninterrupted switching capabilities.  (Reasons for

2  Allowance, El-Gamal Decl., Ex. E, at 277.)

3       The appropriate construction for the function is "switching, both synchronously and

4  asynchronously, the selected console device between the first channel and the third channel

5  without interruption of the data flow through the second channel between the first selected

6  computer system and the selected peripheral device."

7

8            2.4.3   Corresponding Structure

9

10       The parties also dispute the construction for the structure of this means-plus-function

11  claim.  Plaintiffs contend that the structure is "[e]ither: (1) the combination of a KVM switch and

12  a peripheral sharing switch; or (2) the combination of a hub switch module, a device control

13  module, and a CPU."  (Defendant's Brief at 23:14-28.)  Defendant comes back with the

14  following proposal:

15          (i) a USB hub switch module (32) which is a plurality of USB hubs
   interconnected with a matrix analog switch, under the control
16          firmware executing in the CPU (30);

17          (ii) a USB device control module (38), which is one USB device
   controller, which emulates the console devices, for each host PC
18          connection, under the control of firmware executing in the CPU (30);

19          (iii) a USB host control module (44), including a root hub (46) which
   is a USB controller chip, under the control of the firmware executing
20          in CPU (3), where the firmware has the algorithm depicted in Figure
   5; and
21

22          (iv) a CPU (30) running firmware, where most of the algorithm is not
   disclosed."

23  (*Id.*)

24       The first part of Plaintiffs' proposed construction comes directly from the specification

25  '287 Patent at 3:33-35 ("The signal switch of the present invention is the combination of a KVM

26  . . . switch and a peripheral sharing switch.").  But this language does not include sufficient

27  detail for a useful construction of the structure.  It only superficially mentions a KVM switch

28  and a peripheral switch, and it does not provide any explanation regarding the components of

these switches or how the switching is performed.  In fact, the construction is somewhat circular given the last paragraph in the "BACKGROUND" section of the patent, which states that "[w]hat is needed is a KVM switch that is also a peripheral sharing switch."  '287 Patent at 1:53-54.  Plaintiffs give no persuasive reason why this construction is appropriate given the construction's obvious lack of detail or any information concerning how it performs the corresponding function.

The second part of Plaintiffs' construction is much more useful and appropriate.  But the parties still have two main disputes over this construction.  First, Defendants argue that a USB limitation should be included in the claim.  But like Defendants' attempt to do so in claim 1, their attempt here also fails.  As noted, the specification for the '287 Patent states

> Although an embodiment is described with reference to the current [Human Interface Devices] specification, it will be apparent to those skilled in the art with reference to this disclosure that the invention may be implemented with any specification for device interfacing.

*Id.* at 3:55-59.  As before, this language clearly shows that the '287 Patent contemplates embodiments of the invention without USB technology.  And since means-plus-function claims "shall be construed to cover the corresponding structure . . . described in the specification and equivalents thereof," 35 U.S.C. § 112, ¶ 6, including the proposed USB limitation is not appropriate.

The other main dispute is over Defendants' proposed addition of language concerning firmware and an algorithm.  Defendants argue that "the Federal Circuit holds that the structure for a means-plus-function limitation implemented by a CPU must include not only the CPU, but also the algorithm disclosed in the specification that runs on a CPU for performing the claimed function."  (Defendants' Brief at 27 (citing *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348-49 (Fed. Cir. 1999); *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005).  Defendants are correct that here, a proper construction includes reference to the relevant firmware or algorithm running on the CPU.

A patent must "disclose structure that sufficiently corresponds to the claimed function, which in the case of a specific function implemented on a general purpose computer requires an

1  algorithm."  *In re Katz Interactive Call Processing Patent Litigation*, Case Nos. 2009-1450,

2  2009-1451, 2009-1452, 2009-1468, 2009-1469, 2010-1017, 2011 WL 607381, at *8 (Fed. Cir.

3  Feb. 18, 2011) (citations omitted); *see also WMS Gaming*, 184 F.3d. at 1348 ("A general

4  purpose computer, or microprocessor, programmed to carry out an algorithm creates a new

5  machine, because a general purpose computer in effect becomes a special purpose computer

6  once it is programmed to perform particular functions . . . .") (citations and quotations omitted).

7      In *WMS Gaming*, the Federal Circuit addressed a means-plus-function claim that had a

8  recited function implemented by a computer.  *Id.*  The patent claimed slot machines having a

9  "means for assigning a plurality of numbers representing" the angular positions of each slot reel.

10  *Id.*  The Federal Circuit construed part of the structure as "a microprocessor programmed to

11  perform the algorithm illustrated [in the specification]."  It included the algorithm in the

12  construction for the structure because with the algorithm, the structure for the means-plus-

13  function claim was no longer the general purpose computer, but rather a special purpose

14  computer programmed to perform the disclosed algorithm.  *Id.* at 1348 ("The structure of a

15  microprocessor programmed to carry out an algorithm is limited by the disclosed algorithm.").

16      Here, the '287 Patent claims a switching function that is implemented by an algorithm on

17  a general purpose CPU.  The patent even specifically states that the hub switch module is

18  controlled by CPU firmware.  *E.g.*, '287 Patent at 5:27.  As stated in *WMS Gaming*, this "creates

19  a new machine, because a general purpose computer in effect becomes a special purpose

20  computer once it is programmed to perform particular functions . . . ."  *WMS Gaming*, 184 F.3d.

21  at 1346 (citations and quotations omitted).  Accordingly, an appropriate claim construction for

22  the structure of this claim must include the algorithm, or firmware, programmed on the CPU.

23      Defendants additionally request that a host control module limitation should be included

24  in the claim construction.  (Reply at 23.)  But as Plaintiffs correctly note, the host control module

25  simply channels signals between devices.  And while this host control module may make

26  possible the claimed switching by routing the signals, it does not actually perform the claimed

27  switching function.  *Ayst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364 (Fed. Cir. 2001) ("The

28  corresponding structure to a function set forth in a means-plus-function limitation must actually

perform the recited function, not merely enable the pertinent structure to operate as intended.") Therefore this limitation is not appropriate.

Finally, like the hub switch module, the term device control module requires construction. The specification states that device control modules are "device chips that are used to emulate the console devices." '287 Patent at 5:16-20.  The Court rules that this construction is complete and appropriate.

The appropriate claim construction for the means-plus-function claim is the following: "Function: Switching, both synchronously and asynchronously, the selected console device between the first channel and the third channel without interruption of the data flow through the second channel between the first selected computer system and the selected peripheral device. Corresponding Structure: the combination of a hub switch module, a device control module, and a CPU programmed with the firmware disclosed in the specification.  A hub switch module is a bridge between peripheral devices and computer systems allowing the signal switch to connect each of a plurality of computer systems to one or more than one peripheral device.  A device control module is a device chips that is used to emulate the console devices."

### 2.5    "Without Interruption of the Data Flow Through the Second Channel"

Defendant provides no proposed construction for this term, and Plaintiff proposes that the term should be given its plain and ordinary meaning.  The Court agrees with Plaintiff and rules that no construction of "without interruption of the data flow through the second channel" is necessary.

**DISPOSITION**

These claim constructions shall govern this case.

24

1   IT IS SO ORDERED.

2   DATED: August 10, 2011

3

4

5                                           Andrew J. Guilford

6

7                                    United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28